**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RETIREE BENEFIT TRUST OF THE CITY OF BALTIMORE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> MALIBU BOATS, INC., JACK SPRINGER, BRUCE BECKMAN, DAVID BLACK, and WAYNE WILSON, <br><br> Defendants. | Case No.: 1:24-cv-03254-LGS <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **DEMAND FOR JURY TRIAL** |

# **TABLE OF CONTENTS**

Page

I. PRELIMINARY STATEMENT ................................................................................ 2

II. JURISDICTION AND VENUE .............................................................................. 10

III. PARTIES ................................................................................................................ 11

    A. Lead Plaintiff .................................................................................................. 11

    B. Defendants ...................................................................................................... 11

IV. OVERVIEW OF DEFENDANTS' FRAUD .......................................................... 13

    A. MBI's Business and Dealership Network ....................................................... 13

    B. Leading Up To The Class Period, As MBI Experienced A COVID-Fueled Boom, Defendants Repeatedly Boasted About "Unprecedented Consumer Appetite" For MBI's Premium Boats ................................................................ 16

    C. Just Prior To The Class Period, Retail Demand Began To Plummet— Causing Defendants To Hatch A Desperate Scheme To Maintain MBI's Record Sales By Pumping $110 Million Of Excess Inventory Into Tommy's ......................................................................................................... 17

        1. In Mid-2022, Defendants Implemented Their Channel Stuffing Scheme To "Pump Tommy's Full Of Boats" ................................... 17

        2. In Early 2023—After OneWater Had Cancelled Its MBI Orders Due To The Declining Retail Market—Defendants Ratcheted Up Their Channel Stuffing Scheme, Pressuring Tommy's To Take On Even More Inventory To Prop Up Sales ................................... 21

    D. Throughout The Class Period, Defendants Repeatedly And Falsely Claimed That MBI's Strong Financial Performance Was Due To "Strong Demand" For Its Premium Boats ............................................................... 24

    E. Unbeknownst To Investors, And Contrary To Defendants' Positive Public Statements, By The Summer Of 2023, Defendants' Channel Stuffing Scheme Had Crippled Tommy's Business ......................................................... 27

    F. In The Summer Of 2023, MBI And Defendant Springer Were Personally Informed That Tommy's Financial Condition Was In "*One Of The Worst Situations That Can Arise*" ................................................................................ 29

    G. Defendants Did Not Breathe A Word To Investors About Tommy's Financial Distress Due To Its Excess Inventory, But Instead Continued To Proclaim The Exact Opposite: That Consumer Demand Continued And That They Were Ensuring Dealer Health By Controlling Deaer Inventory Levels ............................................................................................................... 31

    H. The Truth Begins To Emerge ........................................................................... 36

i

| | I. | The Truth Is Revealed | 40 |
| | J. | Post-Class Period Developments Confirm Defendants' Fraudulent Scheme | 46 |
| | K. | Defendants Were Motivated To Inflate Revenues In Order To Earn Lavish Incentive Bonuses | 47 |
| V. | | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS | 49 |
| | A. | The November 4, 2022 Earnings Call | 49 |
| | B. | The February 7, 2023 Earnings Call | 51 |
| | C. | The 3Q 2023 Press Release And Earnings Call | 53 |
| | D. | The June 6, 2023 Baird Global Consumer, Technology & Services Conference | 55 |
| | E. | The FY 2023 Form 10-K | 57 |
| | F. | The 4Q and FY 2023 Press Release and Earnings Call | 60 |
| | G. | The September 21, 2023 D. A. Davidson Diversified Industrials & Services Conference | 63 |
| | H. | The 1Q 2024 Form 10-Q | 65 |
| | I. | The 1Q 2024 Earnings Call | 66 |
| | J. | The 2Q 2024 Press Release and Earnings Call | 69 |
| | K. | The 2Q 2024 Form 10-Q | 72 |
| | L. | The March 5, 2024 Raymond James Institutional Investors Conference | 73 |
| VI. | | ADDITIONAL ALLEGATIONS OF SCIENTER | 74 |
| VII. | | LOSS CAUSATION | 82 |
| VIII. | | PRESUMPTION OF RELIANCE | 86 |
| IX. | | INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE | 87 |
| X. | | SCHEME LIABILITY | 88 |
| XI. | | CLASS ACTION ALLEGATIONS | 89 |
| XII. | | CLAIMS FOR RELIEF | 91 |
| XIII. | | PRAYER FOR RELIEF | 96 |
| XIV. | | JURY DEMAND | 96 |

Lead Plaintiff Retiree Benefit Trust of the City of Baltimore ("Plaintiff" or "Lead Plaintiff"), by and through the undersigned counsel, brings this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against Malibu Boats, Inc. ("MBI" or the "Company") and certain of its officers (collectively, "Defendants"). Lead Plaintiff brings these claims on behalf of all persons or entities that purchased or otherwise acquired MBI securities between November 4, 2022 and May 1, 2024, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief as to allegations concerning matters other than itself and its own acts is based upon, among other things, the investigation of Lead Plaintiff and its counsel, which includes, without limitation: (a) review and analysis of public filings made by MBI with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on MBI's website concerning Defendants' public statements; (d) the Verified Complaint filed in *Tommy's Castaic, LLC, et al. v. Malibu Boats, Inc. et al.*, Case No. 3:24-cv-00166 (E.D Tenn. April 10, 2024) (Dkt. No. 1); (e) the signed Declaration of Matthew Borisch In Support of Debtors' Motion To Enforce Automatic Stay And Punitive Damages For Willful Violations of the Automatic Stay Against Malibu Boats, Inc. And Malibu Boats, LLC filed in *In re Tommy's Fort Worth, LLC, et al.*, No. 24-90000-elm11, (Bankr. N.D. Tex. June 4, 2024) (Dkt. No. 113); (f) the complaint filed in *Matthew Allen Borisch v. Malibu Boats, Inc., et al.*, Case No. 3:24-cv-339 (E.D. Tenn. August 16, 2024) (Dkt. No. 1); (g)

other filings in the aforementioned court proceedings; (h) interviews of former employees of MBI as well as former employees of Tommy's Boats, and OneWater Marine, Inc.; and (i) review of other publicly available information concerning the Company and the Individual Defendants. Additionally, Plaintiff's counsel held multiple telephone calls with litigation counsel for Matthew Borisch, President and owner of Tommy's, and confirmed that there was a good faith basis for the allegations asserted in the above-referenced court filings.

Lead Plaintiff's investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I.    PRELIMINARY STATEMENT

1.      MBI designs, manufactures, and sells recreational powerboats. Leading up to the Class Period, the boating industry experienced a COVID-fueled sales boom as socially distancing customers flocked to buy boats. Indeed, during this time, MBI's sales skyrocketed, growing 42% from fiscal year 2020 to fiscal year 2021, and another 30% from fiscal year 2021 to fiscal year 2022. By mid-2022, however, the boat sales boom was losing momentum, with industry sources forecasting retail demand for 2023 to sharply decline by 50% from 2022 levels. As economic conditions worsened and interest rates rose, investors and analysts expressed concern about whether these factors would materially impact MBI's business.

2.      To assuage these concerns, throughout the Class Period, Defendants repeatedly assured the market that MBI's performance was insulated from any market downturn because its "premium buyers" had "not really been affected by economic conditions or interest rates." Indeed, on November 4, 2022—the first day of the Class Period, when MBI reported earnings for the first

quarter of fiscal year ("FY") 2023[1]—Defendant Springer, MBI's CEO, boasted that demand for the Company's premium boats was so high that customers were "***gobbling [them] up like [a Cajun] deep fried turkey dinner at Thanksgiving***."  Similarly, on February 7, 2023, when MBI touted its "***stellar results***" for the second quarter of FY 2023, Springer assured investors that "***[t]he retail environment remains resilient with strong demand carrying the tide for our premium boats***" and that "***we see no worsening of our expected outlook***."  On May 3, 2023, during MBI's third quarter FY 2023 earnings call—and in direct response to analysts' concerns that industry data was showing declining demand in the industry—Springer again assured investors that MBI was insulated from this decline, stating that there was "***[no] slowdown [of retail demand] in the quarter***."  In fact, Springer asserted that demand for MBI's premium boats was so strong that "***[w]e have to put more inventory in the channel to realize the retail that we want to***[,]" and that, "***as it relates to channel inventories, Malibu is right where it needs to be***[.]"

3.     Furthermore, because MBI primarily sells its boats to a national network of third-party boat dealers (who in turn sell the boats to retail customers), throughout the Class Period, Defendants were repeatedly asked about the financial stability of MBI's dealers and whether they held too much inventory.  In response, Defendants emphatically touted to the market that MBI's "***operational prowess***" and "***best-in-class operational capabilities***" enabled the Company to perfectly "***match wholesale and retail demand***."  Defendants even went to far as to assert that this inventory "matching" was a "***key differentiator***" separating MBI from its competitors and was an "***important element to our playbook…not only to protect our margins, but also to protect our dealers and make sure they stay healthy***."  Indeed, Defendant Springer specifically assured

---

[1] MBI's fiscal years begin July 1 and end June 30, such that FY 2022 ended June 30, 2022, and FY 2023 began July 1, 2022, and ended June 30, 2023.  The quarter reported on November 4, 2022 ran from July 1, 2022 through September 30, 2022.

investors in June 2023 that "*[w]e're looking at data all the time*," and that MBI was purportedly so "*very good at managing*" dealer inventory that "*we know how much weeks on-hand of inventory that our dealers should have…we know what the right level of inventory on-hand should be.*" On the strength of Defendants' representations, MBI's stock maintained its inflated prices, trading in the $55-$65 per share range during much of the Class Period.

4.      However, Defendants' statements were utterly false.  In reality, MBI was ***not*** insulated from the post-COVID market downturn.  To the contrary, retail demand for MBI's products was severely impacted by the slowdown in the boat market and the broader economy during the Class Period.  Consequently, rather than "matching [] supply with the retail demand environment[,]" Defendants had hatched a scheme to do the exact opposite: in order to inflate MBI's financial performance, they would pump hundreds of millions of dollars' worth of excess inventory into their distributors—including MBI's most important dealer, Tommy's Boats ("Tommy's").  Tommy's accounted for approximately 11% of MBI's consolidated net sales during the Class Period, and it was so material to MBI's financial performance that it was one of only two dealers that MBI highlighted in its SEC filings.  Significantly, Tommy's was by far the largest dealer of MBI's flagship "Malibu" line of high-priced, high-profit-margin "premium" powerboats, which were "by far [MBI's] most profitable [product]" and a key driver of its revenue and profit margin.  Indeed, Defendants repeatedly emphasized throughout the Class Period that the Malibu line was immune from inflation and interest rate pressures given that its "premium" buyers were wealthy customers who were largely insulated from these concerns.

5.      In a rarity for a securities class action pleading, sworn court filings by Tommy's owner Matthew Borisch ("Borisch") himself, as well as internal documents revealed through litigation between MBI and Tommy's (including emails from the Individual Defendants

themselves) demonstrate exactly how Defendants' scheme transpired. Specifically, Defendants had considerable leverage over Tommy's because it was heavily dependent on MBI for its business, as MBI boats made up more than 80% of Tommy's sales. Thus, beginning in mid-2022 when the COVID-induced boom began to wane, Defendants began strongarming Tommy's into purchasing over $100 million of unneeded, high-margin Malibu boats to maximize MBI's profits. Defendants further pressured Tommy's to dramatically increase its dealership "floor plan" financing limits with lenders by **70%**, from $50 million to $85 million, so that Tommy's could purchase and store the additional MBI boats. Significantly, when Tommy's President and owner Matthew Borisch pushed back on Defendants' plan given that Tommy's was unable to sell the substantial MBI inventory it already had on hand, **Defendants Springer and Wilson expressly threatened Borisch that if Tommy's did not comply, Tommy's would lose its status as an MBI-authorized dealer**, thus effectively destroying Tommy's business.

6. Defendants' plan to stuff their sales channel through the beholden Tommy's took on even more urgency in early 2023. At that time, MBI's largest dealer, OneWater Marine, Inc. ("OneWater"), unexpectedly cancelled a significant amount of MBI boat orders for the year, citing its own assessment of a sharp downturn in demand for MBI boats across its roughly 100 dealerships. Unlike Tommy's, OneWater was not reliant on MBI, as it was a much larger company that sold boats from a wide variety of manufacturers. OneWater's CEO delivered the news of its cancellations directly to Springer in a personal meeting in early 2023. With OneWater accounting for as much as 17% of MBI's sales, the cancellations were disastrous for MBI's business.

7. However, rather than disclose this highly material information to investors, Defendants instead ratcheted up their scheme to "pump Tommy's full of boats." Indeed, mere weeks after the OneWater cancellations, in March 2023, Defendant Springer introduced Tommy's

to a new lender (M&T Bank) so that Tommy's could increase its total floor plan financing yet again—this time from $85 million to ***$130 million***.  Under this new financing, MBI pushed at least ***$50 million worth of excess inventory into Tommy's dealerships in May and June 2023 alone*** (the last two months of FY 2023), even though boat demand was plummeting at this time.

8.    Significantly, Defendants' scheme to sell as many high-margin boats to Tommy's as possible provided a significant benefit to Defendants: it enabled MBI to meet its revenue guidance for FY 2023 by just 3%.  Tellingly, in so doing, MBI was also able to just barely hit the financial targets necessary for Defendant Springer to become eligible to reap a lucrative incentive bonus that would ***more than double*** his cash compensation for the year, from $875,000 to $1.83 million.

9.    By the summer of 2023, Defendants' channel stuffing scheme had left Tommy's in a dire financial condition.  On August 29, 2023, MBI filed its FY 2023 Form 10-K, which specifically identified Tommy's as one of the Company's two most important distributors.  Remarkably, just four days later, on September 2, 2023, Tommy's owner directly and personally notified Defendants that Tommy's was in default with its lender M&T because it was "selling boats out of trust," or "SOT"—meaning that Tommy's had been selling boats without remitting the portion of the proceeds that was due back to M&T in order to keep Tommy's dealerships afloat.  Springer himself left no doubt as to how significant this development was for Tommy's business.  As Springer explicitly stated in a September 11, 2023 email to Borisch, Tommy's SOT status was "***one of the worst situations that can arise***," and "***[u]ntil Tommy's is in good standing with M&T, no dealer agreement can or will be signed***."

10.    Defendants not only concealed from investors the extraordinarily material fact that the Company's single most important dealer was on the brink of financial ruin, but they actively

represented the **exact opposite** to the market.  Indeed, the very next month, during an October 31, 2023 earnings call, Defendant Springer again claimed that MBI continued to "**successfully match[] production to retail demand**" in order "**to protect our dealers and make sure they stay healthy**." Moreover, when analysts questioned Springer about whether he had "[a]ny concerns about your [dealer] network" potentially "carrying excess inventory [] and facing higher interest expense," Springer responded: "**Largely, no**," and stated that Defendants were "**pretty confident**" about MBI's dealer network because they closely monitored dealer health and because of the "early warning systems that are in place."

11.    The truth emerged through a series of disclosures during the first several months of 2024.  Indeed, on January 30, 2024, MBI reported poor financial results for the second quarter of FY 2024, including a 72% decline in net income and a 38% decline in net sales, while missing guidance that Defendants had issued just a few months earlier.  Significantly, in stark contrast to Defendants' assurances as recently as three months earlier of being "laser-focused on inventory levels," Defendant Springer now acknowledged that the declines were largely due to the fact that "**channel inventories [were] higher than we, or our dealers would like to see**."  Nevertheless, Defendant Springer sought to downplay MBI's troubles, assuring investors that "[o]ur customer segment [] has remained strong in the premium segment" and that additional inventory problems were not a concern because we are "**being very responsible with channel inventories and that's what we're hearing [from] our dealers**."  On this news, MBI's stock price fell nearly 20% in a single day—or $9.47 per share—on unusually high volume, from a close of $51.03 on January 29, 2024, to a close of $41.56 per share on January 30, 2024.

12.    However, MBI's problems were just beginning to surface.  According to multiple sworn federal court filings signed under penalty of perjury by Tommy's owner Borisch himself,

just two weeks later, at the February 14, 2024 Miami Boat Show, Borisch was approached by three MBI stakeholders who admitted to him that Springer had been "***intentionally pumping Tommy's full of inventory***" to artificially inflate MBI's sales when "***most manufacturers are 70% too heavy on inventory and [Springer] knows that***." The stakeholders told Borisch that "***[Springer] would not turn the spigot off***" and that they were "***nervous***," but that "***Jack is not going to last***."

13.     The following week, on February 20, 2024, MBI stunned the market by announcing that Defendant Springer, who had been MBI's CEO for over 15 years, was abruptly resigning. On this news, MBI's stock price fell another 9%, on unusually high volume. Analysts were shocked, reporting that "***[t]his announcement is a surprise to us—and we suspect the investment community as well—as we had just met with Mr. Springer … at the Miami International Boat Show last week***" and "there doesn't seem to have been any meaningful succession plan in place."

14.     With Springer out of the picture, Defendants' fraudulent scheme soon collapsed. Although Defendants never disclosed the highly material fact that MBI's most important dealer was on the brink of financial collapse as a direct result of Defendants' channel stuffing scheme, MBI's hand was forced when, on April 10, 2024, Tommy's filed a verified, sworn complaint against MBI in the United States District Court for the Eastern District of Tennessee. Significantly, Tommy's complaint alleged that, ***at the express direction of Defendant Springer, MBI had*** "***engaged in an elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen (15) Tommy's dealerships … in order to artificially inflate Malibu's sales performance, artificially claim increased market share in the industry and artificially inflate its stock value during an obvious and known downturn in the recreational power boat industry***."

15.    Realizing that the news of Tommy's lawsuit would soon become public, the very next day, on April 11, 2024, MBI filed a Form 8-K with the SEC revealing that Tommy's had sued MBI.  In the Form 8-K, Defendants admitted that they had long been aware of Tommy's financial distress, and that the situation was so severe that MBI had ***already terminated*** its dealership agreements with Tommy's and was scrambling to reallocate Tommy's glut of inventory. Specifically, MBI revealed that it "***does not currently have dealership agreements in effect with Tommy's*[**,**]**"** and that the Company was "actively engaged with its dealer network to mitigate any marketplace disruption[.]"

16.    On this news, MBI's stock price fell 8%, and analysts pointedly noted the dramatic ramifications that Tommy's failure had for MBI's business.  For example, Raymond James noted that the ***"inventory owned by Tommy's needs to find a home with other dealers***" and downgraded MBI "***in response to the loss of Tommy's Boats, one of MBUU's largest dealers (10.7% of total sales/23.3% of Malibu segment sales in FY23) which last week filed [the Tommy's complaint]***." Raymond James further emphasized that the "***significant issue in our view is the impact of Tommy's inventory being absorbed into the dealer channel on MBUU's sales and margins, the implications of which we fear could extend into FY25***."

17.    The Class Period ends on May 2, 2024, when MBI released poor financial results for the third quarter of FY 2024 that again fell short of expectations, with Adjusted EBITDA plummeting nearly 70% to just $24.4 million and net sales falling 46% from the prior quarter. With Tommy's just days away from bankruptcy, a glut of excess Tommy's inventory now flooding the market at fire sale prices, and dramatically fewer orders from OneWater and other dealers, MBI slashed its FY 2024 guidance for the third quarter in a row.  Analysts excoriated MBI, with Raymond James emphasizing that "***[Tommy's] failure [had] result[ed] in even heavier***

***inventories***" than Defendants had previously disclosed, and Baird noting that the "big picture" was that the "***MBI story has unraveled as macro headwinds hit hard and lawsuits [and] leadership changes… tank investor confidence***."

