UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

RETIREE BENEFIT TRUST OF THE CITY OF
BALTIMORE, individually and on behalf of all
others similarly situated,

               Plaintiff,

   v.

MALIBU BOATS, INC., JACK SPRINGER,
BRUCE BECKMAN, DAVID BLACK, and
WAYNE WILSON,

               Defendants.

Case No. 1:24-cv-03254-LGS

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## THEIR MOTION TO DISMISS THE AMENDED COMPLAINT

COOLEY LLP
Sarah M. Lightdale
Aric H. Wu
Reed A. Smith
Anne E. Bigler
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
slightdale@cooley.com
ahwu@cooley.com
reed.smith@cooley.com
abigler@cooley.com

Brett De Jarnette (*pro hac vice pending*)
3175 Hanover Street
Palo Alto, CA 94304
Tel: (650) 843-5000
bdejarnette@cooley.com

*Attorneys for Defendants Malibu Boats,
Inc., Jack Springer, Bruce Beckman, David
Black, and Wayne Wilson*

November 8, 2024

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. iii

TABLE OF ABBREVIATIONS ............................................................ viii

INTRODUCTION ........................................................................... 1

FACTUAL BACKGROUND .................................................................. 3

    I.     MBI And The Individual Defendants ............................................ 3

    II.    In August 2022, MBI Projects That FY 2023 Growth Will Be Driven By Dealer Demand To Replenish Inventory To Pre-Pandemic Levels (i.e., Dealer Wholesale Demand), Not By Retail Demand ............................................ 4

    III.   In November 2022, MBI Reports 1Q 2023 Revenue Growth And Reiterates That FY 2023 Growth Will Be Driven By Dealer Wholesale Demand, Not Retail Demand ................................................................................... 5

    IV.   In May 2023, MBI Reports 3Q 2023 Revenue Growth Generated By Dealer Wholesale Demand In The Saltwater Fishing And Cobalt Segments Offset By A Slowdown In The Malibu Segment .............................................................. 6

    V.    In August 2023, MBI Reports That Dealer Inventory Of Malibu And Cobalt Boats Has Reached Pre-Pandemic Levels, And Projects That FY 2024 Revenue Will Decrease Due To A Slowdown In Dealer Wholesale Demand ...................... 7

    VI.   In October 2023, January 2024, And May 2024, MBI Reduces FY 2024 Revenue Projections Due To A Continued Slowdown In Dealer Wholesale Demand ................................................................................... 8

    VII.   In March 2024, MBI Terminates Its Relationship with Malibu Dealer Tommy's, After Tommy's Credit Provider Puts Tommy's In Default .......................... 9

    VIII.  Tommy's Retaliates By Filing Suit Against MBI, But Its Motion To Prevent MBI From Doing Business With New Dealers Is Denied, And Its Bankruptcy Trustee Voluntarily Dismisses The Lawsuit Against MBI ................................ 11

    IX.   This Lawsuit: Plaintiff Parrots The Allegations In The Dismissed Tommy's Lawsuit And Borisch Declaration ................................................................ 12

LEGAL STANDARDS ....................................................................... 13

ARGUMENT ................................................................................. 14

    I.     Plaintiff's Section 10(b) Claim Should Be Dismissed Because the Amended Complaint Fails to Adequately Plead Any False Or Misleading Statement Or Omission ................................................................................... 14

           A.    The AC Fails To Plead Particularized Facts Showing That MBI Planned To "Stuff" Tommy's With "Excess" Inventory .......................... 14

# TABLE OF CONTENTS
## (continued)

**Page**

    B.    The AC Fails to Plead Facts Showing that Retail or Wholesale Demand for MBI Boats Was Inconsistent with Defendants' Public Statements ......... 19

    C.    The AC Fails to Plead Facts Showing That Any Challenged Statement Was Contradicted By What Defendants Knew About Tommy's Financial Condition.................................................................................... 22

    D.    Challenged Statements Referencing Factors Affecting Dealers And Consumers In The Aggregate Did Not Trigger A Duty To Disclose Granular Information About Tommy's............................................................ 23

    E.    Many of the Challenged Statements Are Inactionable As A Matter of Law ....................................................................................................... 25

II.    Plaintiff's Section 10(b) Claim Should Be Dismissed For Failure To Plead Particularized Facts Giving Rise To A Strong Inference Of Scienter ...................... 27

    A.    The AC Does Not Adequately Plead A Motive To Defraud ........................ 28

    B.    The AC Does Not Plead Particularized Facts Showing Conscious Misbehavior Or Recklessness On The Part Of Any Defendant.................... 29

    C.    Any Inference Of Scienter Is Not As Compelling As The Opposing Inference ....................................................................................................... 32

III.    Plaintiff Fails To Adequately Plead A Scheme Liability Claim................................ 33

IV.    Plaintiff's Section 10 (b) Claim Should Be Dismissed For Failure To Adequately Plead Loss Causation.............................................................................. 34

V.    Plaintiff's Section 20(a) Claim Should Be Dismissed .............................................. 35

CONCLUSION.................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abely v. Aterna Zentaris Inc.*,
2013 WL 2399869 (S.D.N.Y. May 29, 2013) ........................................................24

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)............................................................26

*In re Advanced Battery Techs. Inc.*,
781 F.3d 638 (2d Cir. 2015).....................................................................................28

*Amorosa v. Gen. Elec. Co.*,
2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022)........................................................17

*In re AOL Time Warner, Inc. Sec. Litig.*,
503 F. Supp. 2d 666 (S.D.N.Y. 2007)......................................................................34

*Ashland Inc. v. Morgan Stanley & Co.*,
652 F.3d 333 (2d Cir. 2011).....................................................................................19

*In re AT&T/DirecTV Now Sec. Litig.*,
480 F. Supp. 3d 507 (S.D.N.Y. 2020)......................................................................25

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)...................................................................................3, 27

*In re Axis Cap. Holdings, Ltd. Sec. Litig.*,
456 F. Supp. 2d 576 (S.D.N.Y. 2006)......................................................................19

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
980 F. Supp. 2d 564 (S.D.N.Y. 2013)......................................................................20

*Bd. of Trs. of Operating Eng'rs Pensions Trust v. JPMorgan Chase Bank, N.A.*,
2012 WL 1382274 (S.D.N.Y. Apr. 20, 2012)..........................................................22

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*
811 F. Supp. 2d 853 (S.D.N.Y. 2011)................................................................29, 33

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
2023 WL 2308151 (S.D.N.Y. Mar. 1, 2023) ......................................21, 22, 28, 31

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)......................................................................14

*Denny v. Canaan Inc.*,
2023 WL 2647855 (S.D.N.Y. Mar. 27, 2023) ........................................................31

## **TABLE OF AUTHORITIES**

**Page(s)**

*Diabat v. Credit Suisse Group AG*,
    2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)..................................................................34

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)........................................................................2, 27, 28

*Fadia v. FireEye, Inc.*,
    2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ........................................................17

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
    2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015)..........................................................18

*In re Ferrellgas Partners, L.P. Sec. Litig.*,
    2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) .................................................23, 25

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs., Corp.*,
    336 F. Supp. 3d 196 (S.D.N.Y. 2018).........................................................................3

*Gavish v. Revlon, Inc.*,
    2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004)...................................................15, 20

*In re Gen. Elec. Sec. Litig.*,
    844 F. App'x 385 (2d Cir. 2021) .............................................................................27

*Gillis v. QRX Pharma Ltd.*,
    197 F. Supp. 3d 557 (S.D.N.Y. 2016).......................................................................31

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011).................................................................31, 32

*Janbay v. Canadian Solar, Inc.*,
    2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) .....................................................3, 35

*In re Jiangbo Pharma., Inc., Sec. Litig.*,
    884 F. Supp. 2d 1243 (S.D. Fla. 2012) ....................................................................31

*In re JP Morgan Chase Sec. Litig.*,
    363 F. Supp. 2d 595 (S.D.N.Y. 2005).......................................................................28

*Kavanagh v. Zwilling*,
    578 F. App'x 24 (2d Cir. 2014) ...............................................................................14

*In re Keyspan Corp. Sec. Litig.*,
    383 F. Supp. 2d 358 (E.D.N.Y. 2003) ......................................................................20

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)......................................................................................................34

*Liplow v. Net1 UEPS Techs., Inc.*,
    131 F. Supp. 3d 144 (S.D.N.Y. 2015)......................................................................................28

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
    939 F. Supp. 2d 360 (S.D.N.Y. 2013)........................................................................................3

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
    518 F. Supp. 3d (S.D.N.Y. 2021) ............................................................................................31

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
    277 F. Supp. 3d 500 (S.D.N.Y. 2017)......................................................................................33

*Menora Mivtachim Ins. v. Int'l Flavors & Fragrances Inc.*,
    2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021) .........................................................................21

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ...............................................................................................35

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020)......................................................................................33

*In re NBTY, Inc. Sec. Litig.*,
    224 F. Supp. 2d 482 (E.D.N.Y. 2022) .....................................................................................20

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ...................................................................................................30

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
    877 F.3d 687 (6th Cir. 2017) ...................................................................................................35

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000).............................................................................................18, 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..................................................................................................................26

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)......................................................................................................13

*In re Pfizer, Inc. Sec. Litig.*,
    538 F. Supp. 2d 621 (S.D.N.Y. 2008)........................................................................................3

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021)..........................................................................24

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)....................................................................................16

*Rates Tech. Inc. v. Speakeasy, Inc.*,
    685 F.3d 163 (2d Cir. 2012).................................................................................................3

*Reilly v. U.S. Physical Therapy, Inc.*,
    2018 WL 3559089 (S.D.N.Y. July 23, 2018).......................................................................28

*Rein v. Dutch Bros, Inc.*,
    2024 WL 3105004 (S.D.N.Y. June 24, 2024)...............................................................23, 24

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)..................................................................................24

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004).................................................................................................25

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996).............................................................................................30, 31

*In re Sanofi Sec. Litig.*,
    87 F. Supp. 3d 510 (S.D.N.Y. 2015)...................................................................................26

*In re Sanofi-Aventis Sec. Litig.*,
    774 F. Supp. 2d 549 (S.D.N.Y. 2011).................................................................................25

*Schaffer v. Horizon Pharma PLC*,
    2018 WL 481883 (S.D.N.Y. Jan. 18, 2018).......................................................................26

*Scott v. Gen. Motors Co.*,
    46 F. Supp. 3d 387 (S.D.N.Y. 2014).............................................................................18, 19

*Sec. & Exch. Comm'n v. Rio Tinto plc*,
    41 F.4th 47, 49 (2d Cir. 2022).............................................................................................33

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)...................................................................................................30