18.    As a result of Defendants' disclosure, MBI's stock price fell another 4%, and in total, MBI's stock lost roughly 50% of its value during the Class Period, wiping out as much as $660 million in market value for MBI investors.

## II.    JURISDICTION AND VENUE

19.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

22.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

## III.    PARTIES

### A.    Lead Plaintiff

23.    Lead Plaintiff Retiree Benefit Trust of the City of Baltimore ("OPEB") was established to fund the current payment of health benefits for retired Baltimore City employees and to establish a reserve to pay health benefits for future retirees.  OPEB has over $900 million in assets under management.  As reflected in its PSLRA certification (ECF No. 17-1), OPEB purchased MBI common stock during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

### B.    Defendants

24.    Defendant MBI is incorporated under the laws of Delaware with its principal executive offices located in Loudon, Tennessee.  MBI is a leading designer, manufacturer and marketer of a diverse range of recreational powerboats, including performance sport boats, sterndrive and outboard boats under eight brands—Malibu, Axis, Pursuit, Maverick, Cobia, Pathfinder, Hewes and Cobalt.  MBI groups these boats into three "segments."  The largest of these segments is the Malibu Segment, which comprises the Malibu and Axis brands of freshwater powerboats.  The Company's other two segments are Saltwater Fishing (which includes the Pursuit, Maverick, Cobia, Pathfinder, and Hewes brands) and Cobalt (which comprises the Cobalt brand).  During the Class Period, MBI maintained eight manufacturing facilities located in five U.S. states and Australia.  The Company's shares trade on the NASDAQ under the ticker symbol "MBUU."

25.    Defendant Jack Springer ("Springer") was the Company's Chief Executive Officer ("CEO") at all relevant times.  Defendant Springer signed the Company's SEC filings during the Class Period containing statements alleged herein to be false and misleading, including MBI's

Form 10-K for FY 2023 and its Form 10-Qs for the first and second quarters of FY 2024, and directly made other statements alleged herein to be false and misleading in press releases and investor calls during the Class Period.  On February 20, 2024, the Company announced Defendant Springer would be departing as CEO on or before May 17, 2024.

26.    Defendant Bruce Beckman ("Beckman") has been the Company's Chief Financial Officer ("CFO") since November 27, 2023.  Defendant Beckman signed the Company's SEC filings during the Class Period containing statements alleged herein to be false and misleading, including MBI's Form 10-Q for the second quarter of FY 2024.

27.    Defendant David Black ("Black") served as the Company's Interim CFO from May 12, 2023 until November 27, 2023.  Defendant Black signed the Company's SEC filings during the Class Period containing statements alleged herein to be false and misleading, including MBI's Form 10-K for FY 2023 and its Form 10-Q for the first quarter of FY 2024, and directly made other statements alleged herein to be false and misleading in investor calls during the Class Period.

28.    Defendant Wayne Wilson ("Wilson") served as the Company's CFO from approximately September 2009 until May 12, 2023.  Defendant Wilson made statements alleged herein to be false and misleading, including during the Company's earnings call for the second quarter of fiscal year 2023.

29.    Defendants Springer, Beckman, Black, and Wilson are collectively referred to herein as the "Individual Defendants."  The Individual Defendants, because of their positions with MBI, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.    OVERVIEW OF DEFENDANTS' FRAUD

### A.    MBI's Business and Dealership Network

30.    MBI is a designer, manufacturer, and marketer of a wide range of powerboats that it sells via three business segments – Malibu, Saltwater Fishing, and Cobalt.  The largest of the three segments by far is the Malibu segment (the "Malibu Segment"), which, leading up to the Class Period, accounted for more than half of the Company's total revenue.  Indeed, throughout the Class Period, MBI boasted of holding the "number one market share position in the United States for performance sport boats with our [Malibu Segment]."  The Malibu Segment focuses on freshwater performance sport boats, which it sells under two brand names: Malibu, which is the Company's flagship brand and offers premium sport boats with luxury features ("Malibu Brand"); and Axis, which is marketed as a more affordable line of performance sport boats and targets a younger, entry-level boat owner demographic.  During the Class Period, Malibu Brand boats retailed for as much as $300,000 each, and were "by far [MBI's] most profitable product," according to Defendant Springer.  As a result, the Malibu Segment often had gross margins above 30%, and EBITDA margins above 20%—far higher than either of the Company's other two segments.

31.    MBI primarily sells its boats to a network of independent dealers located throughout the United States and abroad.  MBI recognizes a boat sale—and thus the resulting revenue—as soon as a boat ships to a dealer.  Most of MBI's authorized dealers enter into "floor

plan" financing arrangements with third-party finance companies that facilitate the dealers' purchasing MBI products and warehousing them for subsequent sale to retail consumers. Under such arrangements, a dealer establishes a line of credit with a lender for the purchase of boat inventory from MBI. When a dealer purchases a boat pursuant to a floor plan financing arrangement, it draws against its line of credit. The lender then pays the sales price of the boat directly to MBI, allowing MBI to immediately recognize revenue from the sale of the boat to the dealer. The dealer is obligated to reimburse the floor plan lender when it sells the boat to a retail customer by remitting to the lender a portion of the sale proceeds.

32.     Leading up to and throughout the Class Period, MBI's two largest and most lucrative dealer relationships were with OneWater Marine, Inc. ("OneWater") and Tommy's Boats ("Tommy's").[2]  OneWater represented approximately 16.8% and 17.2% of MBI's consolidated net sales in fiscal years 2022 and 2023, respectively, including approximately 18.4% of net sales for the Malibu Segment in fiscal 2022 and 6.5% in fiscal 2023. Tommy's represented approximately 9.4% and 10.7% of MBI's consolidated net sales in fiscal years 2022 and 2023, respectively, including approximately 23.3% of net sales for the Malibu Segment in fiscal 2023. Indeed, OneWater and Tommy's were the only dealers significant enough to MBI's business to be mentioned by name in its SEC filings during the Class Period.

33.     However, OneWater and Tommy's were very differently situated from one another. Specifically, OneWater was a large, publicly traded company whose nearly 100 dealerships across the country sold a wide variety of boats from many different manufacturers, including MBI. For example, in recent years, all eight of MBI's brands combined have accounted for roughly 14-17%

---

[2] Tommy's is not a formal legal entity, but an organization of 15 separate dealership LLCs, all of which are owned and controlled by Borisch. For ease of reference, all 15 Tommy's dealership entities are collectively referred to herein as "Tommy's Boats" or "Tommy's."

of OneWater's annual sales in aggregate.  Thus, while MBI boats made up a meaningful portion of OneWater's sales, OneWater was not beholden to or reliant on MBI for its success.

34.     Tommy's, by contrast, was a much smaller company that was heavily dependent on MBI's products for its business.  Tommy's began in 2012 as a single-dealership business located in Colorado, and, through its relationship with MBI, grew into a network of fifteen dealerships operating in eight different states across the U.S.  Indeed, according to Tommy's President Matthew Borisch ("Borisch"), a significant part of Tommy's growth was directly due to its relationship with MBI, as, on numerous occasions, MBI had approached Borisch about buying other MBI authorized dealerships that had been struggling and Borisch typically had complied.  This led to Tommy's growing from operating just four dealerships in 2017 to fifteen dealerships in 2022.  Significantly, unlike OneWater, Tommy's primarily sold MBI boats (and mostly Malibu Segment boats)—which accounted for more than 80% of its sales.

35.     MBI, for its part, was dependent on both OneWater and Tommy's, given that the two dealers combined accounted for as much as 28% of MBI's consolidated net sales in a given year.  Moreover, during the 2023 fiscal year, ***Tommy's became the largest national dealer for MBI's most profitable Malibu Segment***.  As such, MBI maintained close and frequent contact with these dealers, and carefully monitored their sales and inventory in near real time.  For example, MBI's dealer contracts required dealers to update their inventory levels in MBI's customer relationship management ("CRM") database "on a weekly basis," and required registration of 100% of MBI's boat purchased by a retail customer, with dealers notifying MBI of each registration and sale within ten days.  Indeed, according to MBI's SEC filings, MBI "ha[s] the ability to . . . use data and performance metrics to monitor dealer performance[,]" which MBI used to "continually assess [its] distribution network[.]"

36.     Defendants also emphasized that MBI's ability to continually access sales and inventory data from their dealers was essential to their success.  For example, Defendant Springer explained during the Company's earnings call with investors on October 31, 2023 that "[a]n important element to our playbook is successfully matching production to retail demand, not only to protect our margins, but also to protect our dealers and make sure they stay healthy."

**B.      Leading Up To The Class Period, As MBI Experienced A COVID-Fueled Boom, Defendants Repeatedly Boasted About "Unprecedented Consumer Appetite" For MBI's Premium Boats**

37.     During the COVID pandemic, retail consumer demand for recreational boats skyrocketed to the highest levels seen by the industry in decades, as consumers turned to boating as a form of outdoor, socially distanced recreational activity.  Consequently, MBI's sales and profits soared.  For instance, for FY 2021 (ended June 30, 2021), the Company reported net sales increasing 42% to a record $927 million, and Adjusted EBITDA growing an unprecedented 71% to $190 million year-over-year.  Fiscal year 2022 was yet another record year for the Company, with net sales increasing 31% to $1.2 billion, and Adjusted EBITDA growing another 30% to $247 million year-over-year.

38.     Through late 2022 and leading up to the start of the Class Period, Defendants continued to boast that retail demand for MBI boats was so strong that dealers were selling boats faster than MBI could produce them, depleting MBI's dealers' inventories.  For example, during the Company's 4Q and FY 2022 earnings call on August 25, 2022, Springer touted "unwavering demand" and "unprecedented consumer appetite for [MBI's] larger feature-rich boats."  Springer further proclaimed that this demand would sustain the Company's growth for the next two to three years, stating that "we have orders extending well into the first half of fiscal year 2023, and they show no signs of slowing[,]" while "channel inventory remains at historic lows, providing an incredible opportunity for the continued success for the next 2 to 3 years[.]"

**C.    Just Prior To The Class Period, Retail Demand Began To Plummet—Causing Defendants To Hatch A Desperate Scheme To Maintain MBI's Record Sales By Pumping $110 Million Of Excess Inventory Into Tommy's**

39.    While industry demand had been extremely high due to the COVID-fueled boom in fiscal years 2021 and 2022, by mid-2022, market analysts were projecting that demand would decline by approximately 50% in 2023 due to post-COVID recessionary pressures.  Fearing that an end to the Company's record-setting sales would negatively impact their compensation, Defendants hatched a plan.  MBI would exploit the Company's substantial leverage over Tommy's to load Tommy's dealerships with excess inventory in order to prop up the Company's sales, artificially inflate MBI's financial performance and mask the impact of the post-COVID crash.

40.    As detailed in Tommy's sworn, verified litigation filings, including in a sworn declaration of Tommy's President and owner, Matthew Borisch, filed in federal bankruptcy court, Defendants proceeded to "pump Tommy's full of boats" despite having "full knowledge" that Tommy's did not want or need the additional inventory, as "the market analysis did not warrant such inventory levels":

> *Malibu intentionally and fraudulently demanded that Tommy's increase its floor plan capability and proceeded to 'pump Tommy's full of boats'* (the most expensive, highest margin, slow selling Malibu boats) *with full knowledge that the market analysis did not warrant such inventory levels*, all with the intention of increasing [MBI's] market share and artificially inflating its stock price during a historically low market demand."

**1.    In Mid-2022, Defendants Implemented Their Channel Stuffing Scheme To "Pump Tommy's Full Of Boats"**

41.    Beginning in mid-2022, at the very beginning of MBI's fiscal year 2023, MBI began pressuring Tommy's to significantly increase its line of credit for floor plan financing so that it could purchase far more boats than Tommy's needed or wanted in light of the projected downturn in retail demand.  MBI also threatened to revoke Tommy's status as an authorized MBI dealer and withhold lucrative incentive payments if Tommy's refused to comply.

42.     Specifically, in July 2022, Defendants Springer and Wilson invited Borisch (who was based in Michigan) and his director of operations, Ed Wells, to a lunch meeting in Tennessee. During the meeting, Defendants Springer and Wilson "began pressuring Mr. Borisch to commit to increasing [Tommy's] existing floor plan credit capacity" so that Tommy's could purchase more boats from MBI.  When "Mr. Borisch pushed back, both in the initial meeting [in July 2022] and over the months that followed, ***Malibu made clear that its request was not optional, and that Mr. Borisch would lose his status as a Malibu dealer if he did not comply*.**"  Additionally, Tommy's had earned significant financial incentives during FY 2022, which MBI had not yet paid. Defendants deliberately withheld these incentives as further leverage to push Tommy's into increasing its floor plan financing capacity—while continuing to make clear that Defendants "***would retaliate if [Tommy's] did not comply with their demands*.**"

43.     Then, in late 2022—at the same time that industry sources were expecting boat demand to dramatically decline—Defendants suddenly told Tommy's that it was required to have a minimum of 25 weeks of Malibu Segment inventory on hand, purportedly based on MBI's own internal retail demand forecasts for FY 2023.  At the time, Tommy's had only used approximately $30 million of its $50 million credit facility for floor plan financing with its lender, Fifth Third Bank, with $20 million of additional capacity remaining.  To have 25 weeks of inventory on hand, Tommy's would be forced to increase its current floor plan capacity by ***more than a factor of five*.** Borisch detailed in Tommy's court filings how, to ensure Tommy's would comply, on or about "December 16, 2022, [Defendant] Wilson called Mr. Borisch's primary point of contact with [Fifth Third] bank, Rick Budinger, ***and demanded that the bank immediately fund the boats that Malibu had shipped or else 'bad things would happen*.**'"  Facing significant financial pressure due to

Defendants' ongoing threats and manipulations, Tommy's agreed to MBI's demands, extending its credit facility with Fifth Third Bank *by 70%*, from $50 million to *$85 million.*

44.    However, even this extended floor plan capacity soon proved insufficient for Defendants, as shortly thereafter, MBI began to be even more severely impacted by the downturn in retail demand.  Indeed, Plaintiff's independent investigation has revealed that, in early 2023, OneWater, which was MBI's largest overall dealer and Malibu Segment dealer for the last two fiscal years, cancelled a large portion of its MBI boat orders for FY 2023—particularly its orders for boats made by the Malibu Segment.  Indeed, the number of Malibu Segment boat orders cancelled by OneWater was so large it reduced OneWater's percentage of Malibu Segment sales from 18.4% during FY 2022 to merely 6.5% in FY 2023.

45.    Significantly, OneWater based its decision on its own internal assessment that demand for Malibu Segment boats across its 100 dealership locations was declining sharply in 2023 due to the post-COVID recessionary environment, and would continue to do so for the foreseeable future.  Indeed, CW[3] 1, a former OneWater Senior Sales Executive,[4] stated that OneWater became aware of the market downturn beginning in early 2023.  OneWater had forecasted that there would be a continual downturn in MBI retail boat sales as a result, leading its CEO, Austin Singleton, to hold a meeting with Defendant Springer in early 2023.  During this meeting, Singleton cancelled a significant amount of OneWater's MBI boat orders for FY 2023.  As CW 1 remarked, OneWater cancelled these orders because "the COVID years were done."

---

[3] Confidential witnesses are referred to here in as "CW #" and are all referenced herein in the masculine form to maintain their confidentiality.

[4] CW 1 worked as a Senior Sales Executive for OneWater's Georgia dealership from June 2020 until June 2024.

46.     A former MBI employee likewise confirmed that MBI's own internal market data showed that, beginning in early 2023, there was a sharp drop-off in retail demand for MBI boats. CW 2, a former Data and Analytics Specialist within the Company's Market Research department from December 2021 through January 2024,[5] explained that he was responsible for collecting retail boat registration and customer survey data for MBI's boats that had been sold to consumers from a program called Qualtrics.  He would then create reports on trends within that data which he provided to his superiors as well as to MBI's CEO and its Board of Directors on a quarterly, monthly, and sometimes even weekly basis.  The boat registration data allowed CW 2 to determine how many MBI boats had been sold to retail consumers in any given period.  Since this information provided insight into retail demand levels, CW 2 also provided his reports to MBI's sales department to aid them in their forecasting efforts.

47.     CW 2 recalled that he noticed a big drop-off in boat registrations beginning around January 2023 and continuing throughout calendar year 2023, up until he left the Company in January 2024.  Given that a decline in boat registrations was indicative of declining retail demand, CW 2 created reports documenting MBI's dramatically declining boat registration data and distributed them internally.  Regarding these reports, CW 2 explained: "There was a huge concern with the directors and the sales managers.  They had a lot of questions about what I was presenting to them."  And "whenever I was asked about this the same people would ask the sales department and be told that sales were [indeed] down."

---

[5] As a Data and Analytics Specialist during this period, CW 2 reported directly to MBI's Digital Marketing Manager, Kendall Getley, who in turn, reported to the Vice President of Marketing, Doreen Bayliff.

**2.    In Early 2023—After OneWater Had Cancelled Its MBI Orders Due To The Declining Retail Market—Defendants Ratcheted Up Their Channel Stuffing Scheme, Pressuring Tommy's To Take On Even More Inventory To Prop Up Sales**

48.    With the Company's largest dealer, OneWater, having cancelled a significant percentage of its Malibu Segment boat orders at the outset of 2023 and MBI's own internal marketing and sales departments warning that the Company's retail sales were dramatically declining, Defendants saw the writing on the wall, and again utilized MBI's significant leverage over Tommy's to pump it full of more Malibu Segment inventory.

49.    Specifically, in early 2023, MBI pressured Tommy's to take on even ***more*** floor plan capacity, despite the fact that Tommy's lender Fifth Third Bank was unable to finance additional sales because Tommy's had reached its credit limit.  Accordingly, in March 2023, Defendants introduced Tommy's to a new lender, M&T Bank, that was willing to provide Tommy's with $110 million in floor plan capacity with a $20 million overlimit—amounting to ***$130 million*** total.  However, fully aware of the high financial risk of loading so much surplus inventory into Tommy's so quickly, MBI took extraordinary steps to avoid standard provisions that would otherwise put MBI on the hook for some of the risk.  Specifically, MBI typically entered into "repurchase agreements" with its dealers' lenders—industry standard agreements providing that MBI would repurchase unsold inventory from a dealer in the event the dealer defaulted on repaying its lender for the boats.  However, unbeknownst to Tommy's at the time, MBI did not enter a repurchase agreement with M&T with respect to Tommy's, despite the fact that such agreements were standard in the industry, standard in MBI's financing contracts pursuant to its own public filings, and had in fact been present in all of Tommy's prior financing arrangements.

50.    Significantly, immediately after this new financing arrangement with M&T was secured on May 18, 2023—and with MBI knowing that no repurchase agreement was in place that

could put the Company at risk of repurchasing some or all of Tommy's overloaded inventory—

***"[MBI] began pumping inventory into Mr. Borisch's dealerships in order to artificially inflate
its own numbers and increase its market share and stock price."*** MBI further insisted that the
majority of the excess inventory it was pushing on Tommy's be comprised primarily of its highest
margin Malibu Brand boats, rather than the more even split of Malibu Brand and lower-priced
Axis brand boats carried by Tommy's historically. This served no purpose other than to increase
MBI's profits, as Tommy's had requested a greater share of the lower-priced Axis boats due to the
economic downturn, but MBI ignored Tommy's requests and delivered mostly high-priced Malibu
Brand boats instead. When Tommy's attempted to push back on Defendants' demands to take this
excess inventory, Defendants continued to leverage the incentive payments owed to Tommy's that
had not yet been paid. Specifically, "[MBI Director of Sales] Scott Davenport, acting on behalf of
Malibu, assured Mr. Borisch that ***Malibu was honoring its agreement to pay the rebates and
incentives, and pay for interest recovery, so long as [Tommy's] continued to take on the
inventory, as Malibu was demanding***."