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007).................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

*In re Take–Two Interactive Sec. Litig.*,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)......................................................................34

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................13, 27

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016)........................................................................................26

*Touchstone Strategic Tr. v. Gen. Elec. Co.*,
    2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022)...........................................17, 18, 33

*Tung v. Bristol-Myers Squibb Co.*,
    412 F. Supp. 3d 453 (S.D.N.Y. 2019).......................................................................35

*Tyler v. Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 ....................................................................................................31

*Venkataraman v. Kandi Techs. Grp., Inc.*,
    2022 WL 4225562 (S.D.N.Y. Sept. 13, 2022)..........................................................35

*Wyche v. Advanced Drainage Sys. Inc.*,
    710 F. App'x 471 (2d Cir. 2017) ...............................................................................27

**Statutes, Rules and Regulations**

15 U.S.C. § 78j(b) ........................................................................................... *passim*

15 U.S.C. § 78t(a) .....................................................................................................13, 35

15 U.S.C. § 78u-4(b)(1)(B)..............................................................................................13

15 U.S.C. § 78u-4(b)(2)(A)...............................................................................................13

17 C.F.R. § 240.10b-5................................................................................................23, 33

Fed. R. Civ. P. 9(b) ..........................................................................................13, 17, 18, 33

Fed. R. Civ. P. 8(a) ...........................................................................................................33

Fed R. Civ. P. 12(b)(6)........................................................................................................3

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **AC** | Plaintiff's Amended Complaint (Dkt. 43) |
| **¶ __** | Paragraphs of the Amended Complaint |
| **Class Period** | Plaintiff's proposed class period of November 4, 2022 to May 1, 2024 |
| **Bankr. Pr.** | Proceedings in the chapter 11 bankruptcy cases jointly administered under the caption *In re Tommy's Fort Worth LLC*, No 24-90000-elm11, (Bankr. N.D. Tex.) |
| **Borisch Compl.** | Action under the caption *Borisch v. Malibu Boats Inc.,* No. 3:24-cv-00339 (E.D. Tenn.), ECF 1 |
| **Borisch Decl.** | Declaration of Matthew Borisch in Support of Debtors' Emergency Motion to Enforce Automatic Stay Against Malibu Boats, Inc. and Malibu Boats LLC, Bankr. Pr., ECF No. 113 |
| **Company or MBI** | Malibu Boats, Inc. |
| **Defendants** | Malibu Boats, Inc., Jack Springer, Wayne Wilson, David Black, and Bruce Beckman |
| **Ex. __** | Exhibit to the Lightdale Declaration, dated November 8, 2024 |
| **Exchange Act** | Securities Exchange Act of 1934, as amended |
| **Individual Defendants** | Jack Springer, Wayne Wilson, David Black, and Bruce Beckman |
| **Lightdale Decl.** | Declaration of Sarah M. Lightdale, dated November 8, 2024 |
| **OneWater** | OneWater Marine Inc. |
| **Plaintiff** | Lead Plaintiff Retiree Benefit Trust of The City of Baltimore |
| **PSLRA** | Private Securities Litigation Reform Act of 1995, as amended |
| **SEC** | U.S. Securities and Exchange Commission |
| **Section 10(b)** | 15 U.S.C. § 78j(b) |
| **Section 20(a)** | 15 U.S.C. § 78t(a) |
| **Tommy's** | 15 boat dealerships owned by Matthew Borisch |
| **Tommy's Action** | Dismissed action under the caption *Tommy's Castaic, LLC v. Malibu Boats Inc.,* No. 3:24-cv-00166 (E.D. Tenn.) |
| **Tommy's Compl.** | Dismissed Complaint in the Tommy's Action, ECF 1 |
| **FY** | Fiscal Year (July 1 to June 30 for MBI) |
| **FY 2023** | Fiscal Year 2023 (July 1, 2022 to June 30, 2023 for MBI) |
| **FY 2024** | Fiscal Year 2024 (July 1, 2023 to June 30, 2024 for MBI) |

## INTRODUCTION

Plaintiff's Amended Complaint fails to state a claim and should be dismissed. Lacking any of the particularized facts required under the Private Securities Litigation Reform Act, the AC relies on unwarranted assumptions and untested allegations from a dismissed complaint in another litigation. None of this comes close to stating a claim for securities fraud.

Defendant Malibu Boats, Inc. sells recreational powerboats to over 400 dealerships around the world. In February 2024, M&T Bank informed Tommy's, a network of 15 dealerships that carried boats from one of MBI's three business segments, it was in default on a credit facility it used to pay for inventory, and that M&T would no longer provide Tommy's with credit. In March 2024, MBI notified Tommy's it was terminating their relationship due to, among other things, Tommy's inability to cure the default with M&T. In April 2024, Tommy's retaliated by filing a lawsuit against MBI. In May 2024, Tommy's filed for bankruptcy and moved to enjoin MBI from selling its products to other dealers in Tommy's former territories. Matthew Borisch, Tommy's owner, submitted a supporting declaration. The bankruptcy court denied Tommy's injunction request, and when the court appointed a bankruptcy trustee to supervise Tommy's bankruptcy in Borisch's place, the trustee voluntarily dismissed Tommy's lawsuit against MBI. Borisch then commenced his own suit by copying allegations from the dismissed Tommy's complaint.

This securities class action is a cynical attempt to exploit the unproven and thus far unsuccessful allegations made in the now dismissed Tommy's complaint and in the bankruptcy court. On the day after Tommy's filed its complaint, MBI issued a press release disclosing the lawsuit and made clear that MBI would "vigorously defend" against it. Just over two weeks later, on April 29, 2024, this case was commenced on conclusory allegations that MBI misled investors by not disclosing the "truth"—according to the dismissed Tommy's complaint. The AC likewise

parrots allegations in the dismissed Tommy's complaint as well as the Borisch declaration submitted in support of the injunction motion that the bankruptcy court denied.  Plaintiff contends that Defendants misled investors by not disclosing that Defendants "plotted to inflate MBI's boat sales by stuffing the Company's sales channel with tens of millions of dollars in excess boat inventory into its most important dealer, Tommy's, which Tommy's did not want or need." ¶ 127.

Plaintiff's "channel stuffing" theory fails on every level.  From before the start of the Class Period, MBI was transparent with the market that its strategy was to grow revenues by rebuilding depleted dealer inventory to normal pre-pandemic levels, even while projecting a significant decline in retail demand during 2023.  As inventory levels normalized and when retail demand slowed, MBI reported those developments.  The AC fails to plead particularized facts showing what "excess" inventory means, much less that MBI "stuffed" Tommy's with excess inventory, rather than followed its strategy to normalize inventory.  The AC also fails to adequately plead that MBI's statements addressing inventory and demand of MBI's over 400 dealers in the aggregate were rendered misleading by not disclosing granular information about Tommy's.  And many of the challenged statements are inactionable statements of corporate optimism and opinion.

Plaintiff's scienter allegations also entirely miss the mark.  The AC implausibly alleges that MBI perpetrated fraud so that one of the four individual defendants would be eligible for a non-guaranteed, higher bonus, that he ultimately did not receive.  But "incentive compensation can hardly be the basis on which an allegation of fraud is predicated." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co*., 553 F.3d 187, 201 (2d Cir. 2009).  The AC fails to allege a single contemporaneous fact showing that any Defendant believed MBI "stuffed" Tommy's full of "excess" inventory or that their public statements were false or misleading when made.  Rather, Plaintiff implores the Court to infer fraudulent intent based on mere access to

information, the core operations doctrine, and one resignation. Plaintiff's theories are far too vague and general to give rise to a plausible inference of scienter, much less a strong one.

The AC also fails to adequately plead loss causation.  None of the alleged corrective disclosures revealed the falsity of any challenged statement.  *See Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *14 (S.D.N.Y. Mar. 30, 2012) (dismissing Section 10(b) claim because "an alleged corrective disclosure that does not reveal the falsity of Defendants' challenged public statements" is "a pleading failure that is fatal under Second Circuit precedent") (cleaned up).

For these and all the other reasons herein, the AC should be dismissed with prejudice.

## FACTUAL BACKGROUND

### I.    MBI And The Individual Defendants

Defendant Malibu Boats, Inc. ("MBI" or the "Company") is a leading designer and manufacturer of recreational powerboats.  ¶ 24.[1]  Defendant Jack Springer served as CEO from 2009 through May 2024; Defendant Wayne Wilson served as CFO from September 2009 to May 2023; Defendant David Black served as Interim CFO from May to November 2023; and Defendant Bruce Beckman has served as CFO since November 2023. ¶¶ 25-28.

MBI is comprised of three business segments: Malibu, Saltwater Fishing, and Cobalt.  ¶ 30.  The Malibu segment includes two brands of performance sport boats: Malibu – premium boats with luxury features; and Axis – more affordable sport boats.  *Id*.  At the beginning of the putative

---

[1] Cites to "¶ _" refer to paragraphs of the Amended Complaint (Dkt. 43), and freestanding cites to "Ex. _" refer to exhibits to the Lightdale Decl., which are documents that may be properly considered on a Rule 12(b)(6) motion to dismiss—*i.e.*, "documents incorporated into the complaint by reference," *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007), as well as "matters of which a court may take judicial notice," *In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621, 627 (S.D.N.Y. 2008), including "public disclosure documents required to be filed with the SEC," *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 939 F. Supp. 2d 360, 368 (S.D.N.Y. 2013); "document[s] filed in another court," *Rates Tech. Inc. v. Speakeasy, Inc.*, 685 F.3d 163, 167 n. 3 (2d Cir. 2012); and "transcripts of companies' earnings calls," *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs., Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018). Page numbers refer to the native pagination of each cited document.

Class Period (*i.e.*, November 4, 2022), Malibu and Axis boats cost between $70,000 to $225,000. Ex. 4 at 19.  The Saltwater Fishing segment includes five brands, retailing between $45,000 and $1,300,000.  *Id*. at 20.  The Cobalt segment focuses on mid to large sterndrive boats and luxury cruisers, selling between $65,000 to $525,000.  *Id*.

MBI generates revenue by selling boats to independent dealers in over 400 locations globally, which then sell to retail consumers.  *Id*.  Historically, 50% of retail sales are on dealer lots and the other 50% are from custom pre-orders. Ex. 3 at 11.  To maintain this 50% distribution and attract buyers to dealer lots, MBI recommends that dealers carry double-digit weeks of on hand inventory.  *Id*. at 9.  Accordingly, dealer demand for boats (wholesale demand) depends on dealer inventory levels and does not always rise and fall with retail demand (consumer purchases). For example, when inventory is depleted, wholesale demand may increase to rebuild inventory, even when retail demand[2] decreases compared to prior periods.  Ex. 5 at 9; Ex. 9 at 34.