51.    These allegations were corroborated by CW 3, a former Sales Representative for
Tommy's Colorado dealership from June 2020 through November 2023. CW 3 recalled that
Tommy's Colorado dealership suddenly and dramatically increased its lot size by 50% in the
summer of 2022 to accommodate large numbers of additional Malibu Segment boats that would
soon be delivered.[6] According to CW 3, Tommy's Colorado dealership originally had a lot that

---

[6] CW 3 worked directly for Cassidy Batchel, General Manager of Tommy's Boats in Colorado. As
a Sales Representative for Tommy's, CW 3 had first-hand experience with the fluctuations in retail
demand during and after the COVID-19 pandemic, and was responsible for reporting registration
information concerning his boat sales to MBI on a frequent and consistent basis. CW 3 left
Tommy's voluntarily in November 2023 because selling boats was no longer as lucrative as it was
when he first started working for Tommy's in June 2020.

could store approximately 100 boats in inventory, which was perfectly adequate for the dealership in 2020, 2021, and the first half of 2022, even in the midst of the COVID-fueled boom in boat sales. However, in the summer of 2022, Tommy's Colorado dealership suddenly purchased an additional lot down the street from its showroom, increasing its floor plan capacity by an additional 50 boats, such that Tommy's Colorado dealership could now store around 150 boats in its inventory—tripling its former capacity in an instant. As Borisch himself has stated, Tommy's took these steps to expand its dealerships' floor plan capacity due to the relentless pressure and retaliatory threats from MBI and the Individual Defendants.

52.    CW 3 also recalled that his Colorado dealership typically ordered a 50-50 split of Malibu Brand boat and Axis brand boats each year, and MBI would produce and ship boats to Tommy's Colorado dealership according to that split. However, this changed when the dealership placed its boat orders in the fall of 2022 for boats to be shipped during fiscal year 2023. Specifically, despite the fact that the dealership had requested the same 50-50 split for Malibu Segment boat shipments for FY 2023, MBI instead produced and shipped a 75-25 split in favor of the more expensive Malibu Brand boats throughout fiscal year 2023.

53.    Through this scheme, **between May and June 2023 alone, MBI pushed an additional $50 million of excess inventory** on Tommy's. And the purpose of this inventory stuffing was obvious, as it enabled MBI to just barely meet its FY 2023 guidance. Specifically, MBI had guided that net sales would grow "slightly over 10%" from FY 2022—implying consolidated net sales of roughly $1.34 to $1.35 billion. By stuffing inventory into Tommy's— including the $50 million in May and June 2023 alone—MBI was able to report revenue of $1.388 billion for FY 2023, beating guidance by a mere $38 to $48 million. Without the May and June 2023 sales to Tommy's, MBI would have fallen short of its guidance and analyst expectations.

23

**D.    Throughout The Class Period, Defendants Repeatedly And Falsely Claimed That MBI's Strong Financial Performance Was Due To "Strong Demand" For Its Premium Boats**

54.    When the Class Period began in November 2022—and in the midst of growing market concern about declining retail demand for FY 2023—Defendants sought to strongly reassure investors that MBI was insulated from market pressures and could maintain its record sales after the COVID-fueled boom had ended.  As such, Defendants repeatedly and falsely asserted that "strong demand" for its premium boats among wealthy buyers was continuing unabated.  Significantly, in so doing, Defendants never once revealed that, in reality: (1) OneWater, the Company's largest overall dealer, had cancelled a substantial amount of its MBI orders for FY 2023 due to plummeting retail demand for MBI boats; or (2) that MBI's continued positive financial performance was not due to any purported "strong demand" Defendants were touting, but rather was a direct result of Defendants' scheme to push excess inventory onto its second largest and single most important dealer, Tommy's.

55.    For example, on November 4, 2022, the first day of the Class Period, when MBI announced its financial results for the first quarter of FY 2023, Defendant Springer boasted that "Malibu Boats kicked off fiscal year 2023 with a splash *as our continued momentum was supported by ongoing demand strength in both our fresh and saltwater businesses*," and represented that demand was so strong that "*our customers are gobbling [our boats] up like [a Cajun] deep fried turkey dinner at Thanksgiving*."  Springer further emphasized that "*across the board and everyone with dealer meetings, there was optimism and … demand to get more inventory*."

56.    Similarly On February 7, 2023, Defendants announced MBI's financial results for 2Q 2023.  During the earnings call held that day, Defendant Springer proclaimed that "*[t]he retail environment remains resilient with strong demand carrying the tide for our premium boats*[*,*]"

and that "*we see no worsening of our expected outlook*[.]"  Defendant Springer explained that,
although economic pressure was causing demand to decrease in the industry for certain categories
of boat buyers, MBI was purportedly unaffected because its wealthy "premium" boat buyers were
not impacted by macroeconomic conditions at all:

> It is important to note that ***while retail demand has disproportionately affected more
> entry-level aluminum-based lower-length boats, our customers remain unfazed***.
> Speaking for MBI brands and for what we are generally seeing at shows, ***the premium
> buyer is looking to purchase and has not really been affected by economic conditions or
> interest rates***. . . Conversely, we are hearing of weakness in the smaller foot-length
> segments in entry-level priced boats.  This consumer profile has been impacted the most
> by inflation and interest rates.  Thankfully, that is not our model, and we remain positive
> on our premium business.  ***Meeting existing demand and building channel inventories
> continues to be a primary focus and a major tailwind in the quarters to come***.

57.    Analysts were enthusiastic about MBI's claims regarding continued strong retail
demand for MBI boats, and parroted Defendants' statements.  For example, a February 7, 2023
Baird report highlighted that MBI "***[m]anagement noted a 'resilient consumer appetite for large,
feature-rich boats,' where the company butters its bread***," and commented that the "***[s]ofter
demand for entry-level boats . . . has little impact on the premium MBI boat portfolio***."  A Wolfe
Research report similarly emphasized that "***Malibu believes that they are seeing strong consumer
demand for their premium products***."  A February 7, 2023 Truist Securities report announced that
"[w]e are raising our FY23/FY24 estimates and P[rice] T[arget] to $72 following today's 2Q print
and FY23 guidance reiteration" because "***we came away from today's conference call with greater
comfort in the FY23 outlook, [and] relatively stable demand trends for premium boats,***" given
***MBI's "premium/larger end of the market has remained relatively steady***[.]"

58.    Defendants made similarly positive statements on May 3, 2023, when MBI reported
its 3Q FY 2023 results, touting "another record for sales despite modest margin pressures as
volumes and inventories normalize within our [f]reshwater brands."  Significantly, in direct
response to an analyst inquiry, Springer ***denied that there were any signs of a "slowdown [of retail***

*demand] in the quarter*," instead blaming any evidence of negative trends on "a delay in the season kicking off because of the cool weather and [] precipitation."  Indeed, during the same earnings call, Defendant Black announced that, unlike its competitors, MBI was *increasing* its sales guidance for fiscal year 2023—projecting above 10% revenue growth year-over-year

59.    However, in light of industry data—which showed that retail demand was, in fact, slowing down across the industry—analysts questioned Defendants' confidence in their sales trends, with one analyst asking: "[C]an you help us square your shipments for the quarter with the soft [retail demand] data we've seen so far?  And how do you feel about dealer inventory across your different brands?"  In response, Defendant Springer assured investors that previously depleted inventories continued to provide a runway for further demand, stating: "*You have a retail environment that has been very low on inventory.  And it's a real easy arithmetic equation in terms of—you know that your inventories are down.  You have to build that retail inventory out by shipping wholesale*. . . . [T]he wholesale retail squaring has to do with the channel inventory. *We have to put more inventory in the channel to realize the retail that we want to*."

60.    Analysts were again reassured by Defendants' claims of strong demand for MBI's boats, purportedly fueled both by retail demand and a continued need to restock depleted dealer inventories.  A May 3, 2023 Baird report noted that, although the "marine season is off to a slow start . . . *MBI has successfully replenished dealer inventory ahead of the prime season [and] we expect shipments to track more closely with retail demand.*"  A Raymond James report the same day referred to the Company's freshwater dealership inventory levels as "ideal" and noted that "[p]oor weather was a headwind in the beginning of the quarter but has improved as of late, *and demand appears to have followed suit*."  Reports issued by Truist Securities on May 3, 2023 likewise noted that "*dealer inventories for MBUU's freshwater brands (Malibu/Axis, Cobalt)*

*have now fully rebalanced (i.e., shipments will be more closely tied to retail patterns moving forward)*," and that "*MBUU is the only [marine industry] name under coverage, thus far, which has elected to raise [its] guidance this earnings season.*"

61.    Then, on June 6, 2023—near the end of MBI's fiscal year, and as MBI began renegotiating new dealership agreements with its boat dealers, including Tommy's—Defendant Springer attended an investor conference during which an analyst directly asked him about how the Company would ensure there was "the right amount of inventory in the channel" as economic conditions continued to worsen.    In response, Springer strongly reassured investors that Defendants closely and continuously monitored dealer inventory levels and "know what the right level of inventory on-hand should be":

> On Malibu, from a Malibu or an MBI point of view, *data is critical.  We're looking at data all the time.*  At every juncture of the year, if you think about the boat season or the boat year, it's very seasonal.  So when David [Black] talks about weeks on-hand of inventory in June, *we know how much weeks on-hand of inventory that our dealers should have.*  As we're building for boat shows in that November-December timeframe, *we know what the right level of inventory demand on-hand should be.*  And so that's something that I think not only us but most marine companies *have gotten very good at managing.*

### E.    Unbeknownst To Investors, And Contrary To Defendants' Positive Public Statements, By The Summer Of 2023, Defendants' Channel Stuffing Scheme Had Crippled Tommy's Business

62.    Despite Defendants' positive public statements and unbeknownst to investors, by the summer of 2023, Tommy's bloated inventory levels had begun to take their toll—causing it to spiral into increasing financial distress.  Despite this, Defendants continued to pressure Tommy's to take on more and more inventory that Defendants knew was not needed or wanted, and that Defendants knew there was no market for, as the retail demand market continued to deteriorate.

63.    For example, on June 30, 2023, Tommy's FY 2023 dealership agreements with MBI expired, prompting MBI and Tommy's to begin negotiating the terms of new dealership agreements for FY 2024.  However, before the parties could execute new dealership agreements,

they had to reach agreement on the number of boats Tommy's would commit to ordering from MBI for the year. Despite Defendants' public claims of continuing robust demand for MBI's "feature-rich boats," as of June 12, 2023—a mere few weeks before the end of MBI's fiscal year—*Tommy's still had a staggering 800 of the 1,190 Malibu Segment boats it had purchased in 2023 remaining in its inventory, or nearly 70% of the previous year's boats*—a fact Defendants were well aware of given that they had near real time access to Tommy's retail sales and inventory levels, and received updates on those metrics on a weekly basis. Indeed, CW 3 was personally involved in entering sales data in MBI's CRM portal in order to "register the sale" in MBI's sales tracking system, which MBI used to determine whether Tommy's was entitled to financial incentives under the dealership agreements. Tommy's FY 2023 dealership agreements also provided that "[u]pon delivery to the retail customer," Tommy's was to "complete the Warranty Registration card provided and forward to Malibu"—and that this had to be completed "within 10 days after customer takes delivery of the boat."

64.     Despite knowing that Tommy's still had 800 leftover 2023 Malibu Segment boats in its inventory, Defendants demanded that Tommy's commit to ordering *1,160 Malibu Segment boats* in FY 2024 before MBI would agree to execute new dealership agreements with Tommy's for the upcoming year. With 800 boats of excess inventory still on hand, and in the midst of declining retail demand and rapidly rising interest rates for carrying that inventory, Tommy's countered with an offer to commit to ordering only 559 boats—approximately 50% fewer boats than the total number of MBI boats Tommy's had purchased during FY 2023—but Defendants refused to agree.

65.     CW 3 stated that these facts were consistent with his experience at Tommy's Colorado dealership during the same timeframe. Historically, that dealership ordered

approximately 100 MBI boats per year, and by the end of each fiscal year the Colorado dealership would have sold the vast majority of those boats, with perhaps less than 5 to 10 boats remaining in its inventory.  Given that retail sales had declined substantially during FY 2023, however, when it came time for the Colorado dealership to place its boat orders with MBI for FY 2024, the Colorado dealership still had between 25 and 50 MBI boats in its inventory.  According to CW 3, given all of the sales and inventory data Tommy's was required to input into MBI's online portal, "there was no way Malibu did not know [Tommy's] sales were slowing in real time."  Nevertheless, MBI pushed hard for Tommy's Colorado dealership to order at least 100 additional boats for FY 2024.  And while Tommy's believed this was too much, CW 3 recalled Tommy's executive management tried to accommodate MBI's request anyway so that MBI would finally execute FY 2024 dealership agreements with MBI.  He further explained: "There seemed to be a sense of urgency in moving boats, but the number of boats [MBI] was sending they [i.e., the Colorado dealership] were not comfortable accepting."

66.    Meanwhile, according to CW 3, during the same time period, "many dealerships [other than Tommy's] were holding off on placing and receiving model year 2024 orders" because "*everyone [still] had 2022 and 2023 excess Malibu inventory*."  CW 3 explained that other MBI authorized boat dealers, including Taylor's Boats (which had locations in Utah, Arizona, Nevada and Colorado), in addition to "another Malibu dealership in Coeur d'Alene, Idaho," also were pushing back on MBI and holding off their MBI boat orders.

**F.    In The Summer Of 2023, MBI And Defendant Springer Were Personally Informed That Tommy's Financial Condition Was In "*One Of The Worst Situations That Can Arise*"**

67.    As MBI and Tommy's continued negotiating the 2024 dealership agreements during the summer of 2023, Tommy's continued to relay to MBI that it was unable to take on the 1,160 boats MBI was demanding it purchase due to declining retail demand and a lack of retail

sales.  Indeed, CW 3 stated that in June-July 2023, his personal number of Malibu Segment sales had declined from 5 boats per month to only 1 or 2 boats per month.  While MBI ultimately lowered its required commitment to 605 boats, Tommy's detailed in its court filings that, by that time, it was already rapidly "nearing danger with respect to [its] current inventory due to the unreasonable number of Malibu boats that Malibu had forced upon [Tommy's]"—and "[b]y August 2023, [Tommy's] dealerships were in a dire financial position."  Consequently, in an effort to cover its costs and avoid insolvency, in August 2023, Tommy's sold a number of boats from its inventory without remitting the necessary portion of those sales proceeds to M&T Bank, a significant default event referred to in the marine industry as "sales out of trust," or "SOT"—an event that had never previously occurred in Tommy's entire 12-year relationship with MBI.

68.    Significantly, Tommy's immediately notified MBI of its SOT status, by no later than September 2, 2023.  The next day, September 3, 2023, Tommy's reached out to MBI for assistance in right-sizing its overstocked inventories, and also sought payment of outstanding financial incentives and monetary advances from MBI which Tommy's claimed it could use to cure its default with M&T.  However, Defendants refused to pay any of the outstanding financial incentives, asserting that Tommy's was not eligible to receive them.  MBI and Defendant Springer further made clear to Tommy's that MBI would not enter into any repurchase agreement to buy back excess inventory due to Tommy's worsening financial state.

69.    Once Tommy's reported its SOT status to MBI, Defendant Springer informed Tommy's that it would not enter into any new dealership agreements with Tommy's—meaning virtually no dealership agreements existed anymore between the parties.  Indeed, nearly all of the prior dealership agreements for Tommy's 15 dealerships had already expired as of June 30, 2023.  Springer himself made clear that he fully understood the implications of Tommy's dire financial

situation on MBI's business.  Indeed, on September 11, 2023, Springer sent an email directly to Borisch, which stated: ***"Tommy's is SOT, which is one of the worst situations that can arise. Until Tommy's is in good standing with M&T, no dealer agreement can or will be signed."***

70.     As Springer was well aware, the fact that Tommy's was on the brink of financial collapse was extraordinarily material information.  Tommy's was MBI's single most important dealer—a dealer so important that in its own SEC filings, the Company itself acknowledged how important and material Tommy's was to its business, as it was one of only two dealers that MBI specifically mentioned by name.  Indeed, on August 29, 2023, MBI filed its FY 2023 Form 10-K, which explicitly disclosed that "[s]ales to our dealers under common control of Tommy's Boats represented approximately 10.7%, 9.4% and 7.3% of our consolidated net sales in the fiscal years ended June 30, 2023, 2022 and 2021 respectively, including approximately 23.3% . . . of consolidated sales in fiscal year 2023 for Malibu[.]"  Despite the fact that Defendants knew full well that Tommy's was quickly hurtling towards insolvency as a result of Defendants' channel stuffing scheme, Defendants did not breathe a word of this material information to investors.

71.     Notwithstanding Defendants' direct knowledge of Tommy's precarious financial condition, between July 2023 and March 2024, Defendant Springer sought to continue to exploit MBI's leverage over Tommy's, pushing Tommy's into purchasing ***an additional 131 boats***, notwithstanding the lack of any dealership agreements being in place.

### G.     Defendants Did Not Breathe A Word To Investors About Tommy's Financial Distress Due To Its Excess Inventory, But Instead Continued To Proclaim The Exact Opposite: That Consumer Demand Continued And That They Were Ensuring Dealer Health By Controlling Dealer Inventory Levels

72.     Even after Tommy's reported its SOT status to MBI, Defendants did not breathe a word of Tommy's financial distress to investors, nor that they had refused to enter any new dealer agreements with Tommy's as a result—despite the fact that Tommy's was MBI's second largest

and most important dealer, and the largest dealer of the Company's flagship Malibu Brand boats in particular.  Instead, Defendants not only wholly concealed these facts from investors, but continued to tout the Company's purportedly strong organic retail demand from wealthy "premium" buyers.  Defendants further repeatedly insisted, in response to growing market concerns about too high inventory levels across the marine industry as retail demand continued to worsen, that they were "laser-focused" on "matching" dealer inventory precisely to retail demand in order to "protect our dealers and make sure they stay healthy."

73.    For example, on August 29, 2023—at the same time Tommy's was spiraling into serious financial distress due to its excess inventory levels—MBI announced 4Q and full FY 2023 financial results, which had again exceeded MBI's guidance and the market's expectations. Notwithstanding ongoing market concern about waning retail demand in the marine industry, MBI again reported record breaking financial results for fiscal year 2023, including net sales increasing 14% to a record $1.38 billion, strong gross margins at 25%, and Adjusted EBITDA growing 15% to a record $284 million.

74.    During MBI's earnings call the same day, Defendants acknowledged for the first time that there was "weakening demand" which had "resulted in a softer fourth quarter from a retail perspective"—but strongly reassured investors that MBI was in no way shipping excess inventory to its dealers.  Indeed, to the contrary, Defendant Springer stated that MBI had "***made great strides to match wholesale production to retail demand, which we believe is important and responsible for our investors and our dealers***."  Defendants further emphasized that they had taken several steps to ensure dealer health, including that they had "***t[aken] production down in our freshwater brands [i.e., Malibu] to match where channel inventories were***," that they "***continue[d] to monitor retail sales and channel inventories closely***," that they were "***prepared***

*to make adjustments quickly*[,]" and were "*very focused on matching our supply with the retail demand environment*."

75.    Springer further blamed the more challenging market on factors entirely extraneous to MBI's control—specifically, excessive dealer "caution" in taking on new inventory due to "rising interest rates" and "weather-driven order delays"—and reassured investors that, "despite the slow start to the selling season, *we have continued to gain share across the board in all of our brands[,]*" especially in the Malibu Segment.  Springer proclaimed that "*we have been able to confirm [that] the retail customer is still there and willing to purchase*" MBI's products. During the same call, Defendant Black similarly reiterated "*[o]ur premium boats continue to be highly sought after by consumers*[.]"