## II. In August 2022, MBI Projects That FY 2023 Growth Will Be Driven By Dealer Demand To Replenish Inventory To Pre-Pandemic Levels (*i.e.*, Dealer Wholesale Demand), Not By Retail Demand

The COVID-19 pandemic increased demand for recreational boats to the highest levels in decades, as people turned to boating as an outdoor activity.  ¶ 37.  That demand drove MBI's revenues for FY 2021 (July 2020 through June 2021)[3] and FY 2022 (July 2021 through June 2022) to over $1 billion a year.  *Id*.  It also depleted dealer inventory to "historic lows."  ¶ 38.  MBI could not manufacture boats fast enough to keep up with demand because of production slowdowns caused by supply chain and shipping challenges.  Ex. 9 at 34.

In August 2022, and looking beyond the pandemic, the Company projected FY 2023

---

[2] Retail demand is often measured by new boat registrations following purchases.  ¶ 46.

[3] MBI's fiscal year begins in July and runs through June.  As a result, 1Q is July through September, 2Q is October through December, 3Q is January through March, and 4Q is April through June.

revenues to increase by up to 9% based on a "***channel inventory opportunity***," as opposed to increasing retail demand.  Ex. 2 at 5; Ex. 3 at 11.  Indeed, Wilson disclosed that the Company expected retail demand to be "***down*** [a] high-single digit percentage" in FY 2023. Ex. 3 at 11. MBI nonetheless expected to grow revenues in FY 2023 by rebuilding dealer inventory to pre-pandemic levels in addition to meeting expected, albeit lower, retail demand.  *Id.*; Ex. 9 at 34. Springer explained that the appropriate level of dealer inventory was "double-digits weeks on hand" and that it could take a year to rebuild to just three to five weeks on hand.  Ex. 3 at 9.

### III. In November 2022, MBI Reports 1Q 2023 Revenue Growth And Reiterates That FY 2023 Growth Will Be Driven By Dealer Wholesale Demand, Not Retail Demand

On November 4, 2022, the first day of the Class Period, MBI announced record first quarter revenue in 1Q 2023 of $302.2 million.  Ex. 5 at 1.  Springer commented on the same day earnings call that "Malibu and Axis [we]re outperforming on every metric, supported by the incredible reception of our new model year lineup [and] demand remains strong . . . our customers are gobbling [our boats] up like [a Cajun] deep fried turkey dinner at Thanksgiving."  ¶ 120.

But Springer reiterated that MBI expected FY 2023 revenue to be driven by rebuilding dealer inventories to pre-pandemic levels.  Ex. 5 at 9.  He stated there was a particularly significant opportunity to rebuild dealer inventory in the Saltwater Fishing segment: "Marine [industry] on-hand inventory is still ***down by [34-35%]*** across all of Marine.  And to put a finer point on this, . . . freshwater channel inventory at MBI is consistent with their respective markets, but our saltwater channel inventory is substantially lower than the industry."  *Id*. at 6.

Springer continued to say that, rather than wait to see what custom pre-orders might come in, dealers needed to rebuild on hand inventory to attract buyers and drive in-person retail sales from lots: "[T]he winners are going to be the dealers who have inventory.  The fallacy of thought that somehow we're in a completely retail sold environment [post-pandemic] and 80% of the

people are going to be willing to wait for boats, it is just a fallacy . . . . And I think our dealers realize that. And actually, I would say that across the board and everyone with dealer meetings, there was optimism and almost the demand to get more inventory." Ex. 5 at 8.

**IV.    In May 2023, MBI Reports 3Q 2023 Revenue Growth Generated By Dealer Wholesale Demand In The Saltwater Fishing And Cobalt Segments Offset By A Slowdown In The Malibu Segment**

On May 3, 2023, the Company announced 3Q 2023 revenue of $375.1 million, a year-over-year increase. Ex. 6 at 1. Increased Saltwater Fishing and Cobalt segment boat sales drove growth. *Id*. at 1-2 (disclosing nearly 200 more Saltwater Fishing and Cobalt units sold for $37 million more in revenue than 3Q 2022). MBI's growth was offset by a slowdown in the Malibu segment, for which revenue decreased by $6.3 million or 3.5% compared to 3Q 2022. *Id*. at 2. The Company explained that decreases in the Malibu segment were primarily caused by "***reduced wholesale restocking demand as channel inventory becomes more normalized combined with lower retail activity***, accentuated by an abnormally high comparative period." *Id*.

On the earnings call that day, Springer reiterated that the opportunity to rebuild Malibu inventory had been largely tapped:

> As expected during the quarter, we have seen a softening of volumes within our higher margin Malibu-Axis segment as channel inventories reach the correct balance.
> …
> You have a retail environment that has been very low on inventory. And it's a real easy arithmetic equation in terms of - - you know that your inventories are down. You have to build that retail inventory out by shipping wholesale . . . what we've been doing is playing catch up now for the last, call it, 30 months of trying to get enough inventory in the channel. We're largely there, I think, on the Freshwater brands, which will be Malibu and Cobalt. We are not there yet on the Saltwater . . . We have to put more inventory in the channel to realize the retail that we want to.

Ex. 7 at 5, 9; ¶ 131.

**V.     In August 2023, MBI Reports That Dealer Inventory of Malibu and Cobalt Boats Has Reached Pre-Pandemic Levels, And Projects That FY 2024 Revenue Will Decrease Due To A Slowdown In Dealer Wholesale Demand**

On August 29, 2023, MBI reported FY 2023 revenue increased 14% from the prior year, "driven primarily by increased unit volumes in our Saltwater Fishing and Cobalt segments . . . offset by lower unit volumes in the Malibu segment." Ex. 8 at 3.  Despite strong overall growth, the Malibu segment continued to slow in 4Q 2023, as MBI sold 15% fewer Malibu segment boats than in 4Q 2022 for 9% less revenue "due to reduced wholesale restocking demand [ ] as our channel inventory normalized to pre-COVID levels combined with lower retail activity."  *Id.* at 2.

In its Form 10-K for FY 2023 filed on August 29, 2023, MBI explained that Malibu and Cobalt inventory had returned to pre-pandemic levels: "[C]urrent inventory levels at our Malibu and Cobalt dealers have returned to pre-pandemic levels and at our Saltwater Fishing dealers are continuing to normalize to pre-pandemic levels."  ¶ 146; Ex. 9 at 34.

On August 29, 2023, MBI projected FY 2024 revenue would ***decrease*** "in the mid to high teens year-over-year," or by potentially $250 million. Ex. 8 at 5. Springer explained that after "building boats to return back to where inventories had historically been . . . ***we expect wholesale demand [in FY 2024] to be decreased across all of our brands***." Ex. 10 at 6.  He observed that dealers were becoming more reluctant to carry inventory than pre-pandemic due to macroeconomic factors: "dealers [are] expressing caution in taking on new inventory amid rising interest rates, more normalized channels, recessionary concerns and weather-driven order delays." *Id*. at 5.  Springer elaborated that dealer caution, and a quicker rebuild of inventory than expected, prompted MBI to slow "production [ ] in our freshwater brands to match where channel inventories were at that point.  We continue to monitor retail sales and channel inventories closely and are prepared to make adjustments quickly."  *Id*. at 4.  Springer expressed optimism that "the retail

customer is still there and willing to purchase" based on a Labor Day event where "unit sales were

52% more than what we had projected." *Id.* at 6.

### VI. In October 2023, January 2024, And May 2024, MBI Reduces FY 2024 Revenue Projections Due To A Continued Slowdown In Dealer Wholesale Demand

On October 31, 2023, MBI announced that despite exceeding 1Q 2024 expectations, it was

reducing FY 2024 revenue projections based on macroeconomic factors. Ex. 11 at 6. Springer

explained on the earnings call that day:

> While channel inventories including saltwater normalized much faster than anyone anticipated, our nimbleness to slow down our build schedule has helped our dealers to have healthy inventories, enabling them to sell through mi[]d-year 2023 inventory more quickly. We are certainly laser-focused on inventory levels and believe most marine OEMs are as well, which will ultimately lead to a quicker recovery once demand increases. ***Looking ahead, the retail environment continues to weaken, driven largely by dealer concerns around the broader economic and interest rate environment. And as a result, they are being extremely cautious around inventory levels***. Further, we had expected to see improvement in the second half of the year. But based on what we are seeing today, that is not likely to be the case. Instead, ***we expect wholesale demand across our brands to remain pressured***. As such, we are revising our fiscal year 2024 outlook and now expect sales to be down from a high teens to low 20s percentage versus fiscal year 2023.

*Id*. In light of the macroeconomic factors weakening retail demand, Springer noted that ideal

dealer inventory levels might now be below pre-pandemic levels: "Channel inventories across our

brands are now back to or above pre-COVID levels" and "given the current environment, I think

it is a tad ***below [ ] pre-COVID levels would be the right amount of inventory***." *Id*. at 4, 10.

On January 30, 2024, the Company reported that 2Q 2024 Malibu segment revenue

continued to decrease compared to prior periods. ¶ 82; Ex. 12 at 1. The Company reduced FY 2024

revenue projections again from a low 20s percentage decline to a mid to high 30s percentage

decrease. Ex. 13 at 7. Springer explained that declining retail demand had resulted in dealers across

the industry carrying "around 5 weeks too much on hand inventory" and that MBI needed to slow

production even more to help normalize inventory levels. *Id.* at 8. He elaborated:

> Over the last 2 fiscal years, we have been focused on rebuilding our channels from historically low levels brought on by lingering supply chain challenges and unprecedented demand during the pandemic. Today, these dynamics have shifted and the level setting is going on as the inventory channels have fully recovered. We are back to natural market dynamics and MBI is highly focused on recalibrating to match wholesale production to retail demand. We are very, very committed to reducing channel inventories to lower levels.

*Id.* at 4; ¶ 172.

On May 2, 2024, MBI announced that 3Q 2024 revenues decreased by 46% compared to 2Q 2024. ¶ 105. Springer discussed on the earnings call "a weakened retail environment characterized by lingering uncertainty and softened retail demand" and noted that dealer inventories "remained stubbornly high, making dealers reluctant to bring on additional inventory." ¶ 106. MBI reduced FY 2024 projections again from a mid to high 30s percentage decline to a 40-41 percent decline from FY 2023 to "focus on channel inventory reductions." ¶¶ 105-06, 108.