76.    Then, on September 21, 2023—approximately three weeks after Tommy's had directly informed MBI that it was in serious financial distress and SOT due to its excess inventory levels—MBI participated in the D.A. Davidson Diversified Industrials & Services Conference, attended by Defendants Springer and Black.  During that conference, Springer once again claimed that, while gloomy macroeconomic conditions were impacting retail demand for less expensive, entry-level boat manufacturers, retail demand among MBI's affluent premium boat buyers remained strong.  Specifically, when asked to "talk about trends you're seeing from your end consumer[,]" Springer asserted that Malibu Brand consumers were "very high net income wage earner[s]" that were "very consistent" and "continue [to] buy boats."  Springer claimed that, unlike lower net worth customers who purchased on credit, and thus were deterred by high interest rates, MBI's customers were indifferent to interest rates, as they were able to "writ[e] a check for the entirety of the boat[.]"

77.     Significantly, Springer also reassured investors that he had seen improvement in the health of dealer inventories—that dealers were purportedly "***moving those boats, are taking the actions they need to, to move the product***"—and again strongly asserted that MBI was "***very focused on trying to read and understand what's happening at the retail level and then matching our supply to that.***"  Springer further asserted, in direct response to an analyst question about how MBI felt about its "current dealer network," that MBI's dealer network was "***very good, especially on the Malibu and Cobalt side***"—making no mention at all of Tommy's SOT default only weeks prior or of MBI's resulting refusal to enter any new dealership agreements with Tommy's.

78.     On October 31, 2023, MBI announced financial results for the first quarter of fiscal 2024 and held an earnings call with investors the same day.  MBI once again exceeded the guidance it had provided in August, however, the Company now reported declines across all of its key financial metrics because "over the last several months, the retail market notably deteriorated[.]"  Defendant Springer strongly assured investors, however, that the Company had "***worked diligently to match wholesale supply to retail demand by quickly aligning production levels throughout the quarter***"—and claimed that the Company's "diligent" efforts in this regard was what "account[ed] for the decrease versus last year."   Springer further proclaimed that the "silver lining [] across all of our brands" was that "***[t]hose customers that are looking to buy are continuing to gravitate toward larger, more feature-rich boats, supporting higher [average sale prices]***"—such that "***[m]arket share [across] all of our brands continues to be a very positive story.***"

79.     With dealers continuing to report too high inventory levels industry-wide, Springer also went out of his way to strongly emphasize the Company's unique ability to "successfully match[] production to retail demand" in order to "protect our dealers and make sure they stay

healthy"—calling it MBI's "key differentiator," which gave it a competitive advantage over other boat manufacturers:

> ***An important element to our playbook is successfully matching production to retail demand***, not only to protect our margins, ***but also to protect our dealers and make sure they stay healthy. Malibu's ability to remain agile and flexible has always been and continues to be a key differentiator for Malibu.***

80.     Springer further emphasized that the Company's "nimbleness" in matching retail demand to wholesale supply had in fact successfully "helped our dealers to have healthy inventories," and had "enabled them" to sell off their leftover 2023 supply:

> While channel inventories including saltwater normalized much faster than anyone anticipated, ***our nimbleness to slow down our build schedule has helped our dealers to have healthy inventories, enabling them to sell through mid-year 2023 inventory more quickly. We are certainly laser-focused on inventory levels*** and believe most marine OEMs are as well, which will ultimately lead to a quicker recovery once demand increases.

81.     Significantly, in making these statements, Defendants again made no mention whatsoever of Tommy's significant default only weeks prior due to Defendants' "pumping it full of boats," nor that MBI had refused to enter any new dealership agreements with Tommy's as a result of its dire financial condition. Even when asked directly about the health of MBI's dealer network due to excess inventory levels, Defendant Springer flatly responded that MBI had no concerns in that regard at all:

> Craig R. Kennison, Robert W. Baird & Co. Incorporated, Research Division: ***I wanted to ask about your dealer network and the health of that network, given carrying excess inventory maybe and facing higher interest expense. Any concerns about your network or the broader marine dealer network?***
>
> Jack D. Springer, CEO & Director: ***Largely, no***, Craig. I mean, you always have some that you watch a little bit more closely. We're very in tune with Wells Fargo and what they're seeing. And the early warning systems that are in place, that did not exist in 2008 and 2009. ***So we feel pretty confident. We're actually looking to expand our dealer networks, and we're working on that today***[.]

### H.    The Truth Begins To Emerge

82.    On January 30, 2024—only three months after Defendants had repeatedly touted consumer demand for Malibu Segment boats and the Company's "laser-focus[]" on ensuring dealer health and proper inventory levels—the truth began to emerge.  MBI released financial results that were disastrous—consolidated net sales had decreased 37.7% to $211 million, unit volume had decreased 43.7% to 1,373 units, net income had decreased 72% to $10 million, and Adjusted EBITDA had decreased 60% to $23 million.  Malibu Segment sales were especially poor, having declined 51.7% versus the same quarter a year earlier to just $76.4 million—a far larger decline than MBI's other segments, which was especially striking given Defendants' repeated reassurances that the Malibu Segment's "premium buyers" were unimpacted by economic trends and would continue to carry MBI's sales through a downturn.

83.    Strikingly, MBI also dramatically lowered its full FY 2024 guidance.  Specifically, while three months earlier MBI had forecasted for FY 2024 a "net sales decline percentage in the high teens to low twenties year-over-year and Adjusted EBITDA margin down 350-450 basis points year-over-year," MBI now gave guidance that nearly doubled those declines, forecasting a "net sales decline ranging from the mid-to-high thirties percentage, year-over-year, and Adjusted EBITDA margin down 800 to 900 basis points, year-over year."

84.    Significantly, during MBI's earnings conference call the same day, in stark contrast to Defendants' assurances as recently as three months earlier of being "laser-focused on inventory levels" and perfectly "matching" them to retail demand, Defendant Springer now admitted that "***channel inventories [were] higher than we, or our dealers would like to see***"—and, specifically, that MBI dealers had "***around 5 weeks too much on hand inventory***," requiring MBI to "take an aggressive approach" to lower production levels.  Indeed, when an analyst asked why the "implied EBITDA margin" was lower than it had been in over a decade and what was the reason for the

"magnitude of the change," Springer admitted that MBI had been forced to "significantly" reduce its production due to too high inventory levels.

85.    On this news, MBI's stock price fell nearly 20% in a single day—or $9.47 per share—on unusually high volume, from a close of $51.03 per share on January 29, 2024, to a close of $41.56 per share on January 30, 2024.

86.    Analysts expressed surprise at the Company dramatically reducing guidance in light of its recent reassuring statements only one and two quarters earlier.  Truist lowered its price target to $52 per share (from $62) "following today's FY2Q print/'24 guidance cut" noting that "the combination of elevated MY23 inventory, increased dealer hesitation and MBUU's own efforts to reset stocking levels before MY25/FY25 were the primary drivers" of the guidance cut. Highlighting "the heavier production cuts in [MBI's] most profitable business (Malibu/Axis), it will be contending with a larger mix headwind" than expected.  Truist emphasized that "***we are not attempting to sugarcoat what was a disappointing 2Q/FY24 guidance revision***," which it found "***all the more surprising*** . . . given MBUU's storied track record of setting appropriate/achievable guidance," and explained that "we also believe ***shares will be in the penalty box until there is a clearer view that revenue/margins can begin to recover***[.]"

87.    Baird lowered its price target to $50 per share (from $54) because MBI had "***slashed F2024 guidance as dealers choke on inventory***."  Calling the guidance cut "***deeper than we expected***," Baird emphasized that "***[d]ealers have too much inventory***" and that "***[b]y management estimates, dealers have five weeks of inventory more than needed.***"  Particularly noteworthy, according to Baird, was the 52% net sales decline in the Malibu Segment brands. Raymond James reduced its price target to $46 (from $59), emphasizing that "retail demand

remains soft," and noting that MBI's guidance was "cut sharply…*[c]iting elevated field inventory levels and efforts to match wholesale production with retail demand.*"

88.     However, Defendants also assured investors that the Company's slowdown was temporary and solely due to market forces, that the Company's "premium" brands were well positioned to succeed even in a weaker boat market, and that the Company remained tightly focused on setting appropriate inventory levels.  For example, during the same January 30, 2024 earnings call, Defendant Springer explained that the Company was "*recalibrating to match wholesale production to retail demand*," was "*very, very committed to reducing channel inventory to lower levels*," and further *characterized its approach to inventory levels as* "*conservative*."  And in direct response to analyst questions about inventory levels, Springer asserted that MBI was "*being very responsible with channel inventories and that's what we're hearing [from] our dealers*."

89.     Springer also touted "positive signs following our year-end sales" with "Malibu Axis performing better than we had expected," and with "[a]ll brands [] at the higher end of sales compared to the previous 5 years" at the recent New York boat show.  Indeed, Springer continued to claim that MBI was seeing strong demand in the "premium segment," *i.e.*, from buyers who were financially well off and thus able to pay cash and unaffected by interest rates—explaining that "*[o]ur customer segment that has remained strong [is] the premium segment, cash buyers who are looking for the larger, [feature] rich premium boat*."

90.     Based on Defendants' statements, analysts believed that the worst was over.  Baird noted that, based on management's reassurances, "*investors perceive 'the last cut' to guidance is in place for this cycle*."  Raymond James noted that management had "significantly reduced its FY24 guidance *to a level that it characterized as 'conservative*,'" and ultimately reaffirmed its

"view that **the company remains well-positioned in the U.S. marine industry and poised for meaningful growth and margin expansion despite short-term demand softness and dealer caution**." Truist similarly noted that it "continue[d] to recommend the name to longer-term oriented investors."

91.     However, unbeknownst to investors, Defendants were rapidly reaching the limits of their channel stuffing scheme, and Defendant Springer knew it.  Indeed, in multiple federal district and bankruptcy court filings verified and sworn under penalty of perjury by Borisch himself, three key MBI stakeholders personally told Borisch in early 2024 that they were well aware that Springer was "**intentionally pumping Tommy's full of inventory**" in order to artificially inflate MBI sales and market share, that Springer "**would not turn the spigot off**" in spite of his full awareness of inventories being far too high, and that Springer was "not going to last" at the Company as a result.  Specifically, according to the verified Tommy's complaint (and as further described in a sworn Borisch declaration filed in bankruptcy court), while attending the Miami Boat Show in mid-February 2024, "Mr. Borisch was pulled aside by three Malibu stakeholders to discuss Tommy's Dealership Agreements with Malibu."  During that conversation:

> The stakeholders disclosed to Mr. Borisch their understanding of what Malibu and its CEO, Jack Springer, had done to [Tommy's] (i.e. '**intentionally pumping Tommy's full of inventory' in order to artificially inflate Malibu sales and market share when 'most manufacturers are 70% too heavy on inventory and he knows that**').  They also reported that '**Jack would not turn the spigot off**' (*i.e.*, meaning he would not cut back on manufacturing) despite what the market was showing.  They told Mr. Borisch that Wayne [Wilson], the former CFO, left on 'bad terms' and they were 'nervous.'  They also asked [Tommy's] to '**hold on' as 'Jack is not going to last.'**

92.     Indeed, the very next week, on February 20, 2024, MBI stunned the market by abruptly announcing that Defendant Springer was stepping down as CEO of the Company. Specifically, on February 20, 2024, before market open, MBI suddenly and unexpectedly issued a press release (which it also filed with the SEC on Form 8-K) announcing that its longtime CEO,

Defendant Springer, would resign.  On this news, MBI's stock price fell $4.33 per share—or 9%—on unusually high volume, from a close of $47.48 per share on February 16, 2024 (the previous trading day) to close at $43.15 per share on February 20, 2024.

93.    Analysts expressed shock at Springer's sudden and unexpected resignation, and tied it directly to MBI's inventory and sales troubles.  Raymond James noted that "*[t]his announcement is a surprise to us—and we suspect to the investment community as well*—as we had just met with Mr. Springer and CFO Bruce Beckman (who recently joined MBUU in November after the departure of CFO Wayne Wilson last May) at the Miami International Boat Show last week."  Raymond James further noted that the decision appeared to be connected to the fact that "*the company…has struggled recently amid soft demand and excess channel inventory, resulting in a sharp reduction in FY24 guidance in late January*," and expressed concern that "there doesn't seem to have been any meaningful succession in place."

94.    Nonetheless, in the same press release announcing Defendant Springer's resignation, MBI also sought to reassure the market by reaffirming the FY 2024 guidance it had given in January 2024.

### I.    The Truth Is Revealed

95.    By late February 2024, Tommy's could no longer manage the ongoing financial burden of its bloated inventories, and MBI could thus no longer benefit from Defendants' scheme.  Accordingly, on February 26, 2024, Defendant Springer notified Tommy's that MBI would not enter into dealership agreements with Tommy's for FY 2024.  The next day, on February 27, 2024, Tommy's was forced into default on its financing agreement with M&T Bank—owing amounts in excess of $110 million from its coerced purchases of excess Malibu Segment inventory.

96.    Notwithstanding these developments, even as late as March 5, 2024, Defendant Springer emphasized how closely MBI was supposedly monitoring its dealer network, without

making any mention of the fact that Tommy's, its second largest dealer and largest Malibu Segment dealer, no longer had dealership agreements in place or credit available to purchase MBI boats. Specifically, at a Raymond James investor conference that day, Defendant Springer emphasized that "[w]e're talking about dealers that may be stressed or somewhat, but at the same time *we're following that. We want to know what the dealer health is and we actually have a report card on that*."

97.     Nonetheless, with Tommy's lacking the ability to purchase any more MBI boats, Defendants finally conclusively terminated their relationship with Tommy's.  Specifically, on March 22, 2024, Defendant Springer wrote a letter to Mr. Borisch in which Springer explained that, since M&T Bank was no longer advancing payments, MBI refused to build or ship any further boats to Tommy's.  Defendant Springer also permanently terminated MBI's and Tommy's lengthy and lucrative partnership, stating that, "[g]iven the impact on retail customers, the inability to cure the outstanding defaults with M&T, the lack of current and future floorplan financing, and the lack of other viable options moving forward, this letter is to confirm that Malibu does not anticipate entering into dealership agreements with any of the Tommy's Dealerships for the remainder of model year 2024, model year 2025, and beyond."

98.     Strikingly, even after MBI's relationship with Tommy's was entirely terminated, Defendants still did not voluntarily disclose to investors that MBI had lost Tommy's.  Instead, it was Tommy's who forced the truth to be disclosed.  Specifically, on April 10, 2024, Tommy's filed its Complaint against MBI and its subsidiaries in the United States District Court for the Eastern District of Tennessee alleging that MBI "breached its obligations under dealership agreements with Tommy's Boats, quantum meruit, unjust enrichment, promissory estoppel and intentional and negligent misrepresentations relating to the parties' commercial relationship."  Significantly, the

Tommy's complaint alleged that MBI had "***engaged in an elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen (15) Tommy's dealerships … in order to artificially inflate Malibu's sales performance, artificially claim increased market share in the industry and artificially inflate its stock value*** during an obvious and known downturn in the recreational power boat industry." It further revealed that Defendant Springer had directly enacted and overseen the scheme—and that Springer's abrupt departure was likely directly linked to his involvement in the scheme.

99.     The Tommy's complaint finally forced Defendants' hand; thus, the following day, on April 11, 2024 after market close, MBI filed a Form 8-K with the SEC revealing that Tommy's had filed its lawsuit. The Form 8-K further revealed, for the first time, that the Company had not only terminated its relationship with Tommy's—the largest dealer of its Malibu Segment brands, accounting for more than 20% of those sales the prior fiscal year—but admitted that it needed to find, and was actively seeking, replacement dealers in order to avoid what it called "marketplace disruption." Specifically, the Form 8-K explained that "[t]he Company does not currently have dealership agreements in effect with Tommy's Boats," and that "[t]he Company is actively engaged with its dealer network to mitigate any marketplace disruption and to provide a strong dealer partner in each of the Company's markets served by Tommy's Boats."

100.     On this news, the Company's stock price fell $3.34, or 8%, from a close of $41.82 per share on April 11, 2024 to close at $38.48 per share on April 12, 2024, on unusually heavy trading volume.

101.     Analysts expressed shock at Tommy's allegations, and noted that they revealed even bigger inventory and sales problems for MBI than previously disclosed. Raymond James issued a report before market open on April 12 summarizing that the Tommy's complaint had

alleged that MBI and Springer had enacted "a scheme to artificially inflate [Malibu's] financial results, market share, and stock price by excessively shipping higher priced, higher margin, and slower moving Malibu boats at a time when demand was slowing; refusing to pay millions of dollars in earned dealer incentives; and failing to put into place an inventory repurchase agreement with Tommy's floor plan lender, M&T Bank."  The Raymond James report noted that, given that MBI had "end[ed] its relationship with Tommy's after 12 years," MBI faced the problem that "***the inventory owned by Tommy's needs to find a home with other dealers***."

102.    The following trading day, on April 15, 2024, before market open, Raymond James issued a more detailed report titled "Downgrading to Market Perform, as Headwinds and Uncertainties Continue to Mount."  Raymond James stated that "this shift to a neutral stance ***is in response to the loss of Tommy's Boats, one of MBUU's largest dealers*** (10.7% of total sales/23.3% of Malibu segment sales in FY23) which last week filed [the Tommy's complaint]." Raymond James emphasized that the lawsuit would "likely remain an overhang on the stock," and that, moreover, regardless of the outcome a "***significant issue in our view is the impact of Tommy's inventory being absorbed into the dealer channel on MBUU's sales and margins, the implications of which we fear could extend into FY25***."

103.    Raymond James further explained that an estimated $110 million of Tommy's inventory of Malibu Segment boats "needs to find a home," and that "how this inventory ultimately gets absorbed into [MBI's] dealer network" was a significant problem for MBI's sales, particularly given that other MBI dealers "***are already looking to reduce inventory given the current soft demand environment and will likely only do so at a steep discount***." As Raymond James explained, MBI would likely "feel the impact" and potentially "share in the loss" as what inventory

could be moved would be sold for pennies on the dollar, and as MBI would likely have to provide costly "discounts and dealer incentives" to get other dealers to sell the boats.

104.    In further reaction to the news regarding Tommy's and the Raymond James downgrade, MBI's common stock price continued to decline sharply, falling another $2.34, or 6%, to close at $36.14 per share on April 15, 2024, on unusually heavy trading volume.

105.    Just two weeks later, on May 2, 2024, MBI released financial results for the third quarter of FY 2024 that again fell short of expectations, causing the Company to slash guidance for the third quarter in a row.  Specifically, the Company's net sales fell 46% from the prior quarter to just $203.4 million—driven largely by a 65% decline in Malibu Segment sales—and Adjusted EBITDA plummeted nearly 70% to just $24.4 million, and Defendants now forecasted that consolidated net sales for FY 2024 would be down more than 40% from the prior year.

106.    During the earnings call that day, the impact of Defendants' scheme to stuff Tommy's with inventory became clearer, as Defendant Springer was forced to acknowledge that MBI's sales channels were now clogged with excess inventory in the wake of Tommy's collapse, and that said inventory was not in fact "matched" to retail demand.  Specifically, Defendant Springer blamed a "weakened retail environment characterized by lingering uncertainty and softened retail demand," for the poor results, and emphasized that ***dealer inventories had "remained stubbornly high***, making dealers reluctant to bring on additional inventory."  As a result, MBI needed to "***focus on channel inventory reductions through the remainder of fiscal year '24***," by ***reducing boat production "even further to reach our goals of continuing to optimize the channel inventory***," as well as by providing significant discounts and rebates to induce sales (i.e., being "***aggressive on promotions and also conservative on production***").