## VII.    In March 2024, MBI Terminates Its Relationship with Malibu Dealer Tommy's, After Tommy's Credit Provider Puts Tommy's In Default

Prior to its bankruptcy in May 2024, Tommy's was a network of 15 dealerships that carried Malibu segment boats; Tommy's did not carry Saltwater Fishing or Cobalt segment boats. ¶¶ 32, 34. Matthew Borisch was Tommy's President. ¶ 34.

Each year, MBI and Tommy's negotiated new dealer agreements and order commitments for the new "model year," running from July through June, in which Tommy's agreed to order a certain minimum number of boats. Borisch Decl. at ¶ 5, n.7. For FY 2023 (*i.e.*, July 2022 through June 2023), Tommy's committed to ordering 1,234 boats from MBI. *Id*. at ¶ 23.

Like other MBI dealers, Tommy's entered into "floor plan" credit facilities under which third-party lenders pay for a dealer's boats and are reimbursed when the dealer makes a sale. ¶ 30. Between July 1, 2020 and June 30, 2022, the start of FY 2023, the number of Tommy's dealerships grew from seven to 15. Borisch Decl. at ¶ 23. As of late 2022, Tommy's had a $50 million floor

plan with Fifth Third Bank for purchases from MBI and the other manufacturers Tommy's carried. ¶¶ 5, 43. By March 2023, in an attempt to accommodate the commitments in its dealer agreements, Tommy's had expanded its floor plan to $85 million. *Id.* On May 18, 2023, Tommy's entered a new finance arrangement with a different bank, M&T Bank, in which it further expanded its floor plan to $110 million, with an alleged $20 million "overlimit." ¶¶ 49-50.

During the spring of 2023, MBI and Tommy's began negotiating a model year 2024 dealer agreement. By late August 2023, MBI's expectation was that Tommy's would commit to ordering 605 boats for model year 2024. However, after learning that Tommy's had been selling out of trust ("SOT") in September 2023 – *i.e.*, not reimbursing its lender upon selling boats – Springer emailed Borisch that "Tommy's is SOT, which is one of the worst situations that can arise. Until Tommy's is in good standing with M&T, no dealer agreement can be or will be signed. It is critical that Tommy's resolve any and all SOT situations and has adequate, supported floorplan financing." ¶¶ 67-69. Within weeks, Tommy's resolved the SOT with M&T Bank, and Springer confirmed MBI would resume negotiation with Tommy's over new dealer agreements. Borisch Decl. at ¶¶ 13-14.

On February 27, 2024, however, M&T Bank informed Tommy's that it was placing Tommy's in default, and would not provide any financing for additional boats. ¶ 95; Borisch Decl. at ¶ 38. On March 22, 2024, Springer wrote a letter to Borisch terminating MBI's relationship with Tommy's: "[G]iven the impact on retail customers, the inability to cure outstanding defaults with M&T, the lack of current and future floorplan financing, and the lack of other viable options moving forward, this letter is to confirm that Malibu does not anticipate entering into dealership agreements with any of the remaining Tommy's Dealerships for the remainder of model year 2024, model year 2025, and beyond." ¶ 97.

**VIII.  Tommy's Retaliates By Filing Suit Against MBI, But Its Motion To Prevent MBI From Doing Business With New Dealers Is Denied, And Its Bankruptcy Trustee Voluntarily Dismisses The Lawsuit Against MBI**

On April 10, 2024, Tommy's filed a lawsuit against MBI in the Eastern District of Tennessee, alleging breach of contract and misrepresentation claims.  ¶ 98.  Tommy's alleged that in FYs 2023 and 2024, MBI engaged in a scheme to "pump" "$100 million of boats into Tommy's."  *Id.*  Tommy's also claimed that MBI induced it to increase its floor plan to make room for inventory and to regain market share.  *Id.*  Tommy's based its claims almost entirely on a purported conversation Borisch had with three unnamed "Malibu stakeholders" at a Miami boat show in February 2024.  Tommy's Compl. at ¶ 1, 74-75.  According to Tommy's, "the stakeholders disclosed their understanding of what Malibu and its former CEO, Jack Springer, had done to Tommy's . . . they also reported that 'Jack would not turn the spigot off.'"  *Id.*

The next day, MBI issued a press release disclosing the lawsuit and noting that it "intends to vigorously defend against claims alleged by Tommy's Boats."  ¶ 99; Ex. 15.  MBI stated that, over the first six months of FY 2024, the percentage of MBI revenue derived from boats sold to Tommy's declined to 4% from 10.7% for all of FY 2023.  Ex. 15.  The Company also stated that it was actively engaged with its dealer network to mitigate any disruption and to provide a strong dealer partner in each of the markets served by Tommy's.  ¶ 99; Ex. 15.

On May 20, 2024, various Tommy's dealerships filed for chapter 11 bankruptcy.  ¶ 110. As a part of bankruptcy proceedings, Tommy's moved to enjoin MBI from doing business with other dealers in Tommy's territories, and Borisch, Tommy's President, submitted a supporting declaration.  Borisch Decl. at 1. The court denied that motion. Bankr. Pr. ECF 148 at 2.

Borisch's declaration contradicts claims in the Tommy's complaint that MBI "pumped" Tommy's full of boats in FYs 2023.  *See* Tommy's Compl. at ¶¶ 1, 4, 68, 70.  Specifically, Borisch admits that MBI delivered ***fewer*** boats than Tommy's committed to buy in FY 2023 (1,191

delivered of 1,234 committed).   Borisch Decl. at ¶¶ 23, 25. And contrary to MBI "pumping" Tommy's with more boats than Tommy's wanted, Borisch concedes that Tommy's requested MBI provide Tommy's with a total 1,617 manufacturing slots over FY 2023, but MBI only began production of ("slotted") a total of 1,158 boats for Tommy's. Borisch Decl. at ¶ 25.   On a monthly basis, MBI almost always manufactured fewer, and often *far fewer*, boats than Tommy's monthly requests. *Id*.  (showing monthly ratios of requested to slotted boats of 168 to 67 (Oct. 2022), 100 to 15 (Jan. 2023)*,* 114 to 31 (Feb. 2023), 117 to 91 (June 2023)).

On June 17, 2024, the bankruptcy court appointed a trustee who voluntarily dismissed the Tommy's lawsuit against MBI.  Tommy's Action, ECF No. 39.  Subsequently, Borisch filed his own complaint, copying allegations from the dismissed Tommy's complaint. *See* Borisch Compl.

## IX.     This Lawsuit: Plaintiff Parrots The Allegations In The Dismissed Tommy's Lawsuit And Borisch Declaration

On April 29, 2024, just weeks after Tommy's filed suit, this lawsuit was filed on behalf of a putative class comprised of those who purchased MBI securities between November 4, 2022 and April 11, 2024.  The Complaint alleged that MBI misled investors by not disclosing as the "truth" the untested allegation in Tommy's complaint that MBI "engaged in an 'elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen [] Tommy's dealerships.'"  Dkt. 1. at ¶ 7 (quoting Tommy's Compl. at ¶ 1).

On October 4, 2024, Plaintiff filed the AC asserting claims on behalf of a putative class comprised of those who purchased MBI securities between November 4, 2022 and May 1, 2024. The AC parrots the allegations in the now dismissed Tommy's complaint and Borisch declaration. *Compare, e.g.,* ¶¶ 43, 49-50, 91 *with* dismissed Tommy's Compl. ¶¶ 60-61, 63-67, 73-78; *compare also* ¶¶ 37, 43, 68-69, 91 *with* Borish Decl. at ¶¶ 19, 21, 11-12, 37.   The AC asserts claims under Sections 10(b) and 20(a) of the Exchange Act for allegedly misleading investors

about MBI's growth, demand, and inventory levels by failing to disclose MBI's purported scheme to pump Tommy's with abnormal amounts of inventory.  ¶¶ 1-18.

## LEGAL STANDARDS

To state a Section 10(b) claim, the plaintiff must plead: (1) a material misrepresentation or omission ("falsity"), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) loss causation, and (6) economic loss.  *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010).  Plaintiff's claims are subject to the PSLRA's "exacting pleading requirements" for falsity and scienter.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007).  The PLSRA requires that a complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B); *see also* Fed. R. Civ. P. 9(b) ("a party must state with particularity the circumstances constituting fraud").  In addition, for each alleged misstatement, the PSLRA requires that a complaint state with particularity facts giving rise to a "strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2)(A).

The Court "must consider the complaint in its entirety, … documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs*, 551 U.S. at 322.  "The court need not accept as true an allegation that is contradicted by documents on which the complaint relies."  *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004).  The Court also need "not accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions, or unwarranted inferences."  *Kavanagh v. Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014).

## ARGUMENT

I.    **Plaintiff's Section 10(b) Claim Should Be Dismissed Because the Amended Complaint Fails to Adequately Plead any False or Misleading Statement or Omission**

Plaintiff challenges statements made by Defendants in November 2022; February, May, June, August, September, and October 2023; and January and March 2024.[4]  According to Plaintiff, these statements were rendered misleading by the failure to disclose (i) MBI's purported plan to "stuff" Tommy's full of "excess" inventory; (ii) declining retail and wholesale demand; and/or (iii) Tommy's "dire" financial condition.  *See, e.g.*, ¶¶ 4, 122, 127, 133, 139, 154.  As discussed below, Plaintiff has failed to adequately plead any actionable misstatement or omission.

A.    **The AC Fails To Plead Particularized Facts Showing That MBI Planned To "Stuff" Tommy's With "Excess" Inventory**

Plaintiff's primary ground for challenging Defendants' statements is that they failed to disclose that "beginning no later than July 2022, Defendants plotted to inflate MBI's boat sales by stuffing the Company's sales channel with tens of millions of dollars in excess boat inventory into its most important dealer, Tommy's, which Tommy's did not want or need."  ¶ 127; *see also* ¶¶ 120-27, 130-33, 137-140, 142-44, 146-47, 149-53, 155-59, 161-63, 165-68, 171-76.

Plaintiff's pleading is deficient for multiple independent reasons.  *First*, the AC is devoid of particularized facts showing MBI plotted to "stuff" Tommy's with "excess" inventory.  The AC fails to allege facts showing what "excess" inventory means, what normal inventory levels were, and how Tommy's inventory compared to normal levels at the time each challenged statement was made.  Without at least some of these foundational details, Plaintiff cannot credibly argue, let alone plead with particularity, that Defendants "pumped" "excess" inventory into Tommy's.