107.    On this news, MBI's stock price fell another 4%—or $1.27 per share—on unusually high volume, from a close of $33.06 per share on May 1, 2024, to a close of $31.79 per share on May 2, 2024.

108.    Analysts excoriated the Company for again having to lower its guidance after giving the impression that they had already disclosed the worst, and directly linked the problems to the fallout from the Tommy's situation.  Raymond James, who had downgraded the stock only two weeks earlier, lamented that MBI's "F4Q Guide [Was] Very Weak," and again cut its estimates, noting that "*recent management turnover*" and "*the loss of one of its largest dealers*" were further hanging over the Company.   Raymond James explained that the newly released results and guidance confirmed that Tommy's "*failure [had] result[ed] in even heavier inventories*," while noting that "*with the return of Tommy's inventory back into the channel*…as well as the desire to start FY25 with clean inventory levels, management emphasized its near-term focus on returning to" 2022 levels of inventory.  Raymond James further called the "F4Q implied guide ugly," and lamented that MBI "once again moderated its FY24 guidance," as it "now anticipates a net sales decline of 40-41% y/y vs. the mid-to-high 30% range prior."

109.    Baird noted that MBI had again "*lowered F2024 guidance to address weak demand and elevated inventory*," and stated that its "[b]ig picture" was that the "*MBI story has unraveled as macro headwinds hit hard and lawsuits [and] leadership changes… tank investor confidence*."  KeyBanc similarly cited MBI's guidance reduction, and noted "this year's pullback" combined with "sentiment overhangs (e.g., Tommy's)."  And a Davidson report again lowered its price target (to $36 from $44 per share), noting that "*MBUU shares traded lower after delivering a 3Q24 earnings surprise and cutting their FY24 sales and EBITDA guidance for the third consecutive quarter*," and highlighting in particular that the Malibu Segment had seen a "[l]arge

[s]lowdown in 3Q24 [u]nit [s]ales" (a 65% decrease to just $60.2 million for the quarter, versus the same quarter in the prior year) which was driven by "lower wholesale shipments driven by lower retail activity during the period and *elevated dealer channel inventory levels*."

**J.    Post-Class Period Developments Confirm Defendants' Fraudulent Scheme**

110.    Following the end of the Class Period, unsold inventory from Tommy's—for which there was never sufficient demand—continued to clog MBI's sales channels, further weighing on sales and selling prices.  On May 20, 2024, Tommy's various dealership entities jointly filed for bankruptcy in the U.S. Bankruptcy Court for the Northern District of Texas.

111.    On July 25, 2024, the investment firm Gordon Brothers issued a press release revealing that it had been retained to sell more than *$100 million in unsold inventory* from Tommy's stock, primarily made up of Malibu Segment boats.  Gordon Brothers' press release announced extreme discounts: "up to 35% off the manufacturer's suggested retail price" and touted that "*everything must go*."

112.    On August 29, 2024, MBI filed its Annual Report for the Fiscal Year Ended June 30, 2024 with the SEC on Form 10-K (the "FY 2024 10-K").  The FY 2024 10-K further confirmed that MBI's plummeting sales had been a direct result of the market being flooded with the same inventory that MBI had unreasonably pumped into Tommy's.  For example, the FY 2024 10-K confirmed that the Tommy's bankruptcy trustee had retained Gordon Brothers to "sell the remaining inventory [of Malibu Segment boats held by Tommy's] as part of liquidation sales that are ongoing."  The FY 2024 10-K further revealed that Tommy's had been in the process of liquidating that inventory since it filed for bankruptcy, and that, as of August 29, 2024, there still remained roughly 280 unsold model year 2023 and 2024 Malibu Segment boats in Tommy's inventory—easily $50-$80 million worth of unsold inventory based on the typical retail prices of those boats.  The FY 2024 10-K also emphasized that the unsold inventory was putting downward

pressure on MBI's sales and profit, warning that "*[i]f the boats previously held by Tommy's Boats are sold at prices significantly below market value or in a manner that creates excess supply in a short period of time, it could have an adverse impact on our brands and create a downward pressure on our selling prices*."

113.    Similarly, during the Company's August 29, 2024 earnings call, MBI's CFO, Defendant Beckman, acknowledged that, due to the glut of inventory now clogging MBI's dealers, "*the headwinds will continue for a while longer*," such that sales would fall from their already low levels again in FY 2025.  The same day, Truist issued an analyst report reaffirming that "headwinds (production & discounting) to persist through much of FY25 as the remainder of the [Tommy's] inventory (est. 280 units vs. 500+ in April) is diverted and liquidated across [MBI's] active dealer base."

### K.    Defendants Were Motivated To Inflate Revenues In Order To Earn Lavish Incentive Bonuses

114.    Significantly, Defendants were motivated to perpetrate their channel stuffing scheme so that the Company could meet revenue targets that were a prerequisite for them to earn maximum bonus compensation.  Indeed, under MBI's compensation policy, Defendant Springer in particular was eligible for substantial cash bonuses equal to or greater than his *entire salary* if MBI met certain specified targets for net income and Adjusted EBITDA.[7]

115.    Specifically, for FY 2023, Springer's base salary was set at $875,000.  However, if the Company met or exceeded a net income threshold of $179.8 million and an Adjusted EBITDA threshold of $275.7 million for the year, Springer would be eligible for an additional cash bonus

---

[7] Defendants Wilson, Black, and Beckman potentially would have been eligible to benefit from the scheme in a similar manner, but the timing of their employment ultimately did not allow for it. Specifically, Defendant Wilson left the Company before the end of FY 2023, Defendant Black only served as CFO for a small part of FY 2023, and Defendant Beckman was only CFO during part of FY 2024.

equal to his base salary, ***thus doubling his compensation to $1.75 million***.  And by exceeding that target, Springer would be eligible to receive an even larger bonus.

116.    Moreover, although the compensation plan provided for lower bonus levels if MBI did not reach the specified net income and Adjusted EBITDA, those levels were a fraction of the amount that Springer would receive if the Company met or exceeded those targets.  Indeed, if MBI achieved anything less than 90% of the specified net income and Adjusted EBITDA targets, ***Springer would not be eligible for a cash bonus at all***.  And even if the Company's financial results fell somewhere between 90% and 100% of the targets, ***Springer stood to lose over half a million dollars***.  Indeed, at 90% of the targets, Springer would be awarded just 35% of his maximum bonus amount—$306,250—instead of the full $875,000 award to which Springer would be entitled if MBI reached 100% of the specified targets.  Thus, Springer was highly motivated to ensure that MBI booked enough sales during the Class Period in order to meet or exceed the full amount of the compensation plan's specified targets.

117.    Strikingly, in FY 2023—the year during which Springer's inventory scheme was at its peak—MBI achieved net income (excluding litigation expense) of $184.2 million, ***exceeding the target of $179.8 million by just $4.4 million, or a mere 2%***.  Similarly, MBI achieved Adjusted EBITDA of $284 million, ***a mere 3%, or $8.3 million, above its target of $275.7 million***. Tellingly, Defendants pumped a massive ***$50 million*** in excess inventory into the Tommy's channel ***in May and June 2023 alone***—the final few weeks before the end of FY 2023, and at a time when Defendants assuredly knew exactly how much in sales was necessary for MBI to meet the predetermined net income and Adjusted EBITDA targets necessary to trigger Springer's bonus. These eleventh-hour sales to Tommy's, which caused MBI to slightly exceed its targets, rendered

Springer eligible to receive a *cash bonus of $962,500—more than doubling his total cash compensation to $1.83 million for the year*.

118.    Moreover, given that MBI met the specified financial targets by just a few million dollars, without Defendants' channel-stuffing scheme, MBI would not have achieved anything close to the targets necessary for Springer to obtain any bonus at all.  Accordingly, Defendants had a strong personal financial motive to orchestrate and implement their fraudulent scheme.[8]

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

119.    During the Class Period, Defendants made materially false and misleading misstatements concerning, *inter alia*: (i) the current status of wholesale demand and retail demand for MBI's products; (ii) Defendants' purported efforts to "match" MBI's boat production (i.e., supply) with demand; and (iii) the health of MBI's authorized dealer network.  Defendants' misstatements are set forth in full below, along with a summary of the material facts that Defendants withheld from the public that rendered them materially false and misleading when made.

### A.    The November 4, 2022 Earnings Call

120.    On November 4, 2022, MBI reported financial results for the first quarter of FY 2023.  During the Company's earnings call that day, Defendant Springer repeatedly touted MBI's

---

[8] Subsequent to MBI achieving its targets for FY 2023, MBI's compensation committee determined to reduce Springer's FY 2023 bonus by 50% for an entirely unrelated reason—namely, the $100 million settlement of a product liability lawsuit in June 2023.  While legal expenses were normally excluded from net income for purposes of determining bonuses, the compensation committee opted to include the unusually large settlement expense in its calculation for 2023.  According to the Company's September 15, 2023 Proxy Statement, "[t]he Compensation Committee exercised its discretion to award Mr. Springer and [MBI President and COO Ritchie] Anderson partial bonus payments for fiscal 2023.  Mr. Springer earned an annual bonus for fiscal 2023 equal to 50% of his target bonus amount."  Nonetheless, at the time he enacted his scheme, Springer's actions were designed to ensure MBI just reached its target, and were motivated by his desire to achieve his bonus and double his cash compensation.

"strong" retail demand, specifically stating that "Malibu Boats kicked off fiscal year 2023 with a splash *as our continued momentum was supported by ongoing demand strength in both our fresh and saltwater businesses*." Springer further represented that demand was so strong that "*our customers are gobbling [our boats] up like [a Cajun] deep fried turkey dinner at Thanksgiving*." Springer also touted that "*Malibu and Axis [we]re outperforming on every metric*, supported by the incredible reception of our new model year lineup [and] *demand remains strong*."

121.    During this same earnings call, an analyst asked, in light of "where interest rates are" and "given some of the macro concerns out there," "what's the dealer appetite to carry inventory in the off-season right now?" In response, Defendant Springer stated: "actually, I would say that *across the board and everyone with dealer meetings, there was optimism and almost the demand to get more inventory*."

122.    The statements in paragraphs 120-21 were materially false and misleading and omitted material facts. As Defendants knew full well by this point, demand for MBI's boats *was not* "*strong*," MBI's customers were not "gobbling [boats] up like [a Cajun] deep fried turkey dinner at Thanksgiving," and the Company's dealers were not "demand[ing] to get more inventory." Instead, the opposite was true, as Defendants knew that dealers, including MBI's two largest dealers, OneWater and Tommy's, did not want any additional MBI boats and already had *excessive* inventory. Indeed, OneWater had so much excess inventory that just a few months later, OneWater would cancel a substantial amount of its MBI boat orders for the year. And as revealed in sworn filings in Tommy's litigation against MBI and Tommy's bankruptcy proceedings, Defendants forced Tommy's to take upwards of $100 million worth of boats that Tommy's did not want or need. Defendants also pressured Tommy's into increasing its floor plan financing by *more than a factor of five* in order to purchase excess inventory of high-priced Malibu Brand boats, for

which there was clearly insufficient demand.  Indeed, when Tommy's pushed back, Defendants threatened to revoke Tommy's status as a MBI-authorized dealer.  Further, MBI's channel stuffing scheme was so disconnected from demand that Tommy's would ultimately finish the fiscal year with ***more than 800 unsold Malibu Segment boats—70% of its inventory for the year***.

**B.    The February 7, 2023 Earnings Call**

123.    On February 7, 2023, MBI reported financial results for the second quarter of FY 2023.  During the Company's earnings call that day, Defendant Springer assured investors that MBI would meet or even exceed its guidance for the 2023 fiscal year because retail demand for MBI's products remained "strong," asserting: "***The retail environment remains resilient with strong demand carrying the tide for our premium boats***" and that "***we see no worsening of our expected outlook***."

124.    Further bolstering that claim, during the call, Defendant Springer stated that, while deteriorating macroeconomic conditions were causing demand to decrease for some boat manufacturers, MBI's premium Malibu Brand boat business was unaffected by worsening economic conditions and increasing interest rates:

> It is important to note that while retail demand has disproportionately affected more entry-level aluminum-based lower-length boats, ***our customers remain unfazed. Speaking for MBI brands and for what we are generally seeing at [boat] shows, the premium buyer is looking to purchase and has not really been affected by economic conditions or interest rates***. . . Conversely, we are hearing of weakness in the smaller foot-length segments in entry-level priced boats.  This consumer profile has been impacted the most by inflation and interest rates.  ***Thankfully, that is not our model, and we remain positive on our premium business***.

125.    During this same earnings call, Springer also represented to investors that "[o]ur unit volumes continue to climb" and both wholesale and retail demand for MBI's premium boats remained so strong that "***[m]eeting existing demand and building channel inventories continues to be a primary focus and a major tailwind in the quarters to come***[.]"

126.   Defendant Wilson reported during the same earnings call that MBI's net sales increased 28.4% and unit volumes increased 17.7% during the second quarter, and claimed that the increase in those metrics was "***generated by resilient wholesale demand across all 3 segments***."  Wilson further assured investors that "Malibu is in an enviable position as we continue to capitalize on this resilient demand environment[,]" and also reiterated that "our expectations for fiscal year 2023 remain unchanged[.]"

127.   The statements in paragraphs 123-26 were materially false and misleading and omitted material facts.  As Defendants knew full well, demand was ***not*** "strong" or "resilient," MBI's customers *were* "affected by economic conditions and interest rates," MBI was ***not*** experiencing an ongoing "tailwind" from "meeting channel demand and building channel inventories," and MBI's "outlook" ***was***, in fact, "worsening."  Indeed, as alleged above, beginning no later than July 2022, Defendants plotted to inflate MBI's boat sales by stuffing the Company's sales channel with tens of millions of dollars in excess boat inventory into its most important dealer, Tommy's, which Tommy's did not want or need.  Indeed, as detailed in court filings sworn and verified by Borisch (Tommy's President and owner), by this time, Defendants had artificially inflated wholesale inventories by deliberately pressuring Tommy's to increase its floor plan financing by ***more than a factor of five***, including by withholding financial incentives and threatening to revoke Tommy's status as an MBI authorized dealer and otherwise retaliate if Tommy's refused to take surplus inventory.

128.   Moreover, since January 2023, Defendants had been on notice from MBI's own Marketing Department that MBI's boat registrations were noticeably lower, indicating declining retail demand.  Similarly, by this time, OneWater, MBI's other largest dealer that was responsible for 17% of the Company's sales, had canceled a substantial number of its MBI orders for the year

due to its own assessment that demand for MBI's boats was dramatically weakening. Indeed, demand for MBI's boats was so weak, and dealer inventory was so bloated and disconnected from that demand, that Tommy's would ultimately finish fiscal year 2023 with **_more than 800 unsold Malibu Segment boats—70% of its inventory for the year_**.

### C.    The 3Q 2023 Press Release And Earnings Call

129.    On May 3, 2023, after market close, MBI reported its financial results for the third quarter of FY 2023, including another consecutive quarter of increasing net sales and unit volumes compared to the same quarter prior year. Defendants also raised the Company's FY 2023 guidance, announcing they now expected the Company would achieve net sales growth above 10% year-over-year.

130.    In the Company's press release that day, Defendant Springer claimed that the Company was in the process of "normalizing" inventory—i.e. bringing inventory to normal levels appropriate to meet customer demand, stating: "**_[w]e have made great strides in normalizing our channel inventory_**, particularly within our Malibu and Cobalt segments, **_allowing our dealers to be poised to satisfy customer demand as we enter the prime selling season_**."

131.    During the Company's earnings call held the same day, an analyst asked MBI to explain how it was able to report yet another quarter of increasing sales notwithstanding marine industry sources reporting declining demand. Specifically, the analyst asked: "Can you help us square your shipments for the quarter with the soft SSI data we've seen so far? And how do you feel about dealer inventory across your different brands?" Defendant Springer responded by claiming that MBI's sales to its dealers had remained strong because inventory at those dealers was still too low, such that the Company had "to put more inventory into the channel[:]"

> I think you have to take a step back. You have to understand where we're coming out of. You have a retail environment that has been very low on inventory. And it's a real easy arithmetic equation in terms of -- you know that **_your inventories_**

*are down.  You have to build that retail inventory out by shipping wholesale*. . . . *[T]he wholesale retail squaring has to do with the channel inventory.  We have to put more inventory in the channel to realize the retail that we want to*.

132.    Similarly, regarding current dealer inventory levels for the Company's flagship Malibu Segment boats, Defendant Springer replied that inventory was at exactly the right level to meet demand—*i.e.*: "*Malibu is right where it needs to be in terms of what the historical norms have been in the channel*."  And in response to an analyst question about whether MBI saw any "slowdown in retail," Defendant Springer responded, "I wouldn't say we saw a slowdown in the quarter," and instead claimed that the Company had merely "seen [] a delay in the season kicking off because of the cool weather and because of the precipitation."

133.    The statements in paragraphs 130-32 were materially false and misleading and omitted material facts.  Specifically, by May 2023, Defendants knew that MBI *did not* need to "put more inventory in the channel to realize the retail that we want to," that Malibu Segment inventory *was not* "right where it needs to be," that dealer inventory *was not* "poised to satisfy customer demand," and that demand for MBI boats *was* seeing a "slowdown."  Instead, the exact opposite was true: as alleged further above, beginning no later than July 2022, Defendants plotted to inflate MBI's boat sales by stuffing the Company's sales channel with tens of millions of dollars in excess boat inventory into its most important dealer, Tommy's, which Tommy's did not want or need.  Indeed, as detailed in court filings sworn and verified by Borisch (Tommy's President and owner), by this time, Defendants had artificially inflated wholesale inventories by deliberately pressuring Tommy's to increase its floor plan financing by *more than a factor of five*, including by withholding financial incentives and threatening to revoke Tommy's status as an MBI authorized dealer and otherwise retaliate if Tommy's refused to comply.

134.    Further, by May 2023, as Defendants were fully aware and in furtherance of Defendants' scheme, Tommys' had already expanded and then maxed out its $85 million credit

facility with Fifth Third Bank and was negotiating with M&T Bank to refinance Tommy's credit line to expand it even further. And in May and June 2023 alone—as averred in Tommy's and Borisch's sworn court filings—Defendants knowingly forced Tommy's to take on an additional $50 million of excess inventory, which Tommy's did not need or want. MBI's channel stuffing scheme was so disconnected from demand that by June 2023, Tommy's still had ***more than 800 unsold Malibu Segment boats—70% of its inventory for the year***.

135.    Moreover, by early 2023, Defendants had been on notice from MBI's own Marketing Department that MBI's boat registrations were noticeably lower, indicating declining retail demand. Similarly, by this time, OneWater, MBI's other largest dealer that was responsible for 17% of the Company's sales, had canceled a substantial number of its MBI orders for the year due to its own assessment that demand for MBI's boats was dramatically weakening.

**D.    The June 6, 2023 Baird Global Consumer, Technology & Services Conference**

136.    On June 6, 2023, Defendants Springer and Black attended the Baird Global Consumer, Technology & Services Conference on behalf of the Company.

137.    During that investor conference, the Baird analyst noted that "[e]veryone knows you want to be careful on inventory and it's your job to manage the right amount of inventory in the channel," and asked Defendants Springer and Black "[w]hat can you tell us about that inventory today in light of the retail expectation that you have?" Defendant Black responded first, claiming that "we feel, from a freshwater perspective, that that inventory level is probably pretty close to ***normalized***," i.e., at appropriate levels warranted by demand. Defendant Springer further responded by expressly stating that MBI was carefully monitoring dealer inventory based on extensive data, and that, as such, "***we know how much weeks on-hand of inventory that our dealers should have***. [. . .] ***we know what the right level of inventory on-hand should be. And so***

*that's something that I think that not only us but most marine companies have gotten very good at managing*."