*Gavish v. Revlon, Inc.,* 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) is instructive.  There,

---

[4] For the Court's convenience, a table of the challenged statements is attached as Exhibit 1 to the Lightdale Decl.

the plaintiff alleged that Revlon misled investors by failing to disclose that it sold Safeway far more makeup products than it could sell to consumers. *Id.* at *3, *13, *18. In support, plaintiff relied on witness accounts that Revlon shipped more product to Safeway than requested, retailers returned pallets of makeup and trailers full of lipstick, and stores could not sell the products they unwillingly received. *Id.* In dismissing the action, the court noted that the complaint did not adequately plead inflated wholesale sales because it did not quantify categories of wholesale sales over time compared to consumer sales or "grapple with [the company's] aggregate reported quarterly sales [to retailers] . . . or any measure of sell-through." *Id.* at *18. "[T]hat retailers found themselves carrying substantially more inventory than was commercially necessary" was not enough. *Id.* As in *Gavish*, Plaintiff here fails to plead any facts supporting its contention that MBI pumped "excess" inventory into Tommy's, ¶ 4, whatever that may mean.

Instead, Plaintiff relies almost entirely on an allegation from the Borisch declaration that Tommy's had 800 boats in its inventory "as of June 12, 2023," representing "nearly 70%" of the MBI inventory Tommy's bought in FY 2023. ¶¶ 63-64, 140. While Plaintiff characterizes this as "staggering," the AC pleads no facts showing that 800 boats, at one snapshot in time, meant that MBI "stuffed" Tommy's full of "excess" inventory. ¶¶ 63-64, 140. Nor does it allege how 800 boats compared to expectations, or "normal" levels, especially when June is near the start of the peak retail boat sales season. *See* Ex. 6 at 1.[5]

*Second*, Plaintiff's contention that MBI pushed an "excess" amount of inventory to

---

[5] The anecdotal recollections of CW 3, a former Tommy's salesperson, regarding his time at a single Tommy's location in Colorado, ¶¶ 51-52, 65, do not change the analysis. Courts have repeatedly held that similar and more substantive CW allegations were too nonspecific to establish channel stuffing. *See Gavish*, 2004 WL 2210269 at *18; *In re Hain Celestial Group Inc. Sec. Lit.*, 2022 WL 18859055, *21. (E.D.N.Y. Nov. 4, 2022) (rejecting allegations based on multiple CW statements that distributors were shipped goods with a right of return and CWs personally and regularly processed their returns, as "too conclusory and/or vague to sufficiently plead" channel stuffing). Moreover, CW3's alleged recollections about a single dealership are consistent with MBI's disclosed plans to normalize dealer inventory after the pandemic, and do not show that MBI was "stuffing" Tommy's with "excess" inventory.

Tommy's is not only unsupported by any facts, but also contradicted by the Borisch declaration upon which the AC relies.  AC at 1, ¶¶ 5, 9, 12, 40, 69, 91; *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) ("If these documents contradict the allegations of the amended complaint, the documents control . . ."). As admitted in the Borisch declaration, at the start of FY 2023, Tommy's committed to buy 1,234 boats from MBI, but took delivery of only 1,191. Borisch Decl. at ¶ 23.  Moreover, Tommy's requested that MBI "slot" (manufacture) a running total of 1,617 boats over FY 2023, but MBI manufactured only 1,158 of the boats requested*. Id*.  Despite the AC's allegations that Tommy's did not want more boats, Tommy's continued to request boats each month of FY 2023. *Id.* ¶ 25.  In fact, its request for May 2023 (164 boats) was its highest in six months.  *Id.*  And in June 2023, when MBI was purportedly "stuffing" Tommy's with "excess" inventory, MBI slotted only 91 of 117 boats that Tommy's had asked to be manufactured.  *Id.*  These facts do not support an inference that MBI over-manufactured and stuffed Tommy's with "excess" inventory, but show the opposite.  *See Rapoport*, 88 F. Supp. 2d at 184 ("This Court finds that the documents contradict Plaintiffs' allegations, and, therefore, this Court must grant Defendants' motion to dismiss.").[6]

*Third*, Plaintiff relies on untested allegations from the Borisch complaint that Springer and Wilson met with Borisch in July 2022 and "made clear" Tommy's would lose its status as an MBI dealer if it did not increase floor plan capacity.  ¶¶ 42-43, 49-50; *see also* Borisch Compl. at ¶¶ 4-5, 64.  "Courts 'generally do not consider averments taken directly from uncorroborated allegations embedded in a complaint in another action or parroted allegations for which counsel has not

---

[6] As for Plaintiff's contention that MBI "pushed" a different mix of inventory on Tommy's than Tommy's would have preferred, ¶¶ 5, 14, 50-51, 98, 101, the Borisch declaration shows that Tommy's requested more boats from both the Axis and Malibu segments than MBI delivered.  Borisch Decl. at ¶ 33.

conducted independent investigation.'" *Touchstone Strategic Tr. v. Gen. Elec. Co.,* 2022 WL 4536800, at *2 (S.D.N.Y. Sept. 28, 2022), *aff'd,* 2023 WL 6053007 (2d Cir. Sept. 18, 2023).[7]

Moreover, neither the AC nor the dismissed Borisch complaint provide any detail on what Springer said to Borisch that supposedly "made clear" Tommy's would lose its status as an MBI dealer. *See Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *16 (N.D. Cal. Nov. 14, 2016) ("At a minimum, [p]laintiffs needed to have provided information about *precisely* what was said by the parties in these meetings, which facts the [d]efendants were exposed to, and why this exposure supports an inference of scienter."). Regardless, Plaintiff fails to plead specific facts showing that Tommy's floorplan increases of $50 million to $85 million to $110 million mean that it was carrying "excess" inventory during the Class Period. ¶¶ 43, 49. The AC ignores that during the pandemic Tommy's grew the number of its dealerships from seven to 15, Borisch Decl. at ¶ 23, and alleges no facts showing that MBI required Tommy's to increase its floorplan to further a purported "channel stuffing" scheme, as opposed to accommodating the needs of a higher number of dealerships carrying a normal, post-pandemic level of inventory. Ex. 5 at 8; *see Amorosa*, 2022 WL 3577838, at *3 ("[B]ecause [the] Amended Complaint . . . alleges no non-conclusory facts that support the truth of these secondhand allegations [from another complaint], [a]llowing plaintiff[] to rely on them is impermissible under Rule 9(b).") (cleaned up).

*Fourth*, the AC relies on a conspicuously vague allegation from the dismissed Tommy's complaint regarding a conversation Borisch had with three "Malibu stakeholders" at a Miami boat show in February 2024. ¶¶ 12, 91, 194; Tommy's Compl. at ¶¶ 74-78. The AC does not identify the "stakeholders" titles, roles, involvement with MBI, responsibilities at MBI if any, whether they

---

[7] Rather than interview Borisch to verify or test the allegations in the dismissed Tommy's complaint, Plaintiff concedes that its counsel only spoke with Borisch's litigation counsel. AC at 1; *see Amorosa v. Gen. Elec. Co.*, 2022 WL 3577838, at *3 (S.D.N.Y. Aug. 19, 2022) (disregarding allegations attributed to witnesses from other complaints where plaintiffs did not interview such witnesses).

ever interacted with Springer or anyone else in MBI management, and the underlying factual basis for their opinions. Instead, and without specifying which "stakeholder" supposedly said what Springer had "done," exactly what Springer had done, when, or how, the AC simply parrots the vague allegation that these unidentified "stakeholders" told Borisch "their understanding of what Malibu and its former CEO, Jack Springer, had done to Tommy's" and that "Jack would not turn the spigot off." ¶¶ 12, 91. In addition to being untested and unreliable, *see Touchstone*, 2022 WL 4536800, at *2, these anonymous CW allegations do not come close to meeting the particularity and heightened pleading requirements of Rule 9(b) and the PLSRA. See *Novak v. Kasaks,* 216 F.3d 300, 314 (2d Cir. 2000) (affirming dismissal where CW allegations did not contain "sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 WL 4931357, at *19 (S.D.N.Y. Aug. 19, 2015) (rejecting allegations of CWs who were not alleged to have had direct communications with the individual defendants); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F.Supp.2d 365, 376 (S.D.N.Y. 2007) (dismissing where no facts alleged showing that CW, who had "an unspecified role (if any) at [defendant] during the class period [,] would be in a position to know . . . whether [defendant's sales'] strategy included channel stuffing.").

*Fifth*, before the first alleged corrective disclosure in January 2024, MBI disclosed in August 2023 and again in October 2023 that macroeconomic factors caused inventory levels to be higher than ideal. Such disclosures of elevated inventory preclude fraud claims premised on channel stuffing theories. *See Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 397 (S.D.N.Y. 2014) (dismissing Section 10(b) claim based on channel stuffing theory where company "disclosed its increasing inventories and relatively slower growth in sales" prior to alleged corrective disclosure). In August 2023, after a soft summer sales season, MBI reported that freshwater segment

inventories were "at pre-Covid levels or even higher in some cases," and dealers were facing "higher inventory levels," higher carrying costs, and a weak retail environment, leading the Company to forecast declining wholesale sales. Ex. 10 at 5; *see Scott*, 46 F. Supp. 3d at 398 ("That GM did not characterize this increase in inventory as 'channel stuffing' or accuse itself of 'building up excess inventory on dealer lots,' does not render the disclosure document actionable"). And in October 2023, Springer disclosed that "[c]hannel inventories across our brands are now back to or above pre-COVID levels . . . given the current environment, I think it is a tad below [ ] pre-COVID levels would be the right amount of inventory." Ex. 11 at 10.

Because the AC does not adequately plead that MBI planned to stuff Tommy's with "excess" inventory, Plaintiff has not adequately pled that any public statements were rendered false or misleading by not mentioning such a plan. *See In re Axis Cap. Holdings, Ltd. Sec. Litig.*, 456 F.Supp.2d 576, 585 (S.D.N.Y. 2006) ("If the complaint fails to allege facts which would establish [ ] an illegal scheme, then the securities law claims premised on the *nondisclosure* of the alleged scheme are fatally flawed.") (emphasis in original).

**B.    The AC Fails To Plead Facts Showing That Retail Or Wholesale Demand For MBI Boats Was Inconsistent With Defendants' Public Statements**

Equally deficient is Plaintiff's contention that Defendants misled investors by failing to disclose that retail and wholesale "demand for boats was dramatically weakening" during the Class Period. ¶ 135; *see also* ¶¶ 120-28, 130-33, 137-41, 146-47, 149-53, 155-59, 161-63.