138.    During the same conference, the Baird analyst also asked: "how do you think interest rates have impacted your end consumer and also your dealer who's trying to finance all of this?"  In response, Defendant Black once again reiterated Defendants' mantra that retail demand from MBI's affluent premium boat buyers had not been negatively impacted, stating: "So on the consumer side, I think it's important to keep in mind the demographic.  So 50% of our customers are coming in and stroking a check when they purchase a boat.  So *we haven't seen a meaningful impact at this point from the consumer side of things*."

139.    The statements in paragraphs 137-38 were materially false and misleading and omitted material facts.  Specifically, by June 2023, Defendants knew that it was not the case that dealer inventories were "pretty close to normalized" or that Defendants had "gotten very good at managing" "the right level of inventory on-hand," and MBI had in fact "seen a meaningful impact" from rising interest rates.  Instead, as alleged further above, beginning no later than July 2022, Defendants plotted to inflate MBI's boat sales by stuffing the Company's sales channel with tens of millions of dollars in excess boat inventory into its most important dealer, Tommy's, which Tommy's did not want or need.  Indeed, as detailed in court filings sworn and verified by Borisch (Tommy's President and owner), by this time, Defendants had artificially inflated wholesale inventories by deliberately pressuring Tommy's to increase its floor plan financing by *more than a factor of five*, including by withholding financial incentives and threatening to revoke Tommy's status as an MBI authorized dealer and otherwise retaliate if Tommy's refused to take surplus inventory.

140.    Further, by June 2023, as Defendants were fully aware and in furtherance of Defendants' scheme, Tommy's had already expanded and then maxed out its $85 million credit facility with Fifth Third Bank and refinanced its credit line with M&T Bank, expanding it even further to a total of $130 million.  And, in May and June 2023, alone, Defendants knowingly forced Tommy's to take on an additional $50 million of excess inventory, which Tommy's did not need or want.  As a result, as of June 2023, Tommy's still had a staggering ***800*** high-priced, slow-selling Malibu Segment boats remaining in its inventory—a fact well known to Defendants given that they had real time access to Tommy's retail sales and inventory levels and received updates on those metrics on a weekly basis.

141.    Moreover, by early 2023, Defendants were on notice from MBI's own Marketing Department that MBI's boat registrations were noticeably lower, indicating declining retail demand.  Similarly, by this time, OneWater, MBI's other largest dealer that was responsible for 17% of the Company's sales, had canceled a substantial number of its MBI orders for the year due to its own assessment that demand for MBI's boats was dramatically weakening.

### E.    The FY 2023 Form 10-K

142.    On August 29, 2023, the Company filed its Form 10-K for FY 2023, in which Defendants made their first mention of Tommy's in any of the Company's SEC filings or investor communications.  The FY 2023 10-K touted Tommy's as MBI's largest dealer for the Malibu Segment (and one of only two mentioned by name), and the Company's second largest dealer overall.  The FY 2023 10-K further claimed that MBI had "little control over [its dealers'] activities," and purported to warn that the loss of Tommy's dealers "could" pose a risk to the Company's financial condition.

143.    Specifically, under the header "Our Dealer Network," the FY 2023 10-K stated: "***Sales to our dealers under common control of Tommy's Boats represented approximately***

*10.7%, 9.4% and 7.3% of our consolidated net sales in the fiscal years ended June 30, 2023, 2022 and 2021 respectively, including approximately 23.3% […] of consolidated sales in fiscal year 2023 for Malibu*."  In addition, under the header, "Risks Related To Our Dealers," the FY 2023 10-K stated, in part:

> We depend on our network of independent dealers, face increasing competition for dealers *and have little control over their activities*.  Substantially all of our sales are derived from our network of independent dealers.  Our top ten dealers represented 41.1%, 39.9% and 38.7% of our net sales for fiscal year 2023, 2022 and 2021, respectively.  Sales to our dealers under common control of OneWater Marine, Inc. represented approximately 17.2%, 16.8% and 16.3% of consolidated net sales in fiscal years 2023, 2022 and 2021, respectively.  Sales to our dealers under common control of Tommy's Boats represented approximately 10.7%, 9.4% and 7.3% of our consolidated net sales in the fiscal years ended June 30, 2023, 2022 and 2021 respectively.  *The loss of a significant number of these dealers could have a material adverse effect on our financial condition and results of operations.*

144.    The statements in paragraphs 142-43 were materially false and misleading and omitted material facts.  Specifically, it was misleading to expressly discuss Tommy's as one of its two most important dealers and critical to the Company's business while simultaneously omitting that, by this time, Defendants already knew full well that Tommy's was in dire financial condition and at risk of collapsing due to Defendants' own channel stuffing scheme.  Indeed, according to Borisch's complaint against MBI, due to Defendants' scheme, "Tommy's continued to struggle into and through the summer months of 2023," and "[b]y August 2023, Mr. Borisch's dealerships were in a dire financial position[.]"  Relatedly, rather than having "little control over [Tommy's] activities," Defendants had actively exerted leverage over Tommy's to force it to increase its floor plan financing by more than a factor of five, including by withholding financial incentives and threatening to revoke Tommy's status as an MBI authorized dealer and otherwise retaliate if Tommy's refused to take surplus inventory.  Indeed, in May and June 2023, alone, Defendants used this leverage to force Tommy's to take on an additional $50 million of excess inventory, which the

dealership expressly did not need or want, and subsequently continued to pump additional excess inventory into Tommy's, notwithstanding that Tommy's still had more than 800 unsold Malibu Segment boats at the end of June 2023—70% of its inventory for the year.

145.    Similarly, it was misleading for Defendants to state that the loss of one of the Company's dealers merely "could" have a material effect on MBI's financial condition, when that risk had already materialized given that Tommy's was already failing, and Defendants were already holding off on signing new dealership agreements with Tommy's as a result.  Indeed, according to Borisch's complaint against MBI, "Tommy's continued to struggle into and through the summer months of 2023," and "[b]y August 2023, Mr. Borisch's dealerships were in a dire financial position[.]"  And by August 29, 2023—the date of the Form 10-K—Tommy's was already SOT with its floor plan financing lender, M&T Bank.  Tommy's financial condition was so dire that Defendant Springer himself admitted in an email less than two weeks later that Tommy's found itself in "***one of the worst situations that can arise***" and that "***[u]ntil Tommy's is in good enough standing with M&T, no dealer agreement [for FY 2024] can be or will be signed***."

146.    The FY 2023 10-K also represented that, despite downward trends in retail demand, "***given low inventory levels***" MBI "***continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023***."  Specifically, the FY 2023 10-K disclosed:

> Current inventory levels at our Malibu and Cobalt dealers have returned to prepandemic levels and at our Saltwater Fishing dealers are continuing to normalize to pre-pandemic levels.  ***While retail activity at our dealers trended lower during fiscal year 2023, given low inventory levels at the beginning of the fiscal year, we continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023***.[9]

---

[9] The statements in paragraphs 142-43 and 146 were also repeated in the Company's Annual Report for FY 2023 filed with the SEC on Form ARS on September 15, 2023, after market close.

147.    The statements in paragraph 146 were materially false and misleading and omitted material facts.  Specifically, by August 2023, Defendants knew that it was ***not*** the case that MBI "continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023" due to "low inventory levels," but that the opposite was true.  Indeed, organic demand for MBI's products was weak (as evidenced by OneWater's cancellations and MBI's own internal data).  Instead, Defendants inflated MBI's boat sales by stuffing the Company's sales channel with tens of millions of dollars in excess boat inventory into its most important dealer, Tommy's, which Tommy's did not want or need.  Moreover, as of June 2023, Tommy's still had a staggering ***800*** high-priced, slow-selling Malibu Segment boats remaining in its inventory (more than 70% of the year's boats)—a fact well known to Defendants given that they had real time access to Tommy's retail sales and inventory levels and received updates on those metrics on a weekly basis.

### F.    The 4Q and FY 2023 Press Release and Earnings Call

148.    On August 29, 2023, after market close, MBI reported its financial results for the fourth quarter and fiscal year 2023 in a Company press release.  On the same date, MBI also held its earnings call with investors.  In spite of ongoing concern about waning demand in the marine industry, MBI reported record breaking financial results for FY 2023, including net sales increasing 14% to a record $1.388 billion, strong gross margins at 25%, and Adjusted EBITDA growing 15% to a record $284 million, with Adjusted EBITDA margins increasing to 20.5%.

149.    In the Company's press release, Defendant Springer asserted: "We've made great strides to meet demand throughout the fiscal year as we ramped up production through our first three quarters and reached normalized channel inventories faster than anticipated.  Despite the uncertain macro environment, ***we remain confident in our operational prowess to match wholesale and retail demand***[.]"

150.    During MBI's earnings call the same day, Defendant Springer claimed "***[i]n 2023, channel inventories were still too low and production was in full throttle***, building boats to return back to where inventories had historically been."  He also lauded MBI's recording breaking financial results for FY 2023 and attributed those results in large part to MBI's "matching" of dealer inventory to retail demand:

> During the fiscal year, ***we made great strides to match wholesale production to retail demand***, which we believe is important and responsible for our investors and our dealers.  ***The first three quarters of the year saw us matching our production to a deficient channel inventory environment to reach more normalized channel inventory levels***.

151.    Defendant Black likewise assured investors that MBI would continue "***matching wholesale to retail demand as we launch our new model year lineup***," stating:

> While the outlook for fiscal year 2024 present some uncertainties, our unmatched innovation, product quality and team agility position us at the forefront of the marine industry.  Despite this uncertainty, ***we will continue to showcase our best-in-class operational capabilities, matching wholesale to retail demand as we launch our new model year lineup***.

152.    Also during the call, Springer reassured investors that, although "dealers are concerned about the retail environment," he wanted to be "very clear that this is not 2009 when the customer disappeared.  What ***we have been able to confirm is the retail customer is still there and willing to purchase***" MBI's premium products.  Defendant Black likewise claimed "[o]ur premium boats continue to be highly sought after by consumers."

153.    The statements in paragraphs 149-52 were materially false and misleading and omitted material facts.  Specifically, by August 2023, Defendants knew that it was ***not*** the case that "[i]n 2023, channel inventories were still too low," that Defendants had been "matching our production to a deficient channel inventory environment to reach more normalized channel inventory levels," or that customer demand was "still there" for MBI's boats.  Instead, the exact opposite was true: demand for MBI's boats was extremely weak (as evidenced by MBI's own

internal data and OneWater's order cancelations), and inventories were not "normalized," but were far too high due to Defendants' scheme to inflate MBI's boat sales by stuffing the Company's sales channel with tens of millions of dollars in excess boat inventory into its most important dealer, Tommy's, which Tommy's did not want or need.  Moreover, Defendants had artificially inflated wholesale inventories by deliberately pressuring Tommy's—the largest dealer for MBI's largest and most profitable Malibu Segment—to increase its floor plan financing by ***more than a factor of five***, including by withholding financial incentives and threatening to revoke Tommy's status as an MBI authorized dealer and otherwise retaliate if Tommy's refused to take surplus inventory. Consequently, as of June 2023, Tommy's still had a staggering ***800*** Malibu Segment boats remaining in its inventory—a fact well known to Defendants given that they had real time access to Tommy's retail sales and inventory levels and received updates on those metrics on a weekly basis.

154.    Indeed, by the time of this earnings call, Tommy's was already failing, and Defendants were already holding off on signing new dealership agreements with Tommy's as a result.  As alleged in Borisch's complaint against MBI, "Tommy's continued to struggle into and through the summer months of 2023," and "[b]y August 2023, Mr. Borisch's dealerships were in a dire financial position[.]"   And by September 2, 2023, Tommy's had already directly notified Defendants that Tommy's was SOT with its floor plan financing lender, M&T Bank—a situation that was so dire that Defendant Springer himself admitted in a September 11, 2023 email that it was "***one of the worst situations that can arise***" and that "***[u]ntil Tommy's is in good enough standing with M&T, no dealer agreement [for FY 2024] can be or will be signed***."

**G.    The September 21, 2023 D. A. Davidson Diversified Industrials & Services Conference**

155.    On September 21, 2023, Defendants Springer and Black attended the D. A. Davidson Diversified Industrials & Services Conference on behalf of MBI.   During that conference, analysts asked Defendant Springer to "talk about trends you're seeing from your end" regarding demand from "consumer and dealers in this challenging macro environment."   In response, Springer again assured the market that MBI's premium boat buyers were continuing to buy MBI's products, regardless of increasing interest rates.   Specifically, Springer claimed:

> One of the things that we're seeing, if you look at our demographic, **we have with Malibu [Brand]**, Cobalt, and Pursuit, **a very high net income wage earner**.   The demographic shows that the annual compensation [*sic*] is about $500,000 and they are worth well over $1 million a year.   **That consumer continues to be very consistent**.   **They continue to buy boats…**
>
> \*      \*      \*
>
> [W]here you see and I think that across the marine industry, part of what is happening is that people who are buying on the interest rates that are using interest rates have seen that interest rate increase.   And so the 16-foot to 22-foot segment, the smaller aluminum boats, they're probably most stressed, without a doubt.   We don't play in either one of those categories.   **We play in a larger category and also a more premium category**.

156.    Later in the conference, when analysts asked "how is Malibu positioned to navigate these macro headwinds and ultimately deliver results for investors[,]" Defendant Springer once again assured the market that MBI was "**very well positioned**" because "**we are a premium brand, because our customers are very well off and they're buying the product** that they want."

157.    Also during the conference, when a Davidson analyst inquired about the health of MBI's dealers' inventories, Defendant Springer once again assured investors that Defendants were keenly focused on "**retail demand and supply matching**."   Springer also stated: "**we're very focused on trying to read and understand what's happening at the retail level and then matching our supply to that** . . . we have taken back production so that we're matching that retail

environment." And, when asked by an analyst "[h]ow do you feel about your current guide [for FY 2024] and, what might have driven [MBI competitor] Mastercraft to be more cautious than, what you guys were seeing[,]" Springer replied:

> So I do think that from a data point of view and how we analyze the market, *we are, as I said, very focused on the supply retail matching. And so from what we see, what we're hearing from our dealers is that we feel pretty confident in what that's going to be.* Yeah, in terms of – of their guide, one of the things that I will tell you is that, as we got to June 30, they had about five weeks more of inventory on hand in the channel. So they put more inventory out than we did and so I think that's influencing their guide.

158.    Finally, when asked "how do you feel about your current dealer network[,]" Springer replied: "*we have [a] very good dealer network, especially on the Malibu and Cobalt side*."

159.    The statements in paragraphs 155-58 were materially false and misleading and omitted material facts. Specifically, by September 2023, Defendants knew that it was ***not*** the case that MBI was "very well positioned" because its "customers are very well off and they're buying the product," and that MBI was not "matching our supply to [demand]," and had ***not*** "taken back production so that we're matching that retail environment." Instead, the opposite was true—in reaction to clear indications of weakening demand, Defendants had schemed to artificially inflate wholesale inventories by pushing over $100 million of excess inventory into Tommy's—the largest dealer for MBI's largest and most profitable Malibu Segment—including $50 million in May and June 2023 alone, even though Tommy's still had 70% of its inventory from the year remaining unsold. As a result of the scheme, according to Borisch's complaint against MBI, "Tommy's continued to struggle into and through the summer months of 2023," and "[b]y August 2023, Mr. Borisch's dealerships were in a dire financial position[.]"

160.    Similarly, it was misleading to tout the Company's "very good dealer network, especially on the Malibu [Segment]…side" when, by no later than September 2, 2023—less than

20 days before the Davidson conference at which Defendants made these statements—Tommy's had already notified Defendants directly of their SOT status with M&T Bank, and moreover, **MBI and Tommy's no longer had dealership agreements in effect for all but one of Tommy's dealerships**, as those agreements had ended June 30, 2023.  In fact, in an email dated September 11, 2023 (a full ten days before the Davidson conference), Defendant Springer acknowledged that "**Tommy's is in SOT, which is one of the worst situations that can arise**" and asserted that "**[u]ntil Tommy's is in good enough standing with M&T, no dealer agreement [for FY 2024] can be or will be signed**."

### H.    The 1Q 2024 Form 10-Q

161.    On October 31, 2023, after market close, MBI reported its financial results for the first quarter of FY 2024.  In its Form 10-Q filed the same day, MBI continued to tout its "**strong wholesale demand throughout the first three quarters of fiscal year 2023**."  MBI also stated that "**channel inventory is normalized**."  Specifically, the Form 10-Q disclosed:

> Current inventory levels have now stabilized to pre-pandemic levels across all of our segments.  While retail activity at our dealers trended lower during fiscal year 2023, given low inventory levels at the beginning of the fiscal year, **we continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023**.  Now, as **channel inventory is normalized**, we believe wholesale demand will be directly dependent on the underlying retail activity for our products into the first half of fiscal year 2024.

162.    The statements in paragraph 161 were materially false and misleading and omitted material facts.  Specifically, by October 2023, Defendants knew that it was **not** the case that MBI "continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023" due to "low inventory levels," or that "channel inventory is normalized," but that the opposite was true.  Indeed, in reaction to clear indications of weakening demand, Defendants had schemed to artificially inflate wholesale inventories by stuffing MBI's sales channel with over

$100 million of excess inventory into Tommy's—the largest dealer for MBI's largest and most profitable Malibu Segment—including $50 million in May and June 2023 alone.

163.    Similarly, it was misleading to claim that, moving forward, "wholesale demand will be directly dependent on the underlying retail activity" because wholesale demand for MBI's products during FY 2024 would ***not*** be dictated by retail demand, but instead would be negatively impacted by Defendants' scheme to overstuff the channel with way too much inventory.  Indeed, as of June 2023, Tommy's still had a staggering 800 unsold Malibu Segment boats remaining in its inventory—a fact well known to Defendants given that they had real time access to Tommy's retail sales and inventory levels and received updates on those metrics on a weekly basis.  Yet, despite this knowledge, Defendants still sought to force Tommy's to commit to ordering approximately 1,160 Malibu Segment boats in FY 2024 before MBI would agree to execute new dealership agreements with Tommy's for the upcoming fiscal year.

**I.    The 1Q 2024 Earnings Call**

164.    On October 31, 2023, after market close, MBI reported its financial results for the first quarter of 2024.  While MBI surpassed its guidance for the quarter, net sales and unit volumes were down significantly compared to the first quarter of FY 2023, declining by 15% and 24%, respectively.  MBI also announced that it was lowering its FY 2024 guidance.

165.    During the earnings call for the quarter held the same day, Defendant Springer attributed MBI's lackluster performance in the first quarter to Defendants' "matching" of wholesale supply to deteriorating retail demand.  Specifically, Springer stated that "[c]hannel inventories across our brands are now back to or above pre-COVID levels, and we have ***worked diligently to match wholesale supply to retail demand by quickly aligning production levels throughout the quarter***, ***which accounts for the decrease versus last year***."  Moreover, when asked by an analyst to explain "the rationale for ***why you brought down your guidance***" given that

"*most people would say the [retail sales] numbers were actually decent*" during the quarter,

Springer blamed dealer and consumer "psyche" and "interest rates":

> Michael Arlington Swartz Truist Securities, Inc., Research Division: Maybe just to start off on *the retail environment and some of your commentary around retail being softer and being one of the rationale for why you brought down your guidance*. I mean, we've obviously -- and *everyone has seen the retail over the past couple of months. And I think most people would say the numbers were actually decent*. [. . .] Maybe just help us understand and clarify what exactly you're talking about. *Is this more to do with the dealer psyche than the actual retail demand that we're seeing?* Any color would be great.