*First*, MBI disclosed the information Plaintiff claims it concealed about retail demand— *i.e.*, that retail demand was decreasing in FY 2023 compared to prior periods. *See Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 338 (2d Cir. 2011) (dismissing Section 10(b) claim where the defendants "disclosed the very . . . risks about which [plaintiffs] claim to have been misled"); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) ("[D]ismissal is

appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed."). Indeed, in August 2022, before the Class Period even started, Springer disclosed that the Company expected retail demand to be "***down*** [a] high-single digit percentage" in FY 2023. And MBI attributed its FY 2023 revenues primarily to its efforts to return channel inventory to normal levels, and not to retail demand. *E.g.* ¶ 126 (explaining that the increase in 2Q sales was due to wholesale not retail demand); ¶ 131 (explaining that 3Q revenues were high despite soft retail demand, because MBI had been addressing "a low inventory environment . . . by shipping wholesale [and] putt[ing] more inventory in the channel to realize the retail that we want to.").

Plaintiff mistakenly relies on CW 3. Far from being inconsistent with Defendants' disclosures about declining retail demand in FY 2023, CW 3 allegedly said that at the end of FY 2023 a Tommy's dealership in Colorado had between 25 and 50 boats in inventory compared to the 5 to 10 boats it usually had at FY end in the past, and that he personally sold 1 to 2 boats per month in June and July 2023 compared to the 5 boats he typically sold per month. ¶¶ 65, 67;*see In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F.Supp.2d 564, 576 (S.D.N.Y. 2013) (holding that alleged omission was not actionable where "that [omitted] information was not materially different from the information that was already publicly disclosed").

Plaintiff also mistakenly relies on CW 2, who allegedly said that there was a "sharp drop off in demand for MBI boats" in FY 2023, based on "a decline in boat registrations." ¶¶ 46-47. Plaintiff does not plead any particularized facts to show any inconsistency with MBI's disclosures; indeed, the AC does not specify what CW 2 meant by a "sharp drop off" or a "decline" in registrations. Nor does the AC even generally quantify boat registrations before, during, or after the Class Period. *See Gavish,* 2004 WL 2210269 at *17 (alleged "high level" of inventory lacked details to show company carried excess inventory); *In re NBTY, Inc. Sec. Litig.*, 224 F. Supp. 2d

482, 492 (E.D.N.Y. 2022) (dismissing Section 10(b) claims where allegations of declining sales levels were "not grounded in any supportive facts").

*Second*, MBI disclosed the information Plaintiff claims it concealed about wholesale demand—*i.e.*, that wholesale demand for FY 2024 declined. Indeed, in its Form 10-K for FY 2023 filed on August 29, 2023, MBI explained that Malibu (and Cobalt) inventory had returned to pre-pandemic levels, ¶ 146; Ex. 9 at 34, projected that FY 2024 revenue would ***decrease*** "in the mid to high teens year-over-year," Ex. 8 at 5, and stated that "***we expect wholesale demand [in FY 2024] to be decreased across all of our brands***."  Ex. 10 at 6.  CW 3's alleged statement that dealerships "were holding off on placing and receiving model year 2024 orders," ¶ 66, in not inconsistent with these disclosures.

*Third*, Plaintiff misguidedly relies on CW 1 to claim that wholesale demand decreased in FY 2023.  Plaintiff does not allege that CW 1 attended any meetings between Springer and OneWater's CEO, and thus cannot rely on CW 1's hearsay to allege that "OneWater's CEO directly delivered OneWater's order cancellations to Defendant Springer in a February 2023 meeting."[8]  ¶ 185, *see also* ¶¶ 128, 135, 141, 147, 153, 178; *see Menora Mivtachim Ins. v. Int'l Flavors & Fragrances Inc.*, 2021 WL 1199035, at *25 (S.D.N.Y. Mar. 30, 2021) (rejecting allegations based on a CW who conveyed hearsay and did "not have direct personal knowledge of the state of mind of any [defendant]").  Moreover, the AC is silent on how many orders OneWater cancelled or whether it offset those cancellations with other MBI boat orders, and does not otherwise provide any basis to compare OneWater's orders or inventory with other dealers. *See Novak,* 216 F.3d at 314.

---

[8] Plaintiff does not allege that OneWater cancelled orders until February 2023. ¶ 185.  Challenged statements made in November 2022, ¶¶120-122, could not have been rendered misleading by alleged cancellations that had not yet occurred.  *See In re Bristol-Myers Squibb,* 2023 WL 2308151, at *3 (S.D.N.Y. Mar. 1, 2023).

In addition, as reflected in MBI's public SEC filings, there was no lack of wholesale demand from OneWater. Instead, OneWater *increased* its spend from $201.6 million in FY 2022 to $235 million in FY 2023 and represented a larger percentage of MBI's business in FY 2023. Ex. 9 at 4, 39 (showing year-over-year increase in both revenue from OneWater and OneWater's overall percent of MBI net sales). Plaintiff does not, and cannot, plead any facts to the contrary.

### C.    The AC Fails To Plead Facts Showing That Any Challenged Statement Was Contradicted By What Defendants Knew About Tommy's Financial Condition

The AC also fails to state a claim based on the failure to disclose in challenged statements made between September 2023 and March 2024 that Tommy's was in a "dire financial condition and at risk of collapsing due to Defendants' own channel stuffing scheme."[9] ¶ 144; *see also* 148-154, 155-60, 167-69, 171-178, 180-81.

To plead falsity, Plaintiff is required to "demonstrate with specificity why and how" each challenged statement was "false *at the time it was made*." *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 2023 WL 2308151, at *3 (S.D.N.Y. Mar. 1, 2023) (cleaned up). Here, the AC fails to plead facts showing that any challenged statement was contradicted by what Defendants knew about Tommy's financial condition at the time the statement was made. The AC does not allege what Tommy's financial statements showed at any point during the Class Period, let alone that MBI had access to Tommy's financial data. Instead, Plaintiff simply claims that, by September 2, 2023, MBI was aware that Tommy's was in a "dire financial position" because it learned that Tommy's had sold out of trust. ¶ 186. But the SOT issue was resolved within a matter of weeks, Borisch Decl. at ¶¶ 13-14, and the AC fails to plead particularized facts showing that the SOT issue reflected anything more than Tommy's irresponsibility in failing to timely manage its debt.

---

[9] Plaintiff does not contend that statements made prior to August 2023 were rendered misleading by failing to disclose Tommy's purported "dire" financial condition. ¶¶ 122, 127-28, 133-35, 139-41.

*Id.* (stating that Tommy's "immediately began to work with M&T to resolve the SOT and in October 2023, M&T sent confirmation that [Tommy's] resolved the SOT"); *Bd. of Trs. of Operating Eng'rs Pensions Trust v. JPMorgan Chase Bank, N.A.*, 2012 WL 1382274, at *3-4 (S.D.N.Y. Apr. 20, 2012) ("even if" defendant's access to certain financial models and news articles and role as Lehman's clearing bank "were sufficient to make it 'theoretically conceivable' that [defendant] should have known about Lehman's weakening financial condition, such speculation is not enough to defeat a motion to dismiss"). Rather than convey that it was on the brink of going out of business, Tommy's continued to order boats and to represent MBI at boat shows through February 2024. ¶ 71; Borisch Decl. at ¶ 16. Furthermore, if MBI had believed that Tommy's was going out of business, MBI would not have resumed negotiating dealer agreements with Tommy's, as Borisch says MBI did in October 2023. Borisch Decl. at ¶¶ 13-14.

Plaintiff also misguidedly relies on Tommy's default with M&T Bank on February 27, 2024. ¶ 95. The only challenged statement post-dating the default was made days later on March 5, 2024, ¶ 180 (Springer statement that Wells Fargo was a "key partner" with whom MBI shared dealer health information), and the AC fails to plead specific facts showing that Tommy's informed MBI, or that MBI otherwise learned about, the default before the March 5, 2024 statement.

### D.    Challenged Statements Referencing Factors Affecting Dealers And Consumers In The Aggregate Did Not Trigger A Duty To Disclose Granular Information About Tommy's

Plaintiff's Section 10(b) claim challenging statements for failure to disclose a purported MBI plan to stuff Tommy's with "excess" inventory and/or Tommy's "dire" financial condition, also fails for another reason. There is no duty to disclose all information, and an omission is actionable only if disclosure was necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b).

Plaintiff makes the sweeping contention that every challenged statement in the AC, whether about normalizing inventory across its more than 400 dealer locations, *e.g.*, ¶ 150; resilient wholesale and retail demand, *e.g.*, ¶ 126; accounting for retail demand when determining aggregate inventory levels, *e.g.*, ¶ 167; a strong dealer network, *e.g.*, ¶ 151; or optimism that premium buyers still wanted to buy boats, *e.g.*, ¶ 151, was false without disclosure that MBI stuffed Tommy's with "excess" inventory and/or that Tommy's was in a "dire" financial condition.   ¶¶ 64, 68, 76, 80, 84, 89, 91. That is not the law.  *See Rein v. Dutch Bros, Inc.*, 2024 WL 3105004, at *15 (S.D.N.Y. June 24, 2024) (dismissing Section 10(b) claim where there was "a mismatch between the fact that the AC faults [the defendant company] for omitting . . . and the statements it challenges"); *In re Ferrellgas Partners, L.P. Sec. Litig.*, 2018 WL 2081859, at *11 (S.D.N.Y. Mar. 30, 2018) (dismissing Section 10(b) claim because alleged omissions were not "sufficiently connected to Defendants' existing disclosures to make those public statements misleading").

The challenged statements referenced factors affecting dealers and consumers ***in the aggregate***. *E.g.*, ¶¶ 76, 126, 152, 167.  The challenged statements therefore did not trigger a duty to disclose more granular information about Tommy's – which at its peak represented just 15 of the more than 400 dealer locations for MBI.  *See In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *10-13 (S.D.N.Y. Sept. 10, 2021) (disclosure of positive clinical trial data was not rendered misleading by omission of other study data regarding toxicity); *Abely v. Aterna Zentaris Inc.*, 2013 WL 2399869, *11-12 (S.D.N.Y. May 29, 2013) ("Section 10(b) and Rule 10b-5 do not categorically prohibit statements that are incomplete or that report cumulative figures instead of detailed breakdowns of the underlying data or subcategories of data.") (cleaned up).

Only ***one*** challenged statement mentioned Tommy's.  In its August 29, 2023 Form 10-K, MBI accurately disclosed that Tommy's comprised approximately 10.7% of MBI net sales in 2023.

24

¶¶ 142-45.    MBI did not address, much less make any misrepresentations about Tommy's inventory levels or financial condition.  *See Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012) ("[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as 'what was revealed would not be so incomplete as to mislead.'"); *Rein*, 2024 WL 3105004, at *15 (dismissing where there was "a mismatch between the fact that the AC faults [the company] for omitting . . . and the statements it challenges").[10]

### E.    Many Of The Challenged Statements Are Inactionable As A Matter of Law

Many of the statements Plaintiff challenges also fail because they are inactionable as statements of corporate optimism or opinion.