> Jack D. Springer CEO & Director: *Yes. I think it's a dealer psyche. It's also the consumer psyche*. And I can't belabor enough that anyone that's going to be purchasing on interest rates, they're probably sitting on the sidelines. If you look back to 2021, 2022, the interest rates that they're paying are up to 4x more than what they were paying back then. So I think that's a big impediment to the retail consumer psyche. The dealers are certainly paying more, they want to carry less inventory. That factors into it.

166.    The statements in paragraph 165 were materially false and misleading and omitted

material facts. Specifically, by October 2023, Defendants knew they had *not* "worked diligently

to match wholesale supply to retail demand by quickly aligning production levels." Instead, the

opposite was true—beginning in July 2022 and continuing as late as March 2024, Defendants

schemed to inflate the Company's boat sales by pumping excess inventory into Tommy's.

Relatedly, it was misleading for Defendants to attribute MBI's disappointing financial results and

lowering of its FY 2024 guidance to consumer and dealer "psyche" and "interest rates" because

MBI's boat sales during FY 2024 would *not* be dictated by demand or macroeconomic factors, but

instead were negatively impacted by Defendants' continuing channel stuffing scheme, which

pushed upwards of $100 million of unneeded MBI boat inventory into Tommy's dealerships.

167.    During the same earnings call, with respect to dealer inventory levels, Defendant

Springer promised investors "we are certainly laser-focused on inventory levels" and explained

that "*[a]n important element to our playbook is successfully matching production to retail*

***demand***, not only to protect our margins, but ***also to protect our dealers and make sure they stay healthy***[,]" which is "a ***key differentiator*** for Malibu."  He further claimed that ***channel inventories had*** "***normalized***" but assured investors that "***our nimbleness to slow down our build schedule has helped our dealers to have healthy inventories, enabling them to sell through mid-year 2023 inventory more quickly***."  Later on during the same conference, Defendant Springer and an analyst also engaged in the following similar exchange:

> Craig R. Kennison, Robert W. Baird & Co. Incorporated, Research Division: ***I wanted to ask about your dealer network and the health of that network, given carrying excess inventory maybe and facing higher interest expense.  Any concerns about your network or the broader marine dealer network?***
>
> Jack D. Springer, CEO & Director: ***Largely, no***, Craig.  I mean, you always have some that you watch a little bit more closely.  We're very in tune with Wells Fargo and what they're seeing.  ***And the early warning systems that are in place***, that did not exist in 2008 and 2009.  ***So we feel pretty confident.***

168.    The statements in paragraph 167 were materially false and misleading and omitted material facts.  Specifically, by October 2023, Defendants knew that it was ***not*** the case that "[a]n important element to our playbook is successfully matching production to retail demand" or that they had "helped our dealers to have healthy inventories," but that the opposite was true.  In reality, for well over a year by this point, Defendants had deliberately schemed to ***overinflate*** the inventory of Tommy's to ***unhealthy*** levels.  Indeed, as of June 2023, Tommy's still had a staggering 800 Malibu Segment boats remaining in its inventory—a fact well known to Defendants given that they had real time access to Tommy's retail sales and inventory levels and received updates on those metrics on a weekly basis.  Despite this knowledge, Defendants still sought to force Tommy's to commit to ordering approximately 1,160 Malibu Segment boats in FY 2024 before MBI would agree to execute new dealership agreements with Tommy's for the upcoming year.

169.    As a result, according to Mr. Borisch's complaint against MBI, "Tommy's continued to struggle into and through the summer months of 2023," and "[b]y August 2023, Mr.

Borisch's dealerships were in a dire financial position" due to Defendants' scheme. And for similar reasons, when asked if he had "[a]ny concerns about your [dealer] network," it was misleading for Defendant Springer to reply "[l]argely, no" without disclosing anything about the known, serious financial predicament that Tommy's, the Company's most important dealer, was currently experiencing. Indeed, by no later than September 2, 2023, Defendants not only knew Tommy's had defaulted with M&T Bank (due to its SOT status) and was hurtling toward bankruptcy, but they also knew that, because of Tommy's precarious financial condition, ***MBI and Tommy's no longer had dealership agreements in effect for all but one of Tommy's dealerships***, as those agreements had ended June 30, 2023. In fact, in an email on September 11, 2023, Defendant Springer acknowledged that "***Tommy's is in SOT, which is one of the worst situations that can arise***" and also asserted that "[u]ntil Tommy's is in good enough standing with M&T, no dealer agreement [for FY 2024] can be or will be signed."

### J.    The 2Q 2024 Press Release and Earnings Call

170.    On January 30, 2024, after market close, MBI issued a press release announcing its financial results for the second quarter of 2024 and held an earnings call with investors on the same day. For the second quarter, MBI announced poor financial results, including a nearly 38% decline in sales, almost 44% decline in unit volumes, and a 60% Adjusted EBITDA decrease year-over-year. The Company also reduced its FY 2024 guidance for a second time.

171.    In the Company's press release, Defendant Springer asserted "***[w]e are recalibrating wholesale production to match retail demand, as seasonality along with continued interest rate pressures has resulted in elevated inventory levels***." Springer also reassured investors "we are starting to see some positive signs following our Year End Sales event for Malibu, demonstrating the resiliency of our brands"

172.    During the earnings call the same day, Defendant Springer claimed that "[o]ur customer segment that has remained strong i[s] the premium segment, cash buyers who are looking for the larger, [feature]-rich premium boat."  Defendant Springer also reiterated that Defendants were "***highly focused on recalibrating to match wholesale production to retail demand***" and asserted that MBI was "***very, very committed to reducing channel inventories to lower levels***," stating:

> While the retail environment is compressed, the biggest factor contributing to a tough year-over-year comparison is the normalization of channel inventory.  Over the last 2 fiscal years, we have been focused on rebuilding our channels from historically low levels brought on by lingering supply chain challenges and unprecedented demand during the pandemic.  Today, these dynamics have shifted and the level setting is going on as the inventory channels have fully recovered.  ***We are back to natural market dynamics and MBI is highly focused on recalibrating to match wholesale production to retail demand***.  ***We are very, very committed to reducing channel inventories to lower levels*** that set up the dealer and MBI brands to recover more quickly once retail begins growing again.

173.    Later in the call, Springer also proclaimed MBI was "being very responsible with channel inventories, and that's what we're hearing [from] our dealers."  And further, in direct response to an analyst question about whether MBI's latest guidance constituted "a conservative guide," Defendant Springer emphasized that it was, indeed, "conservative":

> I would tell you ***it's a conservative guide***. We had -- as you can imagine, we've had a lot of discussion on it. There is not any upside baked into the back half of the year for us. So that would be welcome certainly. ***But there's nothing to tell***. ***We believe that this, as we say, is conservative*** in that if we see some positive tailwinds that it will be beneficial.

174.    The statements in paragraphs 171-73 were materially false and misleading and omitted material facts.  Specifically, by January 2024, Defendants knew full well that they were ***not*** "recalibrating wholesale production to match retail demand," but that the opposite was true— Defendants were still attempting to stuff their sales channel by pumping excess inventory into Tommy's, which they continued through as late as March 2024.  Defendants likewise knew it was

*not* the case that retail demand for MBI's premium products "has remained strong" and it was misleading to claim that Defendants were seeing "positive signs following our Year End Sales event for Malibu [Segment]" products.  Instead, the opposite was true—in reaction to clear indications of weakening demand, Defendants had schemed to artificially inflate wholesale inventories by pushing over $100 million of excess inventory into Tommy's—the largest dealer for MBI's largest and most profitable Malibu Segment.  For similar reasons, it was misleading to assert that Defendants "were being very responsible with channel inventories" and were "very, very committed to reducing channel inventories to lower levels" because, rather than slowing down production in response to significant reductions in retail and wholesale demand in a responsible manner, Defendants instead pushed an additional 131 of surplus Malibu Segment boats onto Tommy's over the course of July 1, 2023 through March 13, 2024.  And it was *not* the case that MBI's guidance was "conservative," or that there was "nothing to tell" given that Defendants had never publicly disclosed that Tommy's was on the verge of bankruptcy and, consequently, Defendants would have to lower their guidance again only a few months later.

175.    During the same earnings call, when an analyst inquired about why Adjusted EBITDA margins were down by 60% in the quarter, Defendant Springer stated it was because MBI had "***taken production down more significantly***" in order "***to get inventory levels [back] where they need to be to support our dealers***."  Specifically, he claimed:

> I mean if you look at what our goals are for the rest of this year, channel inventories have to come in line.  ***And so we have taken production down more significantly than were probably anybody can have ascertained or are predicted.  And we are going to get inventory levels [back] where they need to be to support our dealers***. And honestly, I think dealers' appetite right now.  I think they want it to be historic channel inventory.  They would like to be at least for a little while, a little bit lower than general inventory historically.

176.    The statements in paragraph 175 were materially false and misleading and omitted material facts.  Specifically, Defendants had not based MBI's production decisions on "get[ting]

inventory levels [back] where they needed to be to support our dealers," but instead, as alleged further above, Defendants had engaged in a deliberate scheme to pump as much excess inventory as possible into Tommy's, its largest Malibu Segment dealer, to artificially inflate MBI's financial performance.  Furthermore, at this time, Defendants knew full well that their channel stuffing scheme had materially deteriorated Tommy's financial condition and had pushed Tommy's to the brink of bankruptcy.

### K.    The 2Q 2024 Form 10-Q

177.    Also on January 30, 2024, after market close, MBI filed its 2Q 2024 Form 10-Q. The 2Q 2024 10-Q touted MBI's "strong dealer network" which it claimed was the "strongest in the recreational powerboat category," and boasted that the Company "devoted significant time and resources to…develop and improve the performance of our dealers," which was a "competitive advantage":

> ***We sell our boats through a dealer network that we believe is the strongest in the recreational powerboat category…*** Our dealer base is an important part of our consumers' experience, our marketing efforts and our brands. ***We devote significant time and resources to find, develop and improve the performance of our dealers and believe our dealer network gives us a distinct competitive advantage***.
>
> \*        \*        \*
>
> We believe our strong brands, new product pipeline, ***strong dealer network*** and ability to increase production will allow us to maintain, and potentially expand, our leading market position in performance sports boats.

178.    The statements in paragraph 177 were materially false and misleading and omitted material facts.  Clearly, by the time of these statements, it was misleading to claim MBI's "dealer network" was the "strongest in the recreational powerboat category" when, in fact, (1) Defendants knew full well that MBI's most important dealer, Tommy's, which accounted for over 10% of net sales and over 23% of the Company's most profitable segment, was on the verge of losing its ability to sell MBI boats and going bankrupt; and (2) OneWater, MBI's other largest dealer, had

cancelled substantial amounts of orders for FY 2023 due to lack of demand. Moreover, it was misleading to claim that MBI "devote[d] significant time and resources to find, develop and improve the performance of our dealers" when MBI was doing exactly the opposite with Tommy's—stuffing it with inventory and forcing it into bankruptcy.

**L.    The March 5, 2024 Raymond James Institutional Investors Conference**

179.    On March 5, 2024, Defendant Springer attended the Raymond James Institutional Investors Conference on behalf of the Company.

180.    During that conference, Springer elaborated on MBI's monitoring of the health of its authorized dealers in real-time. Specifically, in an effort to assure investors that MBI's network of authorized dealers remained healthy and financially sound, Defendant Springer promised the market that MBI was monitoring the health of its dealers very closely (including through its partnership with Wells Fargo):[10]

> Wells Fargo is a key partner for us. We have monthly calls with them. We're talking about dealers that may be stressed or somewhat, but at the same time we're following that. We want to know what the dealer health is and we actually have a report card on that.

181.    The statements in paragraph 180 were materially false and misleading and omitted material facts. Specifically, by this time, (1) MBI had already notified Tommy's that it would not be entering into 2024 dealership agreements; and (2) Tommy's had already defaulted on its entire $130 million financing agreement with M&T Bank. As such, it was misleading to tout the Company's "following" of dealer health and stress its "report card" on dealer health while omitting

---

[10] By way of background, in the marine industry, Wells Fargo is the primary provider of floor plan financing to boat dealers, allowing dealers to purchase and hold inventory. Previously during the Class Period, including on the Company's October 31, 2023 earnings call, Defendants explained that MBI is "very in tune with Wells Fargo and what they're seeing" from dealers concerning inventory levels, and that the Company relied upon its communications with Wells Fargo as an "early warning system[]" concerning dealer inventory health.

to disclose that its second largest dealer, and the largest dealer for its all-important Malibu Segment, no longer had a relationship with MBI and was about to go bankrupt.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

182.    As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements were materially false and misleading when made.  In addition to the allegations set forth above, these particularized facts include the following.

183.    *The Individual Defendants, and especially Defendant Springer, personally directed the channel stuffing scheme*. As described in further detail above, beginning in July 2022, the Individual Defendants, and particularly Defendant Springer, induced, threatened and strongarmed MBI's dealers, and especially Tommy's, into taking as much as $110 million in excess inventory for which Defendants knew there was no demand. Defendants Springer and Wilson personally met with Borisch to pressure him to commit to more floor plan financing, in order to further the channel stuffing scheme. When Borisch pushed back, Defendants, and especially Springer, made clear that the request was not optional, and that Borisch would lose his status as an MBI dealer if he did not comply. In the face of MBI and Defendant Springer's demands and threats, Borisch complied and arranged for substantial increases in Tommy's floor plan capacity with Fifth Third Bank. MBI and Defendant Springer immediately began pumping inventory into Tommy's to artificially inflate MBI's own numbers and increase its market share and stock price.  Springer was personally involved in the communications with Tommy's and Borisch that comprised this scheme.

184.    Once Tommy's reached its limit with Fifth Third Bank, Tommy's was forced to change lenders to meet MBI's demands.  In March 2023, Tommy's was introduced to M&T Bank so that Tommy's could increase its floor plan capacity further. In May 2023, Tommy's entered into a floor plan financing agreement with M&T Bank based on representations from Defendant

Springer that MBI would enter into repurchase agreements with M&T, provide rebates, incentives, and a new dealership agreement for the 2024 fiscal year. However, MBI did not follow through with any of the promises made to induce Tommy's into committing to more floor plan financing. MBI and Defendant Springer then immediately began forcing $50 million worth of inventory onto Tommy's even though they knew Tommy's already had more inventory than it needed. The fact that *Defendant Springer himself personally directed the channel stuffing scheme by inducing, threatening, and strongarming Tommy's into increasing its floor plan capacity so that MBI could force millions worth of inventory onto Tommy's to artificially inflate its own numbers and increase its market share and stock price*, is extraordinarily compelling evidence that Defendants either knew or were deliberately reckless in not knowing that their statements were false and misleading when made.

185.    *OneWater's CEO directly delivered OneWater's order cancellations to Defendant Springer in a February 2023 meeting.* In February 2023, OneWater—MBI's largest dealer in FY 2022—unexpectedly cancelled its boat orders for the year after its own assessments showed a sudden and dramatic worsening in retail demand. OneWater's CEO delivered the news of OneWater's cancellations directly to Defendant Springer in a personal meeting. This is further evidence that Defendants either knew or were reckless in not knowing that their statements were false and misleading when made.

186.    *Defendant Springer was directly put on notice by Tommy's, by August 2023, that Tommy's was in severe financial distress, and was directly involved in all communications with Tommy's about its financial distress, including personally deciding not to renew Tommy's dealership agreements.* In August 2023, Borisch informed MBI and Defendant Springer that Tommy's was in a "dire financial position." By September 2, 2023 at the latest, Tommy's directly

informed Defendants that it had defaulted on its M&T Bank credit facility by selling boats out of trust.  Consequently, on September 3, 2023, Tommy's reached out to MBI for assistance in right-sizing its overstocked inventories, including seeking monetary advances from MBI which Tommy's claimed it would use to cure its breach.  On September 11, 2023, MBI effectively refused to provide the requested aid to Tommy's by asserting that the Company would not enter into fiscal year 2024 dealership agreements with Tommy's given Tommy's SOT status with M&T Bank.  Specifically, in an email from Defendant Springer to representatives of Tommy's on September 11, 2023, Springer explained: "Tommy's is SOT, which is one of the worst situations that can arise.  Until Tommy's is in good standing with M&T, no dealer agreement can be or will be signed."

187.    Defendant Springer also personally decided not to renew Tommy's dealership agreements.  On February 26, 2024, Springer himself informed Tommy's that MBI would not be renewing any dealership agreements for fiscal year 2024, and on March 11, 2024, MBI sent a letter to Tommy's terminating all dealership agreements with Tommy's that were still in existence due to its issues with M&T Bank.  In fact, on March 22, 2024, even after Springer announced that he was "resigning," he personally signed the letter to Tommy's stating that MBI was not planning to enter into any future dealer agreements with Tommy's and was cancelling all of Tommy's pending orders for boats.  The fact that Defendants were informed about Tommy's severe financial distress and that Defendant Springer personally communicated with Tommy's about the issue, including not renewing Tommy's dealer agreements, is further evidence that Defendants either knew or were reckless in not knowing that their statements were false and misleading when made.

188.    *Defendant Springer knew that MBI no longer had dealership agreements with Tommy's and deliberately did not enter into a repurchase agreement with M&T Bank.* Defendant Springer knew that practically all of Tommy's fiscal year 2023 dealership agreements ended on

June 30, 2023, and that MBI did not enter into any new dealership agreements with Tommy's. However, MBI still delivered another 131 boats to Tommy's in spite of a lack of contract from July 1, 2023 to March 13, 2024.  Defendant Springer was also aware that MBI did not enter into a repurchase agreement with M&T Bank, even though Defendant Springer personally represented that MBI would enter into the agreement in order to induce Borisch to consent to accepting unneeded inventory.  In fact, by August 2023, MBI shipped $6 million worth of inventory to Tommy's that was not covered by M&T's floorplan financing.  M&T Bank refused to add the $6 million worth of inventory because MBI repeatedly refused to provide the required repurchase agreement to M&T Bank.  However, MBI demanded payment of the $6 million and dangled the promise of the fiscal year 2024 dealership agreements being signed if Tommy's was able to convince M&T Bank to pay the $6 million.  Springer nonetheless pushed off any discussion of the fiscal year 2024 dealership agreements, instead suggesting that they "discuss [d]ealership [a]greements in January [2024]."  The fact that Defendant Springer knew that MBI didn't have a dealership agreement with Tommy's or a repurchase agreement with M&T Bank, but continued to deliver inventory to Tommy's for eight months, is further evidence that Defendants either knew or were reckless in not knowing that their statements were false and misleading when made.

189.    *Defendants boasted that they closely monitored inventory levels, demand, and sales at their dealers*. Prior to and throughout the Class Period, MBI and Defendant Springer repeatedly affirmed that they monitored inventory levels, demand, and sales at their dealers.  For example, in MBI's FY 2022 10-K filed on August 25, 2022, the Company stated: "***We consistently review our distribution network*** to identify opportunities to expand our geographic footprint and improve our coverage of the market … We have the ability to opportunistically add new dealers and new dealer locations to previously underserved markets and ***use data and performance metrics to monitor***

*dealer performance*.”  In that same 10-K, MBI stated that “*we regularly monitor and assess the performance of our dealers*[.]” These same statements were included in MBI’s FY 2023 10-K, released August 29, 2023 and signed by Defendants Springer and Black.  The FY 2022 10-K also stated: “*We continually assess our distribution network* and believe we take the actions necessary to achieve our goal.”  Similarly, during MBI’s August 29, 2023 earnings call, Springer stated: “*We continue to monitor retail sales and channel inventories closely*[,]” and during the Company’s January 30, 2024 earnings call, Springer stated: “*I will continue to monitor the channel*.” And during the Company’s May 2, 2024 earnings call, Defendant Beckman similarly stated: “*we monitor the health of our dealer networks very closely with our floor plan finance providers. I am talking about them with them all the time on monitoring the health of the network*.”  Indeed, this was further corroborated by MBI’s own dealer contracts, which required dealers to update their inventory levels in MBI’s CRM database “on a weekly basis,” and required registration of 100% of MBI’s boats purchased by a retail customer, with dealers notifying MBI of each registration and sale within ten days.  Defendants Springer, Wilson, Beckman, Black, and MBI’s admissions that they closely “monitor[ed]” inventory levels, demand, and sales at their dealers is evidence that their statements during the Class Period were knowingly or recklessly false and misleading when made.