***Inactionable Statements of Corporate Optimism***.    Generalized statements of "corporate optimism," or "puffery," cannot give rise to liability, *Rombach v. Chang*, 355 F.3d 164, 174-75 (2d Cir. 2004), because they "make[] no specific claims on which [reasonable persons] can rely." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 565 (S.D.N.Y. 2011).

Here, Plaintiff challenges a number of statements that conveyed generalized optimism about the Company's business. *See, e.g.*, ¶ 120 ("continued momentum;"  "ongoing demand;" customers "gobbling boats;" demand "remains strong"); ¶ 123 ("The retail environment remains resilient with strong demand carrying the tide"); ¶ 124 ("our customers remain unfazed"); ¶ 125 ("meeting existing demand and building channel inventories continues to be a primary focus and a major tailwind in the quarters to come"); ¶ 130 ("we have made great strides in normalizing our channel inventory . . . allowing our dealers to be poised to satisfy customer demand"); ¶ 146 (MBI

---

[10] Plaintiff's contention that the August 29, 2023 Form 10-K disclosure was misleading due to MBI's refusal to enter FY 2024 dealer agreements with Tommy's "[u]ntil Tommy's is in good enough standing with M&T [Bank]," ¶ 145, not only ignores the Form 10-K made no representations about Tommy's for FY 2024, but also that MBI did not learn that Tommy's SOT issue until September 2023 and Borisch's own admission that, after the SOT was resolved with M&T Bank, MBI and Tommy's resumed dealer agreement negotiations in October 2023. Borisch Decl. ¶¶ 13-14.

"continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023."); ¶ 149 ("we remain confident in our operational prowess to match wholesale and retail demand"); ¶ 156 (MBI was "very well positioned"); ¶ 158 ("We have [a] very good dealer network."); ¶ 161 ("we continued to experience strong wholesale demand.").

These types of generalized statements are not "anything like [] guarantee[s] as to [MBI's] invulnerability to commodity risk." *Ferrellgas*, 2018 WL 2081859, at *4-5 (statements touting "model which is not dependent on commodity prices" and "best-in-class capabilities" were puffery); *see also In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 523-24 (S.D.N.Y. 2020) (statements regarding "continued ability to maintain margins" were puffery).

***Inactionable Opinion Statements***.    Plaintiff also challenges several opinion statements about the Company's performance. *See, e.g.*, ¶¶ 167, 171, 173, 175, 177, 180.  Many of these statements are prefaced with opinion language like "we feel," (¶¶ 157, 167), "we believe" (¶¶ 150, 161, 173, 177), or "I think" (¶¶ 137, 138, 165, 175). *See Schaffer v. Horizon Pharma PLC*, 2018 WL 481883, at *10 (S.D.N.Y. Jan. 18, 2018) ("I think" and similar language signals opinions). Other statements—for example, about "matching" production to retail demand (¶¶ 149-51, 157, 165, 167, 171-72)—convey subjective views about MBI's manufacturing production and business. They are not assertions about "presently existing, objective facts." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 531 (S.D.N.Y. 2015), *aff'd sub nom*, *Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

"In contrast to objective statements of material fact, subjective statements of opinion are generally not actionable as fraud." *Id.* at 528.  An opinion statement is only actionable if a plaintiff pleads facts showing that the speaker (i) did not honestly believe the statement or supplied an untrue supporting fact; or (ii) omitted information that made the opinion statement misleading to a reasonable investor.  *Tongue*, 816 F.3d at 210.

The AC alleges no facts showing Defendants did not sincerely believe their stated views. *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *15-17 (S.D.N.Y. Apr. 2, 2020). And it is "no small task" for Plaintiff to plead the falsity of opinion statements via an omissions theory. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189-90, 194 (2015). An opinion statement is not actionable merely because "some fact cutting the other way" is not disclosed. *Id.* at 189-90. Rather, a plaintiff "must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. Here, the AC does not "identify particular (and material) facts going to the basis" of a challenged opinion statement that would render it misleading; and Plaintiff cannot make out a false statement by showing that an opinion turned out to be incorrect. *Id.*

## II.     Plaintiff's Section 10(b) Claim Should Be Dismissed For Failure To Plead Particularized Facts Giving Rise To A Strong Inference Of Scienter

Plaintiff's Section 10(b) claim should also be dismissed for failure to adequately plead scienter. For each alleged misstatement or omission, the PSLRA requires a plaintiff to plead "with particularity" facts giving rise to a "strong inference" of scienter that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 314, 324. Rather than drawing all inferences in a plaintiff's favor, a court "must consider plausible, nonculpable explanations" for a defendant's conduct. *Id.* at 323–24; *In re Gen. Elec. Sec. Litig.*, 844 F. App'x 385, 389 (2d Cir. 2021). A plaintiff may meet its burden by pleading particularized facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Here,

Plaintiff has not come close to meeting its burden.

### A.     The AC Does Not Adequately Plead A Motive To Defraud

Plaintiff's boilerplate allegation that Defendants were motivated to "artificially inflate and maintain the market price of MBI shares," ¶ 227, is patently insufficient.  *See ECA*, 553 F.3d 187 at 198 ("Motives that are common to most corporate officers, such as … the desire to keep stock prices high … do not constitute 'motive' for purposes of this inquiry.").

Equally insufficient is Plaintiff's allegation that Defendants were motivated to "meet revenue targets that were a prerequisite for them to earn maximum bonus compensation." ¶ 114. Neither Wilson, Black, nor Beckman were even eligible for bonuses for FY 2023, because "the timing of their employment ultimately did not allow for it." ¶ 114 n.7.  Springer's bonus eligibility, ¶ 114, adds nothing.  "Bonus compensation is not the type of 'concrete and personal' benefit upon which a finding of motive to commit securities fraud can be based."  *Wyche v. Advanced Drainage Sys. Inc.*, 710 F. App'x 471, 473 (2d Cir. 2017); *ECA*, 553 F.3d at 201 ("[I]ncentive compensation can hardly be the basis on which an action of fraud is predicated.").  Moreover, rather than being automatic upon meeting any financial metric, Springer's bonus was subject to the full discretion of the Company's Compensation Committee, which ultimately opted to award Springer only half of his target bonus amount.  ¶ 118, n.8; *Reilly v. U.S. Physical Therapy, Inc.*, 2018 WL 3559089, at *7, 12 (S.D.N.Y. July 23, 2018) (no inference of scienter from bonus subject to compensation committee approval).  Far higher bonus amounts than the $488,000 Springer was awarded have repeatedly been found insufficient to create a strong inference of scienter.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 622 (S.D.N.Y. 2005) (alleged motive of $15 million in bonus compensation insufficient); *Liplow v. Net1 UEPS Techs., Inc.*, 131 F. Supp. 3d 144, 153, 161 (S.D.N.Y. 2015) (alleged motive of $5.4 million in bonus compensation insufficient).

**B.    The AC Does Not Plead Particularized Facts Showing Conscious Misbehavior Or Recklessness On The Part Of Any Defendant**

In the absence of adequate allegations of motive, Plaintiff must plead "correspondingly greater" allegations of conscious misbehavior or recklessness. *In re Advanced Battery Techs. Inc.*, 781 F. 3d 638, 644 (2d Cir. 2015). Moreover, Plaintiff bears the burden of pleading particularized facts giving rise to a "strong inference" of a fraudulent intent "with respect to each defendant and with respect to each act or omission alleged to [constitute securities fraud]." *Bristol-Myers*, 2023 WL 2308151, at *3.

Here, the AC contains no allegations about Black's mental state at any point in time during the putative Class Period. Instead, the AC merely alleges that Black was the Company's interim CFO from May to November 2023 and made certain challenged statements. ¶¶ 137-38, 151-52, 142-43, 146, 161. There are no allegations of contemporaneous fact showing that Black was aware of information contradicting his challenged statements.

The AC is also devoid of any allegations of contemporaneous fact showing that Beckman, who did not join the Company until November 2023, was aware of information contradicting his challenged statements during the putative Class Period. Instead, Plaintiff quotes a statement Beckman made on May 2, 2024, after the end of the putative Class Period, that "we monitor the health of our dealer networks very closely with our floor plan finance providers." ¶ 189. Plaintiff does not, and cannot, explain how that post-Class Period statement in May 2024 contradicts any challenged statement that Beckman made during the Class Period.

The AC's allegations with respect to Wilson, who served as CFO until May 2023, are equally deficient. In May 2023, MBI announced that 3Q 2023 revenue growth generated by increased Saltwater Fishing and Cobalt segment boat sales was offset by "reduced wholesale restocking demand" in the Malibu segment. Ex. 6 at 2. Plaintiff criticizes Wilson for stating on a

February 7, 2023 earnings call that increased net sales and unit volumes in 2Q 2023 (*i.e.*, October to December 2022) were "generated by resilient wholesale demand across all 3 segments," ¶ 126, but fails to allege any facts showing that the increases in those metrics in 2Q 2023 was not in fact generated by wholesale demand across all three segments. Instead, Plaintiff purports to rely on the same insufficient allegations of "channel stuffing," ¶ 127, discussed above. *See supra* Argument § I. That Wilson did not predict the 3Q 2023 downturn in wholesale demand for the Malibu segment is not fraud. *See Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011).

Plaintiff claims Springer "personally directed the channel stuffing," ¶ 183, but, as discussed above, the AC fails to plead facts showing that MBI engaged in, let alone concealed, "stuffing" Tommy's with "excess" inventory. *See supra* Argument § I. Rather than plead particularized, contemporaneous facts showing Springer or any other Defendant was aware of information contradicting their challenged statements at the time they were made, Plaintiff relies on a hodge-podge of theories that, individually or collectively, are far too vague and general to give rise to a plausible inference of scienter, much less a strong one.

***Alleged OneWater Cancellations***. Plaintiff claims that "OneWater's CEO directly delivered OneWater's order cancellations to Defendant Springer in a February 2023 meeting." ¶ 185. As discussed above, Plaintiff fails to plead particularized facts to substantiate its cancellation allegations. And its cancellation theory makes no sense because OneWater ***increased*** its spend on MBI products in FY 2023. Ex. 9 at 4, 39. *See Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) (rejecting scienter allegations that simply "do[ ] not make a whole lot of sense.").

***Tommy's Selling Out of Trust***. Plaintiff claims that, by September 2, 2023, MBI was aware that Tommy's was in a "dire financial position" by selling out of trust. ¶ 186. But

September 2023 is **after** most of the challenged statements were made.  *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 812-13 (2d Cir. 1996) ("[W]ithout contemporaneous falsity, there can be no fraud.").  Moreover, as discussed above, the AC fails to plead facts showing that MBI interpreted Tommy's SOT, which was quickly resolved, as a risk of going out of business.  *See also* Borisch Decl. at ¶¶ 13-14.