190.    *Defendant Springer stood to more than double his cash compensation for FY 2023 by inflating sales to just barely meet financial targets.*  Defendant Springer was motivated by personal gain to inflate MBI’s revenues by pumping inventory into dealers so that MBI could meet the revenue targets that were a prerequisite for Defendant Springer to earn maximum bonus compensation.  Under MBI’s compensation policy, Defendant Springer was eligible for substantial cash bonuses equal to or greater than his entire salary if MBI met certain specified targets for net

income and Adjusted EBITDA.  By enacting his scheme to pump excess inventory into Tommy's, Defendant Springer ensured that MBI's financial results for FY 2023 just barely exceeded 100% of the targets needed for Defendant Springer to be eligible for a bonus equivalent to his entire salary for the year, thus doubling his cash compensation.

191.    Specifically, for FY 2023, Defendant Springer's base salary was set at $875,000. However, if the Company met a net income threshold of $179.8 million and an Adjusted EBITDA threshold of $275.7 million for the year, Defendant Springer would be eligible for an additional bonus of $875,000—***doubling his cash compensation,*** and stood to earn even more if MBI exceeded those targets.  Notably, it was particularly critical for Springer that the Company reach at least 100% of the targets.  If MBI had earned even 90% of its net income and Adjusted EBITDA targets, he would have been eligible for a mere 35% of his bonus, i.e. a mere $306,250.  And had the Company achieved anything less than 90% of its targets, Defendant Springer's cash bonus would be zero.  Thus, Defendant Springer stood to at least double his compensation by ensuring the Company met these targets, and stood to lose the vast majority, or even all of his bonus, if MBI came fairly close to its targets but did not meet them.

192.    Strikingly, in FY 2023—the year during which Defendant Springer's inventory scheme was at its peak—MBI achieved net income (excluding litigation expense) of $184.2 million, exceeding the target of $179.8 million by a mere 2%.  Similarly, MBI achieved Adjusted EBITDA of $284 million, a mere 3% above its target of $275.7 million—rendering Springer eligible for a cash bonus of $962,500—more than his entire salary.  Had Defendant Springer not enacted his scheme to push excess inventory onto Tommy's, MBI not only would not have achieved 100% of its target for net income and Adjusted EBITDA, but most likely would not even have achieved 90% of its target, such that Defendant Springer would not have been eligible for a

bonus. The fact that Defendant Springer was motivated by personal gain to inflate MBI's revenues, so that they could meet their revenue targets, is evidence that Defendants' statements were knowingly or recklessly false and misleading when made.

193.    *The facts underlying Defendants' fraud concerned MBI's core operations, including MBI's two largest dealers (Tommy's and OneWater), and its largest and most profitable segment (the Malibu Segment).* The Malibu Segment was MBI's largest segment, accounting for as much 52% of MBI's annual revenue, and an even greater share of its profit given that Malibu Segment boats were "by far" more profitable than the Company's other segments. Additionally, OneWater and Tommy's were MBI's two largest boat dealers. OneWater was responsible for as much as 23.7% of MBI's consolidated net sales and as much as 18.4% of net sales for the Malibu Segment. Meanwhile, Tommy's was responsible for as much as 10.7% of MBI's consolidated net sales and as much as 23.3% of net sales for the Malibu Segment. Sales of Malibu Segment boats were central to MBI's business and MBI's CEO and CFO would obviously have been aware of substantial changes to the retail and wholesale demand for Malibu Segment boats during the Class Period. MBI also sells nearly all of its products through its dealers, and the financial health of the dealers in its network, including their ability to access floor plan financing, is critical to the Company's success. The centrality of Tommy's, OneWater, and Malibu Segment boat sales to MBI's business is evidence that Defendants' statements were knowingly or recklessly false and misleading when made.

194.    *Defendant Springer resigned for reasons directly relating to the scheme.* According to Tommy's and Borisch's court filings, while attending the Miami Boat Show in mid-February 2024, "Mr. Borisch was pulled aside by three Malibu stakeholders to discuss Tommy's Dealership Agreements with Malibu." During that conversation, the stakeholders revealed to Borisch that

MBI and Defendant Springer were "intentionally pumping Tommy's full of inventory" in order to artificially inflate MBI sales and market share, and that Springer was "not going to last" at the Company as a result.  Specifically:

> The stakeholders disclosed to Mr. Borisch their understanding of what Malibu and its CEO, Jack Springer, had done to [Tommy's] (i.e. '***intentionally pumping Tommy's full of inventory' in order to artificially inflate Malibu sales and market share when 'most manufacturers are 70% too heavy on inventory and he knows that***'). They also reported that '***Jack would not turn the spigot off***' (*i.e.*, meaning he would not cut back on manufacturing) despite what the market was showing.  They told Mr. Borisch that Wayne [Wilson], the former CFO, left on 'bad terms' and they were 'nervous.'  They also asked [Tommy's] to ***'hold on' as 'Jack is not going to last.'***

195.    Indeed, the very next week, on February 20, 2024, MBI abruptly announced that Springer was resigning as CEO of the Company.  The fact that Defendant Springer's "resignation" was a direct result of his direction of his scheme is further evidence that Defendants either knew or were reckless in not knowing that their statements were false and misleading when made.

196.    *Many of Defendants' false statements were in direct response to analysts' questions, and Defendants held themselves out as having direct knowledge of the purported facts underlying their answers*.  Throughout the Class Period, Defendants were asked multiple times about issues with inventory, demand, and the health of MBI's dealers, and each time, Defendants answered with authority and specificity, holding themselves out as having knowledge of the subject.  For example, during MBI's presentation at the Baird Global Consumer, Technology & Services Conference on June 6, 2023, an analyst asked what MBI could say about its inventory in light of retail expectation, specifically pointing out that it was Defendant Springer's "job to manage the right amount of inventory in the channel" and asking what he could "tell us about that inventory today in light of the retail expectation?"  In response, Springer said "[w]e're looking at data all the time," "we know how much weeks on-hand of inventory that our dealers should have," and it was something that MBI had "gotten very good at managing."

197.    Similarly, during an October 31, 2023 earnings call, a Baird analyst asked Springer about the "health" of MBI's dealer network and whether Springer had "[a]ny concerns about your [dealer] network" in light of "carrying excess inventory maybe and facing higher interest expense." In response, Springer said "[l]argely, no," and affirmed that MBI felt "pretty confident." That same analyst asked a follow-up question related to the "age of inventory" and whether MBI saw "any issues with noncurrent model year inventory." In response, Springer said "[f]or us, no" and that "the inventories are as fresh as they've been." During MBI's January 30, 2024 earnings call, Springer was asked a question by a Morningstar analyst about "cleaning up the inventory channel" and getting the "flow back to normal." In response, Springer said that MBI was "being very responsible with channel inventories, and that's what we're hearing from [*sic*] our dealers."

198.    The fact that Defendants' statements were in direct response to specific analyst questions, and that, in response, Defendants expressly held themselves out as knowledgeable of the subject of their answers, is further evidence that Defendants either knew or were reckless in not knowing that their statements were false and misleading when made.

## VII.    LOSS CAUSATION

199.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions and engaged in a scheme to deceive the market. This artificially inflated the prices of the Company's common stock and operated as a fraud or deceit on the Class. As detailed further, *supra*, when Defendants' prior misrepresentations, information alleged to have been concealed, fraudulent conduct, and/or the effect thereof were disclosed to the market, the price of the Company's stock fell precipitously, as the prior artificial inflation came out of the price.

200.    On January 30, 2024, before market open, MBI announced its financial results for the second quarter of fiscal year 2024. MBI's consolidated net sales, unit volume, net income, and

Adjusted EBITDA had all decreased.  MBI's earnings press release blamed the poor results on "weak retail demand," due in part to "seasonality, along with continued interest rate pressures [that have] resulted in ***elevated inventory levels***."  Particularly poor were Malibu Segment sales, which declined 51.7%, to just $76.4 million versus the same quarter a year earlier—a far larger decline than MBI's other segments, which contradicted Defendants' prior reassurances that the Malibu Segment's "premium buyers" were unimpacted by economic trends and would continue to carry MBI's sales through a downturn.  MBI also lowered its full FY 2024 guidance, and the declines forecasted three months earlier were now forecasted to double.  In MBI's earnings call the same day, in contrast to Defendants' assurances as recently as three months earlier of being "laser-focused on inventory levels" and perfectly "matching" them to retail demand, Defendant Springer now acknowledged that "***channel inventories [were] higher than we, or our dealers would like to see***," and, specifically, MBI dealers had "***around 5 weeks too much on hand inventory***."

201.    On this news, MBI's stock price fell nearly 20% in a single day—or $9.47 per share—on unusually high volume, from a close of $51.03 per share on January 29, 2024, to a close of $41.56 per share on January 30, 2024.

202.    Three weeks later, on February 20, 2024, before market open, MBI suddenly and unexpectedly issued a press release (which it also filed with the SEC on Form 8-K) announcing that its longtime CEO, Defendant Springer, would resign.  On this news, MBI's stock price fell $4.33 per share—or 9%—on unusually high volume, to close at $43.15 per share.

203.    On April 11, 2024, after market close, MBI filed a Form 8-K with the SEC revealing that, the previous day (April 10, 2024), Tommy's had filed a verified, sworn complaint against MBI and its subsidiaries in the United States District Court for the Eastern District of Tennessee alleging "that Malibu Boats breached its obligations under dealership agreements with Tommy's

Boats." The Form 8-K further revealed, for the first time, that the Company had not only terminated its relationship with Tommy's but was already well into the process of finding other dealers to take Tommy's inventory.

204.    Specifically, the Form 8-K explained "[t]he Company does not currently have dealership agreements in effect with Tommy's Boats," and that "[t]he Company is actively engaged with its dealer network to mitigate any marketplace disruption and to provide a strong dealer partner in each of the Company's markets served by Tommy's Boats." According to the Tommy's complaint, MBI "*engaged in an elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen (15) Tommy's dealerships … in order to artificially inflate Malibu's sales performance, artificially claim increased market share in the industry and artificially inflate its stock value* during an obvious and known downturn in the recreational power boat industry." The Tommy's complaint further alleged that Defendant Springer had directly enacted and overseen the scheme.

205.    The Form 8-K was also reported on the evening of April 11, 2024 by newswire services including Dow Jones and GlobeNewswire, and on April 12, 2024, multiple news sources reported on the lawsuit.

206.    On this news, the Company's stock price fell $3.34, or 8%, from a close of $41.82 per share on April 11, 2024, to close at $38.48 per share on April 12, 2024, on unusually heavy trading volume.

207.    The following trading day, on April 15, 2024, before market open, Raymond James issued a more detailed report titled "Downgrading to Market Perform, as Headwinds and Uncertainties Continue to Mount." Raymond James emphasized that "this shift to a neutral stance *is in response to the loss of Tommy's Boats, one of MBUU's largest dealers* (10.7% of total

sales/23.3% of Malibu segment sales in FY23) which last week filed [the Tommy's complaint]." Raymond James also emphasized that the lawsuit would "likely remain an overhang on the stock," and that, moreover, regardless of the outcome a "*significant issue in our view is the impact of Tommy's inventory being absorbed into the dealer channel on MBUU's sales and margins, the implications of which we fear could extend into FY25*." Raymond James further explained that an estimated $110 million of Tommy's inventory of Malibu Segment boats "needs to find a home," and that "how this inventory ultimately gets absorbed into [MBI's] dealer network" was a significant problem for MBI's sales, particularly given that other MBI dealers "*are already looking to reduce inventory given the current soft demand environment and will likely only do so at a steep discount*." As Raymond James explained, MBI would likely "feel the impact" and potentially "share in the loss" as what inventory could be moved would be sold for pennies on the dollar, and as MBI would likely have to provide costly "discounts and dealer incentives" to get other dealers to sell the boats.

208. In further reaction to the news regarding Tommy's and the Raymond James downgrade, MBI's common stock price continued to decline sharply, falling $2.34 or 6% to close at $36.14 per share on April 15, 2024, on unusually heavy trading volume.

209. On May 2, 2024, MBI released financial results for the third quarter of FY 2024 that again fell short of expectations and also slashed the Company's FY 2024 guidance for the third consecutive quarter. During the earnings call that day, Defendant Springer blamed a "weakened retail environment characterized by lingering uncertainty and softened retail demand," for the poor results, and specifically the fact that MBI's sales channels were clogged with excess inventory. As such, Springer said, MBI needed to "*focus on channel inventory reductions through the remainder of fiscal year '24*," by reducing boat production "*even further to reach our goals of*

*continuing to optimize the channel inventory*," as well as by providing significant discounts and rebates to induce sales. Indeed, notwithstanding Defendants' prior promises of "best-in-class operational capabilities, matching wholesale to retail demand," Springer admitted that inventory remained at least four weeks too high—little-changed from the prior quarter.

210. On this news, MBI's stock price fell another 4%—or $1.27 per share—on unusually high volume, from a close of $33.06 per share on May 1, 2024, to a close of $31.79 per share on May 2, 2024.

## VIII. PRESUMPTION OF RELIANCE

211. At all relevant times, the market for the Company's common stock was an open, efficient and well-developed market for the following reasons, among others:

a) MBI's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b) As a regulated issuer, MBI filed periodic reports with the SEC and the NASDAQ;

c) MBI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d) MBI was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

212.    As a result of the foregoing, the market for MBI's common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock.  All investors who purchased the Company's common stock during the Class Period suffered similar injury through their purchase of MBI's common stock at artificially inflated prices, and a presumption of reliance applies.

213.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding MBI's business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

214.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful

cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

215.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of the Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of MBI who knew that such statement was false when made.

## X.    SCHEME LIABILITY

216.    In addition to making false and misleading statements throughout the Class Period, Defendants also employed a scheme to defraud investors and engaged in practices that operated as a fraud upon persons who purchased MBI securities by undertaking to inflate the Company's sales and financial results.  Specifically, beginning in July 2022, Defendants induced, threatened and strongarmed Tommy's dealerships into taking tens or hundreds of millions of dollars in excess inventory for which Defendants knew there was no demand.  The scheme included pushing higher-priced Malibu Brand boats onto Tommy's—which Tommy's had not otherwise asked for, and for which there was not demand—solely to maximize the revenue and profit MBI could report, ensuring that the Company met its guidance and the financial targets the Individual Defendants—and particularly Defendant Springer—needed to achieve to maximize their bonuses.

217.    Defendants undertook actions to further this scheme including threatening Tommy's that it would lose its status as an MBI dealer if it did not comply, and promising and/or withholding incentives from Tommy's in order to induce it to order more Malibu Segment boats

from MBI.  Defendants continued this course of conduct even after MBI's dealership agreements with Tommy's had expired on June 30, 2023, and even after Defendants were well aware that Tommy's was in default on its financing agreement with M&T, in order to squeeze as many additional sales out of Tommy's as they could.  Defendants also did so knowing that MBI had not entered into a customary repurchase agreement with M&T, such that MBI could pump excess inventory into Tommy's without being on the hook if Tommy's defaulted.

218.    Defendants never willingly disclosed their fraudulent scheme to the public.  Instead, it was revealed when Tommy's filed its verified, sworn complaint against MBI, and MBI was forced to file a Form 8-K the next day disclosing that lawsuit, and the truth was only fully revealed by the lawsuit in combination with Defendants' disclosures less than three weeks later of poor sales and rising inventories during the same timeframe.  Prior to that time, Defendants concealed their scheme, and did so even after the scheme backfired, forcing an end to the relationship between MBI and Tommy's.

219.    The conduct underlying Defendants' scheme comprised deceptive acts separate from, and in addition to, Defendants' false and misleading statements throughout the Class Period, but without which Defendants' fraud could not have been effectuated, and thus comprised a device, scheme, or artifice to defraud under SEC Rule 10b-5(a) and acts, practices, or a course of business which operated as a fraud or deceit upon the market under SEC Rule 10b-5(c).

## XI.    CLASS ACTION ALLEGATIONS

220.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired MBI securities between November 4, 2022 and May 1, 2024, inclusive (the "Class"), and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of MBI at all relevant times, members of their immediate families, and their legal

representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

221.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, MBI's shares were actively traded on the NASDAQ.  As of August 23, 2024, the Company had more than 20 million shares outstanding.  While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

222.    Lead Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

223.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interests that conflict with those of the Class.

224.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

    a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

b)      whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

c)      whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of MBI;

d)      whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of MBI;

e)      whether the market price of MBI shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f)      the extent to which the members of the Class have sustained damages and the proper measure of damages.

225.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XII.    CLAIMS FOR RELIEF

### <u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Defendants**

226.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

227.    Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of MBI shares; and (iii) cause Lead Plaintiff and other members of the Class to purchase MBI shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

228.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for MBI shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

229.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about MBI's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of MBI's business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MBI and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more

particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

230.    Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

231.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing MBI's operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge

of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

232.    Additionally, as alleged further *supra* at § X., Defendants' scheme to inflate MBI's sales and financial results by forcing surplus inventory onto Tommy's comprised deceptive acts separate from, and in addition to, Defendants' false and misleading statements throughout the Class Period, but without which Defendants' fraud could not have been effectuated, and thus comprised a device, scheme, or artifice to defraud under Rule 10b-5(a) and acts, practices, or a course of business which operated as a fraud or deceit upon the market under Rule 10b-5(c).

233.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, and as a result of Defendants' fraudulent scheme, as set forth above, the market price of MBI shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiff and the other members of the Class purchased MBI shares during the Class Period at artificially inflated prices and were damaged thereby.

234.    At the time of said misrepresentations and omissions and fraudulent scheme, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and the other members of the Class and the marketplace known of the truth regarding the problems that MBI was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased their MBI shares, or, if they

had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

235.    By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

236.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

237.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

238.    The Individual Defendants acted as controlling persons of MBI within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading, as well as the actions comprising Defendants' fraudulent scheme.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

239. In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

240. As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XIII. PRAYER FOR RELIEF

241. WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

a) Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b) Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c) Awarding Lead Plaintiff and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d) Awarding such other and further relief as this Court deems appropriate.

## XIV. JURY DEMAND

242. Lead Plaintiff demands a trial by jury.

96

Dated: October 4, 2024                      Respectfully submitted,

                                            **SAXENA WHITE P.A.**

                                            By: */s/ Steven B. Singer*
                                            Steven B. Singer
                                            Joshua H. Saltzman
                                            Sara DiLeo (admitted *pro hac vice*)
                                            10 Bank Street, Suite 882
                                            White Plains, NY 10606
                                            Tel.: (914) 437-8551
                                            Fax: (888) 631-3611
                                            ssinger@saxenawhite.com
                                            jsaltzman@saxenawhite.com
                                            sdileo@saxenawhite.com

                                            **SAXENA WHITE P.A.**
                                            Lester R. Hooker
                                            7777 Glades Road, Suite 300
                                            Boca Raton, Florida 33434
                                            Tel.: (561) 394-3399
                                            Fax: (561) 394-3382
                                            lhooker@saxenawhite.com

                                            *Lead Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: */s/ Joshua H. Saltzman*