    ***Access to inventory and demand data***.  Defendants' monitoring of "inventory levels, demand, and sales at [] dealers" does not create a strong inference of scienter.  ¶ 189.  The AC does not allege what any data or reports showed, much less that it contradicted any challenged statement at the time the statement was made.  Defendants' mere "access" to data and reports, ¶ 258, is not enough.  *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 83 (2d Cir. 2021); *Philip Morris*, 75 F.3d at 812; *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d at 781-82 (S.D.N.Y. 2021) (dismissing Section 10(b) claim because allegations that defendants had access to daily sales reports, "assess[ed] inventory on a weekly basis," and "had technology in place to provide real-time information . . . regarding its inventory" were insufficiently particularized to allege defendants' knowledge of sales and inventory issues).

    ***Springer's resignation***.  Springer resigned as CEO as of May 2024.  "[W]ithout some kind of indicia of highly unusual or suspicious circumstances," resignations do not provide strong circumstantial evidence of scienter.  *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 598 (S.D.N.Y. 2011); *see also Denny v. Canaan Inc.*, 2023 WL 2647855, at *14 (S.D.N.Y. Mar. 27, 2023); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 605 (S.D.N.Y. 2016).  Plaintiff claims Springer "resigned for reasons directly relating" to the alleged undisclosed "channel stuffing," ¶ 194, but, as discussed above, the AC fails to plead facts showing that MBI engaged in, let alone concealed, "channel stuffing." *See supra* Argument § I. Moreover, far from terminating their relationship,

MBI and Springer mutually agreed that, after stepping down as CEO, Springer would serve as a consultant for two years with the right to extend for an additional two years.  Ex. 14 at 1; *see In re Jiangbo Pharma., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1263 (S.D. Fla. 2012) (no inference of scienter where CFO "stayed on with the Company as a consultant after her resignation").

*Core Operations.*  The core operations doctrine, ¶ 193, cannot salvage Plaintiff's claim.  "[I]t is far from clear that the core operations doctrine remains valid in light of the PSLRA." *Bristol-Myers*, 2023 WL 2308151, at \*6.  Even if it remained valid, it would not apply because Tommy's, which accounted for between 4% and 10.7% of MBI's net sales during the putative Class Period, Ex. 15, and but 15 of the 400-plus dealer locations for MBI boats, was "not essential to the survival" of the Company.  *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343-44 (core operations doctrine inapplicable where impacted operation constituted 16% of total business).  Moreover, the core operations doctrine cannot independently create a strong inference of scienter. *See Glaser*, 772 F. Supp. 2d at 595-96.  Instead, it can only "bolster[] the strength of the inference of scienter when plaintiffs have already adequately alleged facts indicating that defendants might have known their statements were false."  *Id.* at 595.  Because Plaintiff has not done so, the core operations doctrine cannot salvage its claim against any Defendant.

### C.    Any Inference Of Scienter Is Not As Compelling As The Opposing Inference

Taking a holistic view of the AC, the more cogent and compelling inference is that Defendants believed what they were saying and reported both good and bad news in real time regarding MBI's growth drivers and financial expectations.  In August 2022, before the start of the putative Class Period, MBI told investors that it expected to drive revenue in FY 2023 by rebuilding depleted inventory to pre-pandemic levels, ***not*** increased retail demand.  Ex. 2 at 5.  In fact, MBI projected retail demand to decrease by nearly 10% that fiscal year.  Ex. 3 at 11.  Similarly, when MBI disclosed FY 2023 results in August 2023, it projected that revenues would

*decline* in FY 2024 by potentially $250 million because channel inventory levels had normalized faster than anticipated. Ex. 8 at 5. In October 2023, *before* the first alleged corrective disclosure in January 2024, Springer disclosed the information Plaintiff claims Defendants concealed – that dealer inventory levels were higher than ideal: "Channel inventories across our brands are now back to or above pre-COVID levels . . . given the current environment, I think it is a tad below [ ] pre-COVID levels would be the right amount of inventory." Ex. 11 at 4, 10. Unfortunately, because of challenging economic conditions, dealers could not sell inventory as quickly as anticipated. These conditions caused elevated inventory levels for the rest of the Class Period and forced MBI to reduce FY 2024 projections each quarter. Ex. 11 at 6; Ex. 13 at 7; ¶ 105. "[T]he inability to anticipate future events . . . does not amount to fraudulent intent or conscious recklessness under the PSLRA." *Mechel*, 811 F. Supp. 2d at 882. This is the opposite of fraud.

## III.    Plaintiff Fails To Adequately Plead A Scheme Liability Claim

Plaintiff also fails to adequately plead a scheme liability claim. *See* ¶¶ 216–19. SEC Rule 10b-5(b) makes it "unlawful" to "make any untrue statement of material fact or to omit to state a material fact necessary to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5(b). Plaintiffs do not identify the subsection of Rule 10b-5 under which they bring the scheme liability claim (*i.e.*, Rule 10b-5(a), (c), or both) and thus fail to provide adequate notice of their claim under even Fed. R. Civ. 8(a), much less Fed. R. Civ. P. 9(b) and the PSLRA.

The scheme liability claim also fails for the same reasons as the misrepresentations and omissions claim because it relies on the same deficient allegations. Moreover, a scheme liability claim requires "something *beyond* misstatements and omissions." *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022). It does not suffice to "merely repackage the misrepresentation allegations" into a scheme liability claim. *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 520 (S.D.N.Y. 2017). Yet, that is precisely what Plaintiff attempts to

do here.  ¶ 218 ("Defendants concealed their scheme").[11]  Because the alleged scheme is "indistinguishable from the misstatements and omissions," it fails as a matter of law.  *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 217 (S.D.N.Y. 2020).

## IV.    Plaintiff's Section 10 (b) Claim Should Be Dismissed For Failure To Adequately Plead Loss Causation

Plaintiff's Section 10(b) claim also should be dismissed for failure to adequately plead loss causation.  "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (cleaned up).  To adequately plead loss causation, a plaintiff must connect the drops in stock prices to particular corrective disclosures, "which revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted."  *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 677 (S.D.N.Y. 2007) (citing *Lentell*, 396 F.3d at 175).

Here, Plaintiff attempts to plead loss causation based on alleged corrective disclosures in January, February, April, and May 2024.  ¶¶ 200, 202-05, 207-09.  But none of the alleged corrective disclosures "revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted."  *In re AOL Time Warner*, 503 F. Supp. 2d at 677.  Indeed, although Plaintiff's core theory of fraud is that the challenged statements were rendered false by the failure to disclose information about Tommy's, three of the alleged corrective disclosures (January, February, and May 2024) do not even mention Tommy's.  ¶¶ 200, 202, 209.  "A disclosure cannot correct something that it does not even talk about."  *Diabat v. Credit Suisse*

---

[11] As discussed above, the AC fails to plead facts showing that MBI "stuffed" Tommy's with "excess" inventory.  The AC also fails to plead any facts to show that it would be inherently deceptive to sell "excess" inventory into a channel as part of a business strategy.  Instead, the AC alleges that the "scheme" was designed to "inflate the Company's [public] boat sales," and misled by concealing the factors that drove these sales. ¶ 166.  As the court in *Touchstone* held, such allegations do not allege a separate scheme.  2022 WL 4536800, at *3, *6 (no scheme liability where allegations that defendants "manipulated [ ] revenues to create the illusion that revenues were growing organically" only "allege[d] misstatements and omissions, not 'inherently deceptive conduct'") (citation omitted).

*Group AG*, 2024 WL 4252502, at *151 (S.D.N.Y. Sept. 19, 2024). The only alleged corrective disclosure that mentioned Tommy's was MBI's April 11, 2024 press release disclosing Tommy's lawsuit and noting MBI "intends to vigorously defend against claims alleged by Tommy's Boats." ¶ 99. A statement that a defendant intends to "vigorously defend" against a lawsuit is hardly a concession that the allegations in the lawsuit's complaint correct a prior misstatement. Moreover, the bankruptcy trustee for Tommy's estate voluntarily dismissed the Tommy's complaint. Tommy's Action, ECF No. 39; *compare with In re Take–Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 287–90 (S.D.N.Y. 2008) (disclosure of an SEC investigation sufficient corrective disclosure when followed by a corporate officer's guilty plea to charges of backdating options).[12]

The AC's failure to identify a corrective disclosure that "reveal[s] the falsity of challenged public statements," is "fatal under Second Circuit Precedent." *Janbay*, 2012 WL 1080306, at *14.

## V.    Plaintiff's Section 20(a) Claim Should Be Dismissed

Absent a primary violation of Section 10(b), Plaintiff's Section 20(a) "control person" claim against the Individual Defendants, ¶¶ 237-240, fails. *See Tung v. Bristol-Myers Squibb Co.*, 412 F. Supp. 3d 453, 462 (S.D.N.Y. 2019). The Section 20(a) claim should also be dismissed because Plaintiff has failed to plead facts raising a strong inference that any of the Individual Defendants were culpable participants in any alleged fraud. *See supra* Argument § III; *Venkataraman v. Kandi Techs. Grp., Inc.*, 2022 WL 4225562, at *9 (S.D.N.Y. Sept. 13, 2022).

## <u>CONCLUSION</u>

For all these reasons, the Amended Complaint should be dismissed with prejudice.

---

[12] *Compare also with Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017) (civil complaint, combined with defendant company's CFO's related admission, amounted to corrective disclosure); *Meyer v. Greene*, 710 F.3d 1189, 1201 n.13 (11th Cir. 2013) ("the disclosure of an SEC investigation, standing alone and without any subsequent disclosure of actual wrongdoing does not 'reveal[] to the market the pertinent truth' of anything, and therefore does not qualify as a corrective disclosure") (citation omitted).

Dated:  New York, New York
        November 8, 2024

Respectfully submitted,

COOLEY LLP

By:   */s/ Sarah M. Lightdale*
     Sarah M. Lightdale
     Aric H. Wu
     Reed A. Smith
     Anne E. Bigler

55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
Fax: (212) 479-6275
slightdale@cooley.com
ahwu@cooley.com
reed.smith@cooley.com
abigler@cooley.com

Brett De Jarnette (*pro hac vice pending*)
3175 Hanover Street
Palo Alto, CA 94304
Tel: (650) 843-5000
Fax: (650) 849-7400
bdejarnette@cooley.com

*Attorneys for Defendants Malibu Boats, Inc.,*
*Jack Springer, Bruce Beckman, David Black,*
*and Wayne Wilson*