# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| RETIREE BENEFIT TRUST OF THE CITY OF BALTIMORE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MALIBU BOATS, INC., JACK SPRINGER, BRUCE BECKMAN, DAVID BLACK, and WAYNE WILSON,<br><br>Defendants. | No. 1:24-cv-03254-LGS<br><br><br>LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT |

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT.......................................................................................... 1

II.   STATEMENT OF FACTS ................................................................................................. 8

    A.    MBI's Business And Dealership Network ............................................................ 8

    B.    To Conceal A Dramatic Dropoff In Demand For Malibu Segment Boats, Defendants Engaged In A Scheme To Force Excess Inventory Onto Tommy's ................................................................................................................ 10

    C.    Defendants Make False And Misleading Statements To Reassure The Market.................................................................................................................. 12

    D.    The Scheme Begins To Unravel, But Defendants Continue To Mislead.............. 13

    E.    The Truth Is Revealed......................................................................................... 14

III.  ARGUMENT ................................................................................................................... 17

    A.    The Complaint Adequately Pleads Material Misstatements And Omissions........ 17

        1.    Defendants' Statements About Wholesale And Retail Demand And Dealer Inventory Were Materially False And Misleading ......................... 17

        2.    Defendants' Attacks On The Sources And Particularity Of Plaintiffs' Allegations Fail ........................................................................ 21

        3.    Defendants Did Not "Disclose" Excessive Inventory Levels................... 24

        4.    Defendants' Failure To Disclose Tommy's Dire Financial Condition Rendered Their Statements False And Misleading.................. 25

        5.    Defendants' Statements Were Not Immaterial Puffery Or Opinion.......... 27

    B.    The Amended Complaint Raises A Strong Inference Of Scienter ........................ 28

        1.    Defendants Personally Directed The Channel Stuffing Scheme .............. 29

        2.    Defendants' Access To And Close Monitoring Of All Relevant Data ......................................................................................................... 30

        3.    Defendants' Channel Stuffing Fraud Went To MBI's Core Operations ................................................................................................ 31

        4.    Defendant Springer Had A Strong Financial Motive............................... 32

        5.    Defendant Springer Resigned Due To The Channel Stuffing Scheme ..................................................................................................... 32

        6.    Defendants' Competing Inference Is Not Compelling............................. 33

    C.    The Amended Complaint Adequately Pleads Loss Causation.............................. 33

    D.    The Amended Complaint Adequately Pleads A Scheme Liability Claim............. 34

IV.   CONCLUSION................................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Amorosa v. Gen. Elec. Co.*,
   2022 WL 3577838 (S.D.N.Y. Aug. 19, 2022) ............................................................. 22

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
   477 F. Supp. 3d 123 (S.D.N.Y. 2020) ................................................................. 20, 23

*Cohen v. Kitov Pharms. Holdings, Ltd.*,
   2018 WL 1406619 (S.D.N.Y. Mar. 20, 2018) ........................................................ 17, 34

*Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) .............................................................................. 20

*Fadia v. FireEye, Inc.*,
   2016 WL 6679806 (N.D. Cal. Nov. 14, 2016) ............................................................. 23

*Freudenberg v. E\*Trade Fin.Corp.*,
   712 F. Supp. 2d 171 (S.D.N.Y. 2010) ..................................................................... 33

*Gavish v. Revlon, Inc.*,
   2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) ........................................................ 18, 19

*Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*,
   2023 WL 6316252 (S.D.N.Y. Sept. 28, 2023) .......................................................... 7, 33

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
   298 F.R.D. 116 (S.D.N.Y. 2014) ....................................................................... 5, 21

*In re AppHarvest Sec. Litig.*,
   684 F. Supp. 3d 201 (S.D.N.Y. 2023) ................................................................. 22, 34

*In re Axis Cap. Holdings, Ltd. Sec. Litig.*,
   456 F. Supp. 2d 576 (S.D.N.Y. 2006) ..................................................................... 23

*In re Braskem S.A. Sec. Litig.*,
   246 F. Supp. 3d 731 (S.D.N.Y. 2017) ..................................................................... 29

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. May 24, 2018) .............................................................. 28

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014) ...................................................................... 17

*In re Dentsply Sirona, Inc. Sec. Litig.*,
   665 F. Supp. 3d 255 (E.D.N.Y. 2023) ..................................................................... 18

*In re Dynex Cap., Inc. Sec. Litig.*,
  2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ................................................................. 31

*In re Ferrellgas Partners, L.P., Sec. Litig.*,
  2018 WL 2081859 (S.D.N.Y. Mar. 30, 2018) ................................................................ 27

*In re Fibrogen, Inc.*,
  2022 WL 2793032 (N.D. Cal. July 15, 2022) ................................................................ 33

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) ........................................................................... 30

*In re iDreamSky Tech. Ltd. Sec. Litig.*,
  236 F. Supp. 3d 824 (S.D.N.Y. 2017) ........................................................................... 28

*In re Jiangbo Pharma., Inc., Sec. Litig.*,
  884 F. Supp. 2d 1243 (S.D. Fla. 2012) .......................................................................... 33

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) ...................................................................... 6, 25

*In re Mylan N.V. Sec. Litig.*,
  2020 WL 1673811 (S.D.N.Y. Apr. 6, 2020) ................................................................. 35

*In re NIO, Inc. Sec. Litig.*,
  2021 WL 3566300 (E.D.N.Y. Aug. 12, 2021) .............................................................. 22

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  2021 WL 4135059 (S.D.N.Y. Sept. 10, 2021) .............................................................. 27

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ............................................................... 31

*In re Signet Jewelers Ltd. Sec. Litig.*,
  2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) .............................................................. 27

*In Re SolarEdge Tech. Sec. Litig.*,
  2024 WL 4979296 (S.D.N.Y. Dec. 4, 2024) ................................................................... 6

*In re Top Tankers, Inc. Sec. Litig.*,
  528 F. Supp. 2d 408 (S.D.N.Y. 2007) ........................................................................... 33

*In re Tronox, Inc. Sec. Litig.*,
  2010 WL 2835545 (S.D.N.Y. June 28, 2010) ............................................................ 5, 21

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  625 F. Supp. 3d 164 (S.D.N.Y. 2022) ...................................................................... 6, 27

*In re XL Fleet Corp. Sec. Litig.*,
  2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) .................................................................... 7, 35

*IWA Forest Indus. Pension Plan v. Textron Inc.*,
  14 F.4th 141 (2d Cir. 2021) .................................................................................................. 23

*Maloney v. Ollie's Bargain Outlet Holdings, Inc.*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021) ................................................................................. 31

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) .................................................................................................. 25

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................................................. 28

*Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019) ................................................................................... 18

*Ortiz v. Canopy Growth Corp.*,
  537 F. Supp. 3d 621 (D.N.J. 2021) ....................................................................................... 20

*Puddu v. 6D Glob. Techs., Inc.*,
  2021 WL 1198566 (S.D.N.Y. Mar. 30, 2021) ...................................................................... 25

*Rapoport v. Asia Elecs. Holding Co.*,
  88 F. Supp. 2d 179 (S.D.N.Y. 2000) .................................................................................... 24

*Rein v. Dutch Bros, Inc.*,
  2024 WL 3105004 (S.D.N.Y. June 24, 2024) ....................................................................... 27

*San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*,
  2024 WL 1898512 (S.D.N.Y. May 1, 2024) ......................................................................... 32

*Scott v. Gen. Motors Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014) .................................................................................... 24

*SEC v. DiMaria*,
  207 F. Supp. 3d 343 (S.D.N.Y. 2016) .................................................................................. 29

*Sec. & Exch. Comm'n v. Farnsworth*,
  692 F. Supp. 3d 157 (S.D.N.Y. 2023) .................................................................................. 35

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) .................................................................................................... 31

*Sills v. United Nat. Foods, Inc.*,
  2024 WL 4188324 (S.D.N.Y. Sept. 13, 2024) ...................................................................... 32

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................................ 29, 30, 31

*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) ..................................................................................... 22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007).................................................................................................................. 29

*Touchstone Strategic Tr. v. Gen. Elec. Co.*,
  2022 WL 4536800 (S.D.N.Y. Sept. 28, 2022) ....................................................................... 22

*Tyler v. Liz Claiborne, Inc.*,
  814 F. Supp. 2d 323 (S.D.N.Y. 2011)...................................................................................... 31

Lead Plaintiff respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint.[1]

## I.    PRELIMINARY STATEMENT

Between 2020 and mid-2022, MBI's recreational powerboat sales experienced a COVID-fueled boom, and its revenues soared by more than 80%.  By mid-2022, however, the boom was coming to an end, and the boat industry was forecast to experience sharp declines due to waning demand, rising interest rates, and worsening economic conditions.

Thus, in order to assuage investor and analyst concerns about the downturn's impact on MBI's business, Defendants spun a story that MBI's boats—and particularly, its flagship, high-priced Malibu Brand—were insulated from the downturn, because MBI's "premium buyers" had "not really been affected by economic conditions or interest rates." Indeed, according to Defendants, MBI's customers were "*gobbling [boats] up like [a Cajun] deep fried turkey dinner at Thanksgiving*[,]" and as the Class Period progressed—and investors became increasingly concerned about macroeconomic conditions—Defendants repeatedly assured them that there was "*no worsening of our expected outlook*" and "*[no] slowdown [of retail demand]*."  Defendants also maintained that the Company was precisely "matching" dealer inventory to retail demand, proudly boasting that, "*as it relates to channel inventories, [MBI] is right where it needs to be*[.]" Indeed, Defendants claimed that MBI's ability to "match" dealer inventory to demand was a "key differentiator" separating MBI from its competitors, and ensured that the Company's network of third-party boat dealers remained financially sound and had the right amount of inventory in stock,

---

[1] Defendants are Malibu Boats, Inc. ("MBI" or the "Company"), former CEO Jack Springer ("Springer"), former CFO Bruce Beckman ("Beckman"), former CFO David Black ("Black"), and former CFO Wayne Wilson ("Wilson"). References to "MTD" or "Motion" refer to the Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 52).  All citations to "¶_" are to paragraphs in the Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint," or "AC," ECF No. 43).  All terms not otherwise defined herein have the same meanings as in the Complaint.  Unless otherwise noted, all emphasis is added, and internal citations and quotations are omitted.  The Class Period is from November 4, 2022 through May 1, 2024, inclusive.

as this was an "*important element to our playbook…not only to protect our margins, but also to protect our dealers and make sure they stay healthy*."

Unfortunately for investors, however, Defendants' statements were utterly false and misleading. In reality, by June 2022—five months before the start of the Class Period—demand for MBI's boats had cratered, and Defendants were artificially inflating MBI's sales performance by stuffing its key distributor with staggering amounts of inventory for which Defendants knew there was no demand. Indeed, as was revealed at the end of the Class Period *by the Company's own most important distributor*, Tommy's, Defendants fraudulently concealed this precipitous decline in demand by forcing Tommy's to take $100 million worth of excess inventory of MBI's highest-priced, hardest-to-sell boats—boats which Defendants knew that Tommy's did not want, did not need, and could not sell. In furtherance of the scheme, *Defendant Springer personally threatened Tommy's owner, Matthew Borisch, that Tommy's—which depended on MBI for 80% of its sales—would lose its status as an MBI dealer if it did not dramatically expand its available financing and purchase MBI's excess inventory*.

These transactions were extraordinarily material for both MBI and its CEO: by strongarming Tommy's into purchasing $50 million in excess inventory in May and June 2023 alone (even as most of Tommy's existing inventory remained unsold), MBI was able to just meet its annual revenue and EBITDA guidance.[2] And Defendant Springer stood to profit handsomely, as these forced sales allowed MBI to just barely hit the financial targets needed for *Springer to be eligible to double his compensation*. Remarkably, the details of this scheme have been set forth in court filings sworn under penalty of perjury by Borisch himself, who supported his allegations by recounting verbatim communications he had with MBI executives regarding MBI's channel-

---

[2] MBI's 2023 fiscal year ended on June 30, 2023.

2

stuffing—including Company emails sent by, and meetings with, MBI's most senior officers.

Despite Defendants' machinations, their scheme could not be sustained.  MBI's rapid channel stuffing strained Tommy's finances, and, by August 2023, Tommy's was forced into default with its lender.  Significantly, Defendant Springer immediately recognized how dire this development was for MBI's business:  indeed, in September 2023, Springer personally wrote an email to Borisch in which he called it "*one of the worst situations that can arise*."  Despite this knowledge, Defendants never breathed a word to investors that Tommy's—which MBI had previously identified in its SEC filings as one of its two most important dealers—was at severe risk of bankruptcy due to MBI's channel stuffing.  Instead, Defendants reassured investors that they continued to "successfully match[] production to retail demand" in order "*to protect our dealers and make sure they stay healthy*."  And when analysts directly questioned Springer about whether he had "[a]ny concerns about your [dealer] network" potentially "carrying excess inventory [] and facing higher interest expense[,]" Springer maintained the façade, responding: "Largely, no," and insisting that Defendants were "confident" about MBI's dealer network because they closely monitored dealer health and had "early warning systems that are in place[.]"

Yet, behind the scenes, Defendants' scheme continued to unravel.  On February 14, 2024, at the Miami Boat Show, Borisch was approached by three MBI stakeholders, who admitted to Borisch that Springer had been "*intentionally pumping Tommy's full of inventory*" to artificially inflate MBI's sales when "*most manufacturers are 70% too heavy on inventory and [Springer] knows that*." The stakeholders told Borisch that "*[Springer] would not turn the spigot off*[,]" that the stakeholders were "*nervous*," and that "*Jack is not going to last*."  These warnings were proven correct a mere week later, on February 20, 2024, when MBI announced that Defendant Springer was abruptly resigning. MBI's stock price fell 9%, and analysts expressed shock, reporting that

"*[t]his announcement is a surprise to us—and we suspect the investment community as well*" and "[t]here doesn't seem to have been any meaningful succession plan in place[.]"

Meanwhile, still unbeknownst to investors, Tommy's was nearly bankrupt, and MBI had not renewed its dealership agreements with Tommy's—meaning that MBI was about to lose its most important dealer, and the market was about to be flooded with inventory that would have to be liquidated at fire sale prices. Investors finally began to learn the truth when, on April 10, 2024, Tommy's filed a verified, sworn complaint against MBI in the U.S. District Court for the Eastern District of Tennessee. Significantly, Tommy's complaint alleged that, *at the express direction of Defendant Springer, MBI had* "*engaged in an elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen (15) Tommy's dealerships … in order to artificially inflate Malibu's sales performance, artificially claim increased market share in the industry and artificially inflate its stock value during an obvious and known downturn in the recreational power boat industry*."

News of the lawsuit was made public the next day, on April 11, 2024, when Defendants were forced to file a Form 8-K responding to the allegations. The Form 8-K revealed, for the first time, that MBI had *already terminated* its dealership agreements with Tommy's and was scrambling to reallocate Tommy's glut of inventory. MBI's stock price fell 14% on the news, and analysts downgraded MBI's stock "*in response to the loss of Tommy's Boats, one of MBUU's largest dealers (10.7% of total sales/23.3% of Malibu segment sales in FY23), which last week filed [its complaint][*,]" and expressed concern that "*the impact of Tommy's inventory being absorbed into the dealer channel on MBUU's sales and margins…could extend into FY25.*"

Finally, three weeks later, on May 2, 2024, Defendants again slashed guidance and reported results even worse than expected due to Tommy's failure and the inventory glut in the market, with

4

Adjusted EBITDA decimated by 70% and Malibu Segment sales falling 65%.  MBI's stock price fell another 4% on the news, and analysts again excoriated MBI, emphasizing that "*[Tommy's] failure [had] result[ed] in even heavier inventories*" than Defendants had previously let on, and noting that the "big picture" was that the "*MBI story has unraveled as macro headwinds hit hard and lawsuits [and] leadership changes… tank investor confidence*."  Defendants' fraud wiped out $660 million in shareholder value, as MBI's stock price was halved from its Class Period high.

It is extraordinarily rare in securities fraud cases for plaintiffs to be able to allege such detailed facts, including direct personal communications with the Defendants' own CEO.  Yet, in the face of these damning facts, Defendants nonetheless argue that the Complaint fails to adequately plead that they engaged in any fraudulent scheme, and that the Court should essentially ignore the plethora of facts revealed in Borisch's court filings.  This is nonsense.  Borisch's facts are drawn directly from firsthand experiences set forth in multiple sworn court filings; as such, they "contain their own indicia of reliability." *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014); *In re Tronox, Inc. Sec. Litig.*, 2010 WL 2835545, at \*7 (S.D.N.Y. June 28, 2010) (that the "allegations [borrowed from another complaint] are corroborated by a sworn declaration" bolstered their reliability for pleading purposes).  Moreover, Plaintiff's investigation—which included discussing the allegations with Borisch's counsel and corroborating them with former employees of MBI and its dealers—only bolsters their credibility.

Defendants also argue that, in any case, their statements were not materially false and misleading.  For example, Defendants argue that the Complaint does not allege that demand was "inconsistent with [their] public statements."  Not so.  Defendants repeatedly assured the market that MBI's "premium" buyers were supposedly insensitive to economic conditions, while omitting the highly material information that demand was being artificially propped up by their scheme to

force $100 million in unwanted inventory on Tommy's. Such statements not only concealed the precipitous drop in demand for MBI's boats, but also allowed Defendants to present a highly misleading picture of their business. *See, e.g., In Re SolarEdge Tech. Sec. Litig.,* 2024 WL 4979296, at *7, *10 (S.D.N.Y. Dec. 4, 2024) (Woods, J.) ("SolarEdge") (statements regarding customer demand and inventory levels materially false where defendants failed to disclose their channel stuffing).

Defendants further argue that they purportedly "disclosed" rising inventories during the Class Period. But this is wrong. Defendants repeatedly claimed—throughout the Class Period— that they were carefully "matching" inventories to demand. At best, Defendants referred—toward the end of the Class Period—to inventories being at either appropriate levels or "a tad" too high. This is a far cry from the information later revealed in Defendants' corrective disclosures, which, as one analyst put it, revealed that dealers were "chok[ing] on inventory." And the market's strong reaction to the corrective disclosures further belies any suggestion that the truth had previously been disclosed. *See, e.g., In re MBIA, Inc., Sec. Litig.,* 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) (analyst surprise and stock drop precluded finding that truth had been disclosed).

Defendants' argument that some statements were immaterial "puffery" or "opinion" similarly fails. These statements were made in direct response to analyst questions about negative trends in the boat market, and were expressly intended to reassure investors that MBI was insulated from those trends because its "premium" customers were continuing to purchase the Company's high-priced boats and MBI was precisely "matching" inventory levels to demand, when the opposite was true. *See, e.g., In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 222– 24 (S.D.N.Y. 2022) (statements "made to reassure investors as to specific risks" not puffery).

Defendants further argue that the Complaint fails to plead scienter. But this flies in the face

6

of the highly detailed allegations drawn from Borisch's sworn filings and independently supported by other sources. Indeed, Defendant Springer himself directly pressured Tommy's to take on excess product that Tommy's did not want, did not need and could not sell, and if Tommy's did not comply, Springer threatened to revoke Tommy's status as an MBI dealer. Moreover, Defendants themselves boasted of their close monitoring of sales and inventory data in real time (which was corroborated by a former MBI employee), and the fraud concerned MBI's most important segment—the Malibu Segment—which accounted for most of MBI's revenue and profit, and MBI's most important dealer—Tommy's—which was by far the single largest distributor of Malibu Segment boats. Further, Defendant Springer had motive: he stood to more than double his compensation, as the scheme enabled MBI to just barely meet applicable financial targets.

Defendants' loss causation arguments also fail. Plaintiff's burden to plead loss causation "is not a heavy one." *Harrington Glob. Opportunity Fund, Ltd. v. CIBC World Markets Corp.*, 2023 WL 6316252, at *8 (S.D.N.Y. Sept. 28, 2023). The Complaint pleads "a plausible causal link between that loss and the alleged misrepresentations" (*id.*) by alleging that the truth of Defendants' fraud came out through a series of partial disclosures in which demand was revealed to be lower and inventory levels higher than previously disclosed, including details of the Tommy's scheme and the poor financial health of MBI's largest Malibu Brand dealer. This is more than sufficient.

Finally, the Complaint adequately pleads scheme liability under Rule 10b-5(a) and (c), as it alleges "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, at *7 (S.D.N.Y. Feb. 17, 2022). Specifically, Defendants took actions beyond merely making false and misleading statements by enacting their scheme to strongarm and threaten Tommy's into dramatically expanding its floorplan financing and taking on $100 million in

7

excessive and unwanted inventory over a brief period of time.

Defendants' motion to dismiss should be denied in its entirety.

## II.    STATEMENT OF FACTS

### A.    MBI's Business And Dealership Network

MBI manufactures recreational powerboats under eight different brands.  ¶24.  MBI groups these boats into three "segments"—Malibu, Saltwater Fishing, and Cobalt.  ¶30.  Both prior to and during the Class Period, the largest and most profitable of these segments by far was the Malibu Segment, which accounted for more than 50% of MBI's revenue and generated the highest margins of the three segments.  *Id.*  The Malibu Segment focused on freshwater sport boats, which MBI sold under two brand names: Malibu Brand, which was the Company's flagship brand and offered premium sport boats with luxury features retailing for as much as $300,000 each[3]; and Axis, which was marketed as a more affordable line of performance sport boats.  *Id.*  During the Class Period, Malibu Brand boats were "by far [MBI's] most profitable product," according to Springer.  *Id.*

MBI primarily sold its boats to a network of independent dealers located throughout the United States and abroad.  ¶31.  Those dealerships in turn sold MBI's boats to retail consumers.  ¶3.[4]  Most of MBI's authorized dealers entered into "floor plan" financing arrangements with third-party lenders that facilitated the dealers' purchasing and warehousing of MBI products for subsequent sale to retail consumers.  ¶31.  Under such arrangements, a dealer established a line of credit with a lender for the purchase of inventory and then drew against that line of credit when purchasing boats from MBI.  *Id.*  The dealer was obligated to reimburse the floor plan lender the

---

[3] The MTD states that Malibu Segment boats "cost between $70,000 to $225,000."  MTD at 4 (citing Ex. 4 at 19).  However, that price range pre-dates the Class Period, as it comes from the Form 10-K for the fiscal year ended June 30, 2022.  During FY 2023, Malibu Segment boats sold for between $80,000 to $300,000.

[4] Demand from dealers to purchase boats from MBI was referred to as "wholesale demand," whereas demand from end customers was referred to as "retail demand."

appropriate portion of the sale proceeds once it sold a boat to a retail customer. *Id.*

Leading up to and throughout the Class Period, MBI's two largest and most lucrative dealer relationships were with OneWater and Tommy's. ¶32. Indeed, OneWater and Tommy's were the only dealers material enough to MBI's business to be mentioned by name in the Company's SEC filings during the Class Period. *Id.* As disclosed in those filings, for MBI's fiscal years 2022 and 2023, OneWater represented approximately 16.8% and 17.2% of MBI's consolidated net sales, respectively, and Tommy's represented approximately 9.4% and 10.7% of MBI's consolidated net sales, respectively. Significantly, however, Tommy's was by far the Company's largest dealer when it came to MBI's most important segment, as it accounted for 23.3% of the Malibu Segment's sales in 2023, compared to only 6.5% for OneWater. *Id.*

Unlike OneWater—which sold boats from a variety of manufacturers—Tommy's primarily sold MBI boats, which accounted for more than 80% of Tommy's total boat sales, rendering Tommy's utterly dependent upon MBI for its business. ¶34. MBI, for its part, was highly dependent on both OneWater and Tommy's, given that the two dealers combined accounted for close to 30% of MBI's annual consolidated net sales, and Tommy's alone accounted for nearly one quarter of sales of MBI's "most profitable product." ¶35. Accordingly, MBI's SEC filings stated that the "loss of a significant number of these dealers could have a material adverse effect on our financial condition and the results of operations." ¶143.

Given the importance of these dealers to MBI's financial condition, Defendants repeatedly told investors that MBI carefully monitored its dealers' retail sales and inventory levels in near real time. ¶35. Indeed, according to MBI's SEC filings, MBI "ha[s] the ability to . . . use data and performance metrics to monitor dealer performance[,]" which the Company used to "***continually assess [its] distribution network[.]***" *Id.* MBI's dealer contracts also required dealers to disclose

their inventory levels to MBI "on a weekly basis," and to register 100% of their MBI boat sales with MBI within ten days from sale. *Id.* And Defendant Springer emphasized MBI's close and direct monitoring of dealer inventory levels to investors as an essential aspect of MBI's business— for example, he explained during an October 2023 earnings call that "[a]n important element of our playbook is successfully matching productions to retail demand, not only to protect our margins, but also to protect our dealers and make sure they stay healthy." ¶36.

### B.    To Conceal A Dramatic Dropoff In Demand For Malibu Segment Boats, Defendants Engaged In A Scheme To Force Excess Inventory Onto Tommy's

Leading up to the Class Period, the boating industry experienced a COVID-fueled sales boom as socially distancing customers flocked to buy boats. ¶37. During this time, MBI's sales skyrocketed, increasing 42% during fiscal year 2021, and another 30% during fiscal year 2022. *Id.* In fact, Defendants boasted that retail demand was so strong that dealers were selling boats faster than MBI could produce them, purportedly resulting in depleted inventories that required restocking. ¶38. By mid-2022, however, the boat sales boom was losing momentum, with industry sources forecasting retail demand for 2023 to sharply decline by 50% from 2022 levels. ¶1.

Internally, Defendants were on notice from MBI's own Marketing Department that MBI's boat registrations were dramatically lower, indicating a substantial decline in retail demand, as confirmed by a former MBI data analytics specialist, CW 2, who was directly responsible for compiling and reporting the relevant data internally. ¶¶46, 47. Moreover, in early 2023, MBI's largest overall dealer, OneWater, cancelled a significant amount of its Malibu Segment boat orders for the year, citing its own assessment of a sharp downturn in retail demand—highly material facts that OneWater's CEO communicated directly to Defendant Springer. ¶¶6, 44, 45. OneWater's cancellation was so large that it reduced OneWater's percentage of Malibu Segment sales from 18.4% during FY 2022 to merely 6.5% in FY 2023. ¶44.

10

Fearing that an end to MBI's record-setting sales would cause MBI to miss guidance—and the targets for their own lucrative incentive compensation—Defendants hatched a plan to exploit the Company's leverage over Tommy's to load Tommy's dealerships with excess inventory. Specifically, as detailed in Tommy's sworn litigation filings, Defendants "intentionally and fraudulently *demanded that Tommy's increase its floor plan capability and proceeded to 'pump Tommy's full of boats*' (the most expensive, highest margin, slow selling Malibu boats) *with full knowledge that the market analysis did not warrant such inventory levels*[.]"  ¶40.

According to these filings, Defendants' scheme began in July 2022 during a lunch meeting between Defendant Springer, Defendant Wilson, Borisch and another executive, when Springer and Wilson "began pressuring Mr. Borisch to commit to increasing [Tommy's] existing floor plan credit capacity" so that Tommy's could purchase more MBI boats.  ¶42.  When Borisch "pushed back, both in the initial meeting and over the months that followed, *[MBI] made clear that its request was not optional, and that Mr. Borisch would lose his status as a [MBI] dealer if he did not comply*."  *Id.*  As a result, Tommy's agreed to significantly expand its financing with its then-lender, Fifth Third Bank, from $50 million to $85 million.  ¶43.

Defendants' scheme took on even more urgency once OneWater cancelled a significant amount of its MBI boat orders in early 2023.  ¶48.  Indeed, mere weeks after the OneWater cancellations, in March 2023, Defendants introduced Tommy's to a new lender (M&T Bank) so that Tommy's could increase its total floor plan financing yet again—*this time from $85 million to $130 million*.  ¶49.  Thereafter, Defendants once again "*began pumping inventory into Mr. Borisch's dealerships in order to artificially inflate its own numbers and increase its market share and stock price*."  ¶50.  Defendants insisted that most of this inventory be comprised of

11

high-priced and unwanted Malibu Brand boats. *Id.*; *see also* ¶¶51, 52.[5]

By June 2023, Tommy's still had in its inventory ***more than 800 of the 1,190 (i.e., 70%)*** Malibu Segment boats Defendants had forced upon Tommy's during FY 2023. ¶63. Nevertheless, in May and June 2023 alone, Defendants pushed ***an additional $50 million of excess inventory*** onto Tommy's. ¶53. Additionally, despite Tommy's enormous glut of inventory, Defendants sought to pressure Tommy's into ordering another 1,160 Malibu Segment boats for FY 2024, refusing to negotiate a new dealership agreement with Tommy's until Tommy's agreed. ¶¶64, 66.[6]

Defendants' scheme to prop up MBI's sales by overloading Tommy's with excess inventory immediately began to have its intended effect, as the $50 million in May and June sales to Tommy's enabled MBI to just barely meet its FY 2023 guidance (¶53)—and enabled Springer to just barely meet the target for an incentive bonus that stood to double his incentive compensation. ¶¶114-18.

###### C.     Defendants Make False And Misleading Statements To Reassure The Market

Despite knowing full well that demand for Malibu Segment boats was plummeting, Defendants concealed this highly material fact while falsely assuring investors that demand remained strong, that MBI was precisely "matching" inventory to demand, and that MBI's dealer network was financially stable. For instance, at the start of the Class Period on November 4, 2022, Defendant Springer assured investors that "***demand remains strong***" and MBI's "customers are gobbling [our boats] up like [a Cajun] deep fried turkey dinner at Thanksgiving[,]" while MBI's dealers were exhibiting "almost the demand to get more inventory." ¶¶120, 121. Similarly, on

---

[5] CW 3, who worked for Tommy's Colorado dealership, corroborated this. For example, CW 3 recalled that, beginning in Summer 2022—exactly the time when Defendants began pressuring Tommy's to dramatically increase its floorplan financing and take on more inventory—Tommy's Colorado dealership suddenly and inexplicably began increasing its floorspace for boats, including buying an additional lot that instantly increased the dealership's capacity by 50%. ¶51.

[6] Moreover, as corroborated by both Borisch and CW 3, while Tommy's asked Defendants to provide the dealer's traditional "split" that was heavier on lower-priced Axis brand boats, MBI instead provided an excessive amount of higher priced, harder to sell luxury Malibu Brand boats that Tommy's had not asked for. ¶¶50, 52.

February 7, 2023, Springer stated in no uncertain terms that declining demand across the industry was not affecting MBI, as MBI's "customers remain unfazed" and its "*premium buyer is looking to purchase and has not really been affected by economic conditions or interest rates*." ¶124.

Then, reporting earnings on May 3, 2023, Springer stated "[w]e have made great strides in normalizing our channel inventory, particularly within our Malibu [Segment]," which "is right where it needs to be" and "*our dealers [are] poised to satisfy customer demand*[.]" ¶¶130, 132. And during a June 6, 2023 investor call, Defendant Black asserted that Malibu Segment "inventory level is [] pretty close to normalized" and retail demand remained strong, claiming "we haven't seen a meaningful [negative] impact at this point from the consumer side of things." ¶¶137-38.

### D.    The Scheme Begins To Unravel, But Defendants Continue To Mislead

By no later than the summer of 2023, however, Defendants' scheme had irreparably harmed Tommy's. Indeed, Tommy's was "nearing danger with respect to [its] current inventory due to the unreasonable number of Malibu boats that Malibu had forced upon [Tommy's]"—and "*[b]y August 2023, [Tommy's] dealerships were in a dire financial position*." ¶67; *see also* ¶¶62-65. Thus, to stave off insolvency, in August 2023, Tommy's sold a number of boats without remitting the necessary portion of those sales proceeds to its floor plan lender, M&T Bank. ¶67. Tommy's failure to do so was a significant event of default referred to in the marine industry as "sales out of trust," or "SOT"—a critical fact that Tommy's directly conveyed to MBI by no later than September 2, 2023. ¶¶67,68. Indeed, Defendants' own internal emails confirm as much, as on September 11, 2023, Springer sent an email directly to Borisch acknowledging the dire impact of this development, stating: "*Tommy's is SOT, which is one of the worst situations that can arise. Until Tommy's is in good standing with M&T, no dealer agreement can or will be signed*." ¶69.

Yet, in spite of these striking developments, MBI's FY 2023 10-K, filed on August 29, 2023, described Tommy's as one of its two most important dealers and the largest dealer of its

13

Malibu Segment boats, while omitting any mention of Tommy's known severe financial distress. Moreover, during MBI's earnings call the same day, Springer claimed "[i]n 2023, channel inventories were still too low" and "*we made great strides to match wholesale production to retail demand*[.]" ¶150.    Defendant Black likewise assured investors that MBI would continue "*matching wholesale to retail demand as we launch our new model year lineup.*"  ¶151.

On September 21, 2023, when asked how MBI felt about its "current dealer network," Springer unequivocally replied that it was "very good [], especially on the Malibu and Cobalt side."  ¶158.  Similarly, during an October 31, 2023 earnings call, when Spinger was again asked whether MBI had concerns "about your dealer network and the health of that network," he stridently responded: "Largely, no," insisting "we feel pretty confident" because MBI had "early warning systems that are in place[.]"  ¶167.  Springer also assured investors, "we are certainly laser-focused on inventory levels" and "have worked diligently to match wholesale supply to retail demand," which he purported has "helped our dealers to have healthy inventories[.]" ¶¶165, 167. Meanwhile, notwithstanding their awareness of Tommy's precarious financial situation, between July 2023 and March 2024, Defendants forced Tommy's to purchase an additional 131 boats it did not need, even though the parties had not entered an FY 2024 dealership agreement.  ¶71.

### E.    The Truth Is Revealed

Defendants' scheme soon unraveled, as their efforts to artificially inflate MBI's profits and sales by overloading Tommy's with excess inventory were unsustainable, plunging Tommy's into bankruptcy and eventually crippling MBI's business throughout FY 2024. ¶¶164, 170.

The truth began to emerge on January 30, 2024, when MBI lowered its annual guidance and announced disastrously poor financial results for the second quarter of FY 2024—including that sales for the lucrative Malibu Segment had declined by 51.7% year-over-year.  ¶¶82, 83. During MBI's earnings call the same day, Defendant Springer attributed MBI's poor results to the

14

fact that "*channel inventories [were] higher than we, or our dealers would like to see*[,]" admitting that MBI dealers had "around 5 weeks too much on hand inventory" ¶84.  On this news, MBI's stock price fell nearly 20% in a single day, or $9.47 per share.  ¶85.  Analysts emphasized that the guidance cut was "surprising," which put MBI management "in the penalty box," and noted that MBI had "*slashed F2024 guidance as dealers choke on inventory*. ¶¶86, 87.  Springer sought to assuage concerns by claiming that MBI was "very, very committed to reducing channel inventories," that demand from Malibu Segment customers "ha[d] remained strong[,]" and that MBI's approach to inventory was even "conservative." ¶¶88, 171, 172, 175.

Shortly thereafter, at the Miami Boat show in mid-February 2024, *three key MBI stakeholders personally told Borisch* that they were aware that Springer was "*intentionally pumping Tommy's full of inventory*" at a time "*when 'most manufacturers are 70% too heavy on inventory and he knows that*'"—and asked Tommy's "*to 'hold on' as 'Jack is not going to last.*'" ¶91.  The very next week, Springer announced his sudden and unexpected resignation, which would be effective no later than May 17, 2024. ¶92.  On this news, MBI's stock price fell $4.33 per share—or 9%—on unusually high volume. *Id.*  Analysts were shocked, noting that "*[t]his announcement is a surprise to us—and we suspect the investment community as well— as we had just met with Mr. Springer … at the Miami International Boat Show last week*" and "[t]here doesn't seem to have been any meaningful succession plan in place." ¶93.

On February 27, 2024, Tommy's was forced into default on its financing agreement with M&T Bank—*owing more than $110 million* from its coerced purchases of excess Malibu Segment inventory.  ¶95.  With Tommy's unable to purchase any more MBI boats, on March 22, 2024, Defendants conclusively terminated their relationship with Tommy's.   ¶97.   Remarkably, Defendants still did not disclose its most important distributor's imminent demise to investors.

15

Tommy's filed its federal lawsuit on April 10, 2024, which finally forced Defendants' hand. On April 11, 2024, MBI filed a Form 8-K which disclosed that Tommy's had filed a verified complaint against MBI alleging that Defendants had "***engaged in an elaborate scheme to over manufacture and pump nearly $100 million of its [Malibu Segment boats] into fifteen (15) Tommy's dealerships … during an obvious and known downturn in the recreational power boat industry***."  ¶¶98, 99.  Additionally, the Form 8-K revealed for the first time that "[t]he Company does not currently have dealership agreements in effect with Tommy's Boats[.]"  ¶99.  On this news, the Company's stock price fell 14%, from $41.82 to $36.14, on high volume.  ¶¶100, 104.

Finally, on May 2, 2024, MBI released financial results for 3Q FY 2024, reporting that the Company's net sales fell 46% from the prior quarter—including a 65% decline in Malibu Segment sales—and Adjusted EBITDA plummeted nearly 70%.  ¶105.  As a result, MBI slashed its FY 2024 guidance for the third quarter in a row, and Defendants now forecasted that ***consolidated net sales for FY 2024 would be down more than 40% from the prior year***.  *Id.*  During the Company's earnings call, Defendant Springer attributed these poor results to the fact that dealer inventories had "remained stubbornly high, making dealers reluctant to bring on additional inventory."  ¶106. On this news, MBI's stock price fell another 4%, or $1.27 per share.  ¶107.

Tommy's declared bankruptcy on May 20, 2024.  ¶110.  While the Court should decline Defendants' invitation to consider facts beyond the Complaint, Lead Plaintiff notes that: (i) Tommy's lawsuit was only voluntarily dismissed so that it could be rolled into the bankruptcy proceedings (*Tommy's Castaic, LLC, et al., v. Malibu Boats, Inc.,* No. 3:24-cv-00166-KAC-JEM (E.D. Tenn.), Dkt. Nos. 39, 40); (ii) the trustee settled that lawsuit (*In re: Tommy's Fort Worth, LLC,* No. 24-90000-elm11 (N.D. Tex. Bankr.) ("Tommy's Bkcy."), Dkt. Nos. 486, 599); (iii) the Bankruptcy court did not adjudicate most of the claims against MBI (Tommy's Bkcy., Dkt. Nos.

16

12, 147); and (iv) Borisch's individual litigation against MBI is ongoing.  Defendants' descriptions of the proceedings in those actions are incomplete and misleading. MTD at 1, 11-12, 35.

## III.   ARGUMENT

### A.   The Complaint Adequately Pleads Material Misstatements And Omissions

A statement or omission is materially misleading when there is "a substantial likelihood that the disclosure of the omitted [or corrected] fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available to the market." *In re Delcath Sys., Inc. Sec. Litig.,* 36 F. Supp. 3d 320, 331 (S.D.N.Y. 2014) (Schofield, J.).  When corporations and their officers make public statements to investors, they must disclose all information "necessary to make ... [the] statements made, in the light of the circumstances under which they were made, not misleading."  *Cohen v. Kitov Pharms. Holdings, Ltd.* 2018 WL 1406619, at *5 (S.D.N.Y. Mar. 20, 2018) (Schofield, J.).

#### 1.   Defendants' Statements About Wholesale And Retail Demand And Dealer Inventory Were Materially False And Misleading

Throughout the Class Period, Defendants made a series of misstatements designed to reassure the market that demand for MBI's boats remained strong because the Company's "premium" customers were purportedly insensitive to higher interest rates and poor economic conditions.  For example, Defendant Springer boasted that there was "demand [from dealers] to get more inventory" and that "customers are gobbling [our boats] up like [a Cajun] deep fried turkey dinner at Thanksgiving."  Indeed, in direct response to investor concerns about waning demand and a worsening economy, Springer boasted that "[t]he retail environment remains resilient with strong demand carrying the tide for our premium boats," such that "***we see no worsening of our expected outlook***," as MBI's "***premium buyer is looking to purchase and has not really been affected by economic conditions or interest rates***."  Defendants emphasized that

17

MBI's 28% net sales increase had been "generated by *resilient wholesale demand* across all 3 segments," while also insisting that demand would continue to fuel growth, as "[m]eeting existing demand and building channel inventories continues to be a primary focus and *a major tailwind in the quarters to come*." As the Class Period progressed, Defendants continued to assert that "*we haven't seen a meaningful impact [from interest rates] … from the consumer side of things*."

These statements were materially false and misleading when made. In reality, the opposite was true—economic conditions were severely hampering demand for MBI's boats, leading MBI's largest overall dealer, OneWater, to cancel a substantial amount of its orders for 2023, and forcing Defendants to strongarm Tommy's into taking $100 million in inventory it did not want and could not sell. Such facts readily establish falsity. *See, e.g., SolarEdge* at \*7 (misleading to discuss reasons for revenue while "omitting that part of the increase in revenues was caused by a practice of channel stuffing"); *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F. Supp. 3d 255, 283 (E.D.N.Y. 2023) (statements touting "strong demand" were misleading because they "omit[ted] to state that sales were driven by the minimum purchase requirements, not end-user market demand"); *Oklahoma Firefighters Pension & Retirement System v. Lexmark International, Inc.*, 367 F. Supp. 3d 16, 32-33 (S.D.N.Y. 2019) (statements attributing growth to strong demand were misleading where growth was driven by "inflated channel inventory," as these causes "fundamentally differ[] in sustainability").[7]

_____

[7] Defendants rely on *Gavish v. Revlon, Inc.,* 2004 WL 2210269 (S.D.N.Y. Sept. 30, 2004) for the proposition that Plaintiff was required to "quantify categories of wholesale sales over time compared to consumer sales or 'grapple with [the company's] aggregate reported quarterly sales [to retailers] . . . or any measure of sell-through.'" *Id.* at \*18. But *Revlon* did not set forth any requirement that these specific facts be pled. Rather, it held that the complaint needed to be "sufficiently particularized to support a reasonable belief that, during the Class Period, Revlon was exacerbating this inventory imbalance by selling more inventory to retailers than retailers were selling to consumers and then making misstatements or failing to disclose information about that practice." *Id.* at \*17. The complaint in *Revlon* failed to meet these requirements because it pled only generalized allegations that inventory at retailers was too high and that the company engaged in end-of-quarter sales practices that were entirely proper in themselves. *Id*. Here, by contrast, the Complaint details that Malibu's own CEO directly pressured and threatened Tommy's to take on excess

Defendants nonetheless argue that the Complaint fails to plead that actual demand was "[i]nconsistent [w]ith Defendants' [p]ublic [s]tatements." MTD at 19. For example, Defendants argue that they told the market prior to the Class Period that retail demand would be "down [a] high-single digit percentage" in FY 2023 and that they supposedly only attributed strong sales to *wholesale* demand from dealers restocking their inventory, not retail demand from customers. MTD at 19-20. But this misses the point. First, Defendants' statements about demand were misleading because wholesale demand was ***not*** simply due to dealers restocking inventories, but because MBI was forcing its key distributor to take $100 million of unwanted inventory for which Defendants knew there was no demand. Second, Defendants made highly positive statements about ***both wholesale and retail demand*** throughout the Class Period, and then revealed, through their corrective disclosures, that ***both*** wholesale and retail demand were far worse than previously disclosed, as guidance was slashed, sales plummeted, and inventories "choked" dealerships.[8] Nor does the fact that Defendants began to disclose declining wholesale demand *toward the end of the Class Period* (MTD at 21) shield them from liability, particularly given that Defendants continued to conceal that true wholesale demand was ***significantly worse*** than publicly disclosed, and that said demand was artificially inflated by the Tommy's scheme.[9]

---

inventory, and pleads other specifics including the amount of inventory Tommy's had left at the end of FY 2023 (¶¶63-64), the amount Tommy's was forced to take on in May and June (¶53), and the excess sales made to Tommy's in FY 2024 (¶112). Moreover, unlike in *Revlon*, where excess inventory was disclosed throughout the Class Period, here, Defendants only began to disclose excess inventory in the first corrective disclosure on January 30, 2024. (¶¶170-72).

[8] Defendants' argument that CW 3's allegations about declining demand at the Tommy's Colorado dealership were "[]consistent" with their pre-Class Period statements about retail demand is wrong. MTD at 20. While Defendants told the market that overall retail demand would decline "a high single-digit percentage" in FY 2023, CW 3 reported ***a decline of 60-80%*** in his sales (dropping from five boats per month to just one to two boats per month), and described year-end inventory ***rising by as much as 400%.*** ¶¶65, 67.

[9] Defendants' attacks on the AC's allegations about the OneWater order cancellations also fail. MTD at 21-22. The fact that CW 1 did not precisely quantify the cancellations is of little import, as the magnitude of these cancellations was evident in the fact that OneWater's share of Malibu Segment sales plummeted from 18.4% in FY 2022 to just 6.5% in FY 2023. ¶32. And Defendants' argument that OneWater's *overall* spend on MBI's boats increased in FY 2023 is a red herring: the numbers confirm that OneWater cancelled massive amounts of *Malibu Segment* sales. Nor can CW 1's allegations be ignored as "hearsay." (MTD at 21). *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 132 (S.D.N.Y. 2020) (hearsay allegations permitted at pleading stage).

19

Defendants' statements about their precise "matching" of inventory to demand were similarly false and misleading. Specifically, in response to growing investor concerns about demand and inventory as the Class Period progressed, Defendants assured investors that they had "made great strides to match wholesale production to retail demand," that they had "reach[ed] more normalized channel inventory levels" during FY 2023, and that in FY 2024, MBI would "continue to showcase our best-in-class operational capabilities, matching wholesale to retail demand." Defendants made many of these statements in direct response to analyst questions, insisting that they were "confident" in MBI's guidance because of its unique ability to "match" inventory to demand. Indeed, Defendant Springer emphasized that Defendants "worked diligently to match wholesale supply to retail demand by quickly aligning production levels throughout the quarter"; that "[a]n important element to our playbook is successfully matching production to retail demand, not only to protect our margins, but also to protect our dealers and make sure they stay healthy"; and that this precision inventory "matching" was "a key differentiator" for the Company.

These statements were false and misleading when made. In reality, Defendants were doing the opposite of precisely "matching" dealer inventory to demand: they were forcing their largest Malibu Brand dealer to take on $100 million in excess inventory for which Defendants knew there was no demand. *See, e.g., SolarEdge* at \*10 (misleading to attribute inventory levels to "a variety of factors meanwhile omitting that part of the increase in inventory was caused by a practice of channel stuffing"); *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (statements denying "excess inventories" and touting "appropriate inventory levels" were misleading in light of inventory buildup); *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 661 (D.N.J. 2021) (defendants "had excess inventory, which the company excused by telling investors that inventory levels were keyed to anticipated demand.").

### 2.    Defendants' Attacks On The Sources And Particularity Of Plaintiffs' Allegations Fail

Unable to refute the Complaint's well-pled allegations, Defendants argue that they are inadequately sourced and insufficiently particularized to plead that MBI "plotted to 'stuff' Tommy's with 'excess' inventory." MTD at 14. For example, Defendants seek to discredit certain allegations because they are drawn from Borisch's court filings. MTD at 15-18. But this attack fails. Courts in this district regularly credit detailed, specific allegations drawn from other cases, particularly where, as here, they "contain their own indicia of reliability." *Homeward Residential, Inc.* 298 F.R.D. at 126. Indeed, the facts set forth in Borisch's court filings are drawn directly from Borisch's firsthand experience, supported by extensive documentary evidence,[10] and sworn under penalty of perjury. *See Tronox,* 2010 WL 2835545, at *7 (that the "allegations [borrowed from another complaint] are corroborated by a sworn declaration" bolstered their reliability).

Moreover, courts in this district typically credit allegations drawn from other litigations so long as the plaintiff does its own investigation to corroborate those facts. *See Homeward Residential*, 298 F.R.D. at 126 (allegations from other complaints allowed where "combined with material the plaintiff has investigated personally that lend credence to the borrowed allegations"); *Tronox*, 2010 WL 2835545, at *6–7 (allowing use of another complaint's allegations, and finding neither the PSLRA nor Rule 11 require that "counsel must conduct a personal investigation into every factual contention in the complaint").[11] Here, Plaintiff's counsel not only discussed

---

[10] Specifically, the Borisch Declaration is supported by 51 exhibits, including emails and documents exchanged between Borisch and Defendants. *See* Tommy's Bkcy., Dkt. No. 113 (Borisch Decl.); *Id.* at Dkt. Nos. 371, 371-1, 371-2 (redacted appendix of exhibits). Notably, while Defendants claim that certain allegations are not sufficiently described, this was of Defendants' own doing—Plaintiffs were unable to access most of these exhibits because Defendants moved to have them sealed. *Id.* at Dkt. No. 123 (MBI motion to seal), Dkt. No. 333 (order granting motion).

[11] *Touchstone Strategic Tr. v. Gen. Elec. Co.*, 2022 WL 4536800, at *2 (S.D.N.Y. Sept. 28, 2022) and *Amorosa v. Gen. Elec. Co.*, 2022 WL 3577838, at *3 (S.D.N.Y. Aug. 19, 2022) (MTD at 17, 18) are inapposite, as both concerned opt-out actions wherein the plaintiffs had done little more than copy, verbatim, allegations from the operative class action

Borisch's allegations with Borisch's counsel,[12] but corroborated them with facts provided by former employees of MBI, Tommy's, and OneWater, as well as through review of SEC filings, investor call transcripts, analyst reports, news articles, and other documents.  Complaint at p. 1.

Defendants further argue that the AC purportedly doesn't allege sufficient "detail on what Springer said to Borisch that […] 'made clear' Tommy's would lose its status as an MBI dealer." MTD at 16.  But there is no requirement that the AC directly quote Springer, and the AC's allegations are extraordinarily specific. For example, the Complaint describes a specific July 2022 lunch meeting during which Defendants "began pressuring Mr. Borisch to commit to increasing [Tommy's] existing floor plan credit capacity" so that Tommy's could purchase more boats from MBI, and that after "Mr. Borisch pushed back, both in the initial meeting [in July 2022] and over the months that followed, *Malibu made clear that its request was not optional, and that Mr. Borisch would lose his status as a Malibu dealer if he did not comply*." ¶42.  *See In re AppHarvest Sec. Litig.,* 684 F. Supp. 3d 201, 249 (S.D.N.Y. 2023) (witness "attended the relevant meetings [] and thus had firsthand knowledge of what was discussed.").[13]  The Complaint further alleges that Defendants withheld incentive payments as leverage to push Tommy's into increasing its financing capacity—while emphasizing that Defendants "*would retaliate if [Tommy's] did not comply with*

---

complaints.  Here, the allegations from the Borisch complaints and declaration are based on Borisch's firsthand experience and sworn under penalty of perjury, and Plaintiff's counsel discussed the allegations with Borisch's counsel and corroborated them via their own independent investigation.

[12] *See, e.g., Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 343 (S.D.N.Y. 2015) (allowing reliance on another pleading where the "facts [we]re derived from a credible complaint based on facts obtained after an investigation" and counsel "indicated that they ha[d] reached out to attorneys at the NYAG to verify the allegations.").

[13] Defendants also seek to discredit as insufficiently specific Borisch's allegations that three Malibu stakeholders approached him at the Miami Boat Show on February 14, 2024 to tell him that Springer had been "intentionally pumping Tommy's full of inventory" to artificially inflate MBI's sales, that "[Springer] would not turn the spigot off" and that "Jack is not going to last." MTD at 18.  However, in addition to the fact that Borisch's conversation with the stakeholders is described with specificity, the stakeholders' claims are also corroborated by the fact that Springer did, in fact, *resign only one week later*.  *See, e.g., In re NIO, Inc. Sec. Litig.*, 2021 WL 3566300, at *7 (E.D.N.Y. Aug. 12, 2021) (crediting allegations where "independent adequately pled factual allegations corroborate a confidential source's statements.").  Moreover, it is unclear what relevance Defendants' caselaw regarding *confidential witnesses* has to these allegations, which are set forth in sworn filings by a party to the conversations.  *See* MTD at 18.

***their demands***."[14]  ¶42. These highly detailed allegations require no further specificity.[15]

Similarly, Defendants argue that the Complaint fails to allege that the inventory shipped to Tommy's was "excess" because the 800 unsold MBI boats Tommy's had on hand at FY 2023 end—70% of its inventory for the fiscal year—was just "one snapshot in time" and was not sufficiently "compared to expectations, or 'normal' levels."  MTD at 15.  But no such comparison is required here, particularly given the averments of Tommy's own President and Owner (Borisch)—i.e., the person best situated to determine whether his own inventory of MBI boats was far too high.[16]

Finally, Defendants argue that facts within the Borisch declaration "contradict" the AC. MTD at 11-12, 16.  But this is wrong.  The AC specifically alleges that MBI delivered its most expensive, hardest-to-sell Malibu Brand boats, while Tommy's had requested lower-priced, more in-demand Axis boats. *See, e.g.,* ¶¶50, 52, 101, 216.  As such, there is nothing contradictory about alleging both that MBI pushed excess inventory on Tommy's and that it simultaneously failed to deliver the boats Tommy's requested.  *See IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145-48 (2d Cir. 2021) (reversing finding that allegations were "inconsistent" because this was "not [a finding] we can make at this stage of the litigation, when we must 'accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor.'")[17]

---

[14] Defendants' purely speculative argument that Tommy's actually increased its floor-plan financing because "during the pandemic Tommy's grew the number of its dealerships from seven to 15" has no factual support anywhere in the AC or in Borisch's filings, and is in fact directly contradicted by Borisch, who stated that Tommy's increased its floorplan financing because of pressure from Defendants.  Defendants' "alternative explanation" at best creates "a factual dispute that the Court must resolve in plaintiff's favor at this stage." *World Wrestling*, 477 F. Supp. 3d at 137.

[15] *Fadia v. FireEye, Inc.*, 2016 WL 6679806, at *16 (N.D. Cal. Nov. 14, 2016) (MTD at 17) is inapposite, as, there, plaintiff merely alleged generically that Defendants "attended board meetings," and did not allege anything specific whatsoever about what transpired at those meetings.  That is nothing like the situation here.

[16] *In re Axis Cap. Holdings, Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 585 (S.D.N.Y. 2006) is inapposite.  MTD at 19. There, because the complaint specifically alleged an illegal anticompetitive scheme in violation of antitrust laws, the court found that the plaintiff was required to plead facts establishing illegal conduct.  Here, the allegations are not predicated on illegality, but on a scheme to create temporarily inflated sales by stuffing Tommy's with inventory.

[17] The situation here is far different from that in *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184-5 (S.D.N.Y. 2000) (MTD at 16), wherein the plaintiffs purported to rely on a news article for their allegation that defendants had engaged in illegal behavior, but the article itself never said that defendants had done anything illegal.

### 3.    Defendants Did Not "Disclose" Excessive Inventory Levels

Defendants also argue that their statements about demand and inventory could not have been false and misleading because they "disclosed," toward the end of the Class Period, "that macroeconomic factors caused inventory levels to be higher than ideal." MTD at 18. But this is wrong. First, defendants failed to disclose that the reason inventory levels rose was because of their channel stuffing scheme. *SolarEdge* at *10. Second, the only such "disclosures" Defendants made were August 2023 statements that inventory was "at pre-Covid levels or even higher in some cases" and that dealers had "higher inventory levels" *than they previously had*; and an October 2023 statement that Defendant Springer would prefer inventories to be "a tad below" where they were. MTD at 19, 33. Neither of these statements convey that inventory was *materially too high*, let alone the truth that was later disclosed—that inventory levels were so "stubbornly high" that they caused a massive 65% decline in the Malibu Segment's sales, the Company would have to dramatically reduce production and "aggressive[ly]" discount pricing as a result, and dealers were "***chok[ing] on inventory***." ¶¶84, 87, 106. And moreover, Defendants continued to make reassuring statements, in the same investor calls, about strong retail demand and the Company's "matching" of inventory to demand. ¶¶148-69. Indeed, had Defendants fully disclosed the truth during the Class Period, analysts surely would not have expressed such "surprise" at the corrective disclosures, nor would MBI's stock price have fallen precipitously on the news.[18] ¶¶86, 109. *See, e.g., In re MBIA, Inc., Sec. Litig.,* 700 F. Supp. 2d 566, 582 (S.D.N.Y. 2010) (analyst surprise and stock drop precluded finding that truth had already been disclosed).[19]

---

[18] *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 397 (S.D.N.Y. 2014) (MTD at 18) is inapposite. There, the "fundamental flaw" was that there had been "public knowledge of the excessive inventory problem, through press coverage and GM disclosures, ***at all relevant times***," and the defendants further disclosed specific and detailed figures on sales and inventory that enabled investors to determine exactly to what extent inventories were too high.

[19] Moreover, such "truth on the market" defenses are typically inappropriate at the pleading stage. *See id.* at 581; *Puddu v. 6D Glob. Techs., Inc.*, 2021 WL 1198566, at *7 (S.D.N.Y. Mar. 30, 2021) (same).

### 4. Defendants' Failure To Disclose Tommy's Dire Financial Condition Rendered Their Statements False And Misleading

Beginning on August 29, 2023, and continuing thereafter, Defendants made statements specifically about the financial strength and health of MBI's dealership network, and about Tommy's itself, that were misleading when made because they omitted the highly material fact that Tommy's was in dire financial condition and teetering on the brink of insolvency. For example, in the Company's Form 10-K filed on August 29, 2023, and again in MBI's annual report on September 15, 2023, Defendants stated that, during FY 2023, Tommy's had been MBI's largest dealer for the lucrative Malibu Segment, *responsible for 23.3% of net sales*, and also stated that loss of Tommy's dealerships merely "*could* have a material adverse effect on our financial condition and results of operations." ¶143. This hypothetical "risk" statement was materially misleading given that Tommy's was already failing, and Defendants were already avoiding signing new dealership agreements with Tommy's as a result. *See Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 251 (2d Cir. 2014) ("[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability.").

Defendants further made statements about its dealer network that were misleading in light of Tommy's precarious financial situation. For example, on September 21, 2023, when asked "how do you feel about your current dealer network[,]" Springer replied: "we have [a] very good dealer network, especially on the Malibu [Segment] side." ¶158. It was clearly misleading to tout the strength of MBI's Malibu Segment dealers, while *failing to disclose that MBI's largest Malibu Segment dealer was currently in "one of the worst situations that can arise" and, as a result, "no dealer agreement [for FY 2024] can be or will be signed*"—facts to which Defendant Springer himself admitted in an email sent *ten days* before this statement was made. ¶160. For similar reasons, when asked on October 31, 2023, if he had "[a]ny concerns about your [dealer] network,"

it was misleading for Springer to reply "[l]argely, no," without disclosing the known, serious financial predicament of its most important dealer, Tommy's. ¶167.[20]

Defendants argue these statements were not misleading because Tommy's SOT status was purportedly "resolved" in October 2023. MTD at 22-23. But this argument fails. First, even if the Court considers this "fact" (which is outside the Complaint), Defendants' August and September 2023 statements were made *before* the SOT was purportedly "resolved," and Defendants' March 5, 2024 statements were made *after* Tommy's had defaulted on its financing and after Defendants told Tommy's MBI would not renew its dealership agreements in February 2024. ¶95.

Second, merely "resolving" the SOT problem did not resolve Tommy's underlying financial distress. Tellingly, even after the SOT was purportedly "resolved" in October 2023, MBI ***never*** entered into a new dealership agreement with Tommy's, which contradicts any assertion that MBI believed Tommy's financial issues were resolved. Further evidencing this is the fact that MBI refused to enter into a customary "repurchase agreement" with M&T Bank and told Tommy's it would not enter new dealership agreements on February 26, 2024. ¶¶43, 62-71, 95. Under these facts, it is absurd to suggest that, after proclaiming that Tommy's was in "one of the worst situations that can arise" in September 2023, Defendants truly believed that everything was fine between October 2023 and January 2024, only to refuse to sign new agreements in February 2024.

Defendants nonetheless argue that their statements about their dealer inventory and the

---

[20] Similarly, in MBI's January 30, 2024 Form 10-Q, Defendants stated that MBI's "dealer network" was the "strongest in the recreational powerboat category" providing "a distinct competitive advantage" ¶177. And even as late as March 5, 2024, Springer emphasized how closely MBI was supposedly monitoring the financial health of its dealer network, promising the market that "[w]e're talking about dealers that may be stressed or somewhat, but at the same time we're following that. We want to know what the dealer health is and we actually have a report card on that." ¶96. Yet, by no later than February 27, 2024, MBI had already notified Tommy's that it would not be entering into 2024 dealership agreements, and Tommy's had already defaulted on its entire $130 million financing agreement with M&T Bank.

26

health of their dealer network did not trigger a duty to disclose specific facts about Tommy's. MTD at 23-25. But Tommy's was not just any dealer—it was one of MBI's two largest dealers, it was specifically identified in MBI's SEC filings, and it was by far the largest dealer for MBI's biggest, most profitable segment, representing nearly 25% of all sales for that segment.[21] As such, it was misleading to make highly specific, positive statements about precisely "matching" inventory to demand, and MBI's dealer network being healthy, while concealing the highly material information concerning Defendants' channel stuffing scheme and Tommy's resulting demise.

### 5.    Defendants' Statements Were Not Immaterial Puffery Or Opinion

Defendants argue that certain of the alleged false statements are inactionable "puffery." MTD at 25-26. However, the statements Defendants cite were not puffery, because they were "made to reassure investors as to specific risks." *Turquoise Hill*, 625 F. Supp. 3d at 222–24; *See also In re Signet Jewelers Ltd. Sec. Litig.,* 2018 WL 6167889, at *12 (S.D.N.Y. Nov. 26, 2018) (statements that credit portfolio was "strong," "healthy," "well managed" etc. not puffery where meant to reassure investors). For example, Defendants' statements about "strong demand," a "resilient" retail environment, customers "remain[ing] unfazed," and "operational prowess to match wholesale and retail demand" were made to assuage concerns as to the impact of slowing demand. *See, e.g.,* ¶121 (analyst asking in light of "interest rates" and "macro concerns," "what's the dealer appetite to carry inventory in the off-season right now?"); *id.* at ¶155 (question about "consumers and dealers in this challenging macro environment"). Moreover, analysts relied on

---

[21] Defendants' minimization of Tommy's as representing "just 15 of the more than 400 dealer locations for MBI" is thus disingenuous at best. MTD at 24. And Defendants' cases (MTD at 24) are wholly inapposite, as they concern non-disclosure of facts entirely unrelated to the statements. *See, e.g., Rein v. Dutch Bros, Inc.,* 2024 WL 3105004, at *15 (S.D.N.Y. June 24, 2024) (statements about margins in a single quarter "did not oblige [defendants] to comment on 'macroeconomic conditions plaguing the U.S. economy.'"); *In re Ferrellgas Partners, L.P., Sec. Litig.*, 2018 WL 2081859, at *11 (S.D.N.Y. Mar. 30, 2018) (statements about "protections against commodity price fluctuations" unrelated to performance of defendant's trucking segment); *In re Philip Morris Int'l Inc. Sec. Litig.*, 2021 WL 4135059, at *11 (S.D.N.Y. Sept. 10, 2021) (no obligation to disclose unrelated category of data).

and even quoted Defendants' assurances. *See, e.g.,* ¶¶57, 60 ("[m]anagement noted a 'resilient consumer appetite for large, feature-rich boats,' where the company butters its bread"; "[s]ofter demand for entry-level boats . . . has little impact on the premium MBI boat portfolio"; MBI "seeing strong consumer demand for their premium products"; and "we came away from today's conference call with greater comfort in the FY23 outlook, [and] relatively stable demand trends for premium boats").[22] Analysts' reliance on these statements makes their materiality obvious.

## B.     The Amended Complaint Raises A Strong Inference Of Scienter

A complaint pleads scienter by alleging facts that give rise to a strong inference of "conscious misbehavior or recklessness." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007) (emphasis in original). The inference "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020) (citing *Tellabs*, 551 U.S. at 324). "[A] tie on scienter goes to the plaintiff." *Id.*

---

[22] Defendants' argument that certain statements were inactionable "opinion" consists mostly of bulk citations to paragraphs of the AC accompanied by conclusory claims that these were inactionable because they were prefaced with "we feel" (¶¶ 157, 167) or "we believe," and because "[o]ther statements—for example, about 'matching' production to retail demand (¶¶ 149-51, 157, 165, 167, 171-72)—convey subjective views about MBI's manufacturing production and business." Defendants' argument fails—it is unclear which statements Defendants contend are "subjective" or why. Indeed, many of the statements in the cited paragraphs cannot plausibly be characterized as opinion. *See, e.g.,* ¶150 ("[t]he first three quarters of the year saw us matching our production to a deficient channel inventory environment to reach more normalized channel inventory levels,"); ¶165 ("[c]hannel inventories across our brands are now back to or above pre-COVID levels, and we have worked diligently to match wholesale supply to retail demand by quickly aligning production levels throughout the quarter, which accounts for the decrease versus last year."). Nonetheless, even with respect to statements beginning with "we feel" and "we believe," the AC pleads that Defendant Springer had information in his possession contradicting them, as he was orchestrating a scheme to prop up demand by coercing Tommy's to purchase excess inventory. *See, e.g., In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,* 2018 WL 2382600, at *8 (S.D.N.Y. May 24, 2018) (Schofield, J.) (statement that "I am very pleased with the milestone" not inactionable opinion where company had experienced delays, investigations, and a stop work order.); *see also In re iDreamSky Tech. Ltd. Sec. Litig.*, 236 F. Supp. 3d 824, 833 (S.D.N.Y. 2017) ("opinions, though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker omits information whose omission makes the statement misleading to a reasonable investor.").

### 1.     Defendants Personally Directed The Channel Stuffing Scheme

The fact that Defendants—and especially Springer and Wilson—personally directed MBI's channel stuffing scheme creates a strong inference of scienter, and the evidence of their involvement is overwhelming.  ¶¶1-15, 39-47, 62-95, 183-95.  Indeed, the AC alleges, in detail, specific meetings between Springer, Wilson and Borisch (complete with date and location), and specific *verbatim* emails and communications with Defendants and other MBI executives, all of which establish that Defendants directly pressured Borisch to increase Tommy's credit limits and take on $100 million in unneeded inventory.  *Id.*  Defendants threatened to revoke Tommy's MBI dealer status if it did not comply with the scheme (¶¶41-42), dangled incentives (¶¶42, 49), and withheld the same once Tommy's was too distressed to take more inventory (¶¶68, 97).  *Id.*[23]  *See SEC v. DiMaria*, 207 F. Supp. 3d 343, 356-57 (S.D.N.Y. 2016) (scienter where the CEO directed an accounting scheme); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 764 (S.D.N.Y. 2017) (defendants' involvement in a bribery scheme sufficed to plead scienter).

Moreover, the AC alleges with similar specificity communications directly informing Defendant Springer and others of the impact of their scheme on Tommy's.  In August 2023, Borisch informed *Springer himself* that Tommy's was in a "*dire financial position*."  ¶186.  Tommy's told MBI that it was unable to purchase the 1,160 boats that MBI was demanding due to declining retail demand.  *Id.*; *see also* ¶¶95-97, 163-68, 181-88.  The fact that Tommy's had 800 unsold prior-year boats was further evidence of financial distress.  ¶¶63-64.  And by September 2, 2023, Tommy's directly informed Springer it was SOT (¶68), which Springer himself—in a September 11, 2023 email—stated was "***one of the worst situations that can arise***," and "***[u]ntil Tommy's is in good***

---

[23] Defendants' contention that despite these well-pled allegations, the AC is "uncorroborated" and "parroted" (MTD 16-17) and does not specifically plead what "excess" inventory is (MTD 30), fails for the reasons stated above.

*standing with M&T, no dealer agreement can or will be signed*." ¶¶9, 69, 186.[24]

### 2.    Defendants' Access To And Close Monitoring Of All Relevant Data

The fact that Defendants repeatedly affirmed that they monitored dealer health and inventory levels, demand, and sales at their dealers—where even the most cursory review of that data would contradict Defendants' statements—strongly supports scienter.  Indeed, Defendants boasted about their ability to monitor such data "*all the time*."  ¶¶3, 10, 35-36, 61, 74, 137, 180, 189.  Defendants obligated their dealers to update their inventory in MBI's database "on a weekly basis."  ¶¶35, 189.  Defendants consistently touted, in MBI's SEC filings and earnings calls, that their "*consistent[]*" "*review*" and "*monitoring*" of "*data*" was essential to MBI's success.  ¶¶36, 79, 167, 189.  It defies logic to believe that Defendants would not have known the actual truth of their statements given blatantly contradicting data.  *See In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (scienter where defendant "regularly made detailed reports" to investors about quality of loan portfolio so he "must have educated himself" on the topic); *Skiadas,* 2020 WL 3268495, at *11  ("access to information that contradicted the challenged statements" supported scienter).

Defendants claim the Complaint does not allege what any data or reports showed.  MTD 31.  Not so.  For example, CW 2 described data concerning retail boat registration and customer survey data for MBI's boats sold to consumers during the Class Period that was received by the Individual Defendants as often as weekly, and averred that the data showed a sharp drop-off in retail demand for MBI boats beginning in early 2023, which continued throughout calendar year

---

[24] Defendants' assertion that MBI never saw Tommy's SOT status "as a risk of going out of business" (MTD 30-31) is belied by the AC.  Indeed, as set forth *supra* at III(A)(4), numerous factors put Defendants on notice of Tommy's financial distress, and the mere "resolution" of the SOT in no way meant that Tommy's was out of financial trouble.  Moreover, if Defendants had truly believed Tommy's financial distress was "resolved," they would not have withheld incentives and refused to enter dealership agreements and repurchase agreements.  ¶68, 69.  Further, Defendants' argument that they didn't know of Tommy's financial condition early in the Class Period (MTD 30-31) is a red herring; the AC only asserts falsity on this basis beginning August 29, 2023.  *Compare* ¶¶120-41 *with* ¶¶142-81.

2023. ¶¶46-47, 189.[25]  *See In re Dynex Cap., Inc. Sec. Litig.*, 2009 WL 3380621, at \*14 (S.D.N.Y. Oct. 19, 2009) (defendants had access to reports that collectively revealed existence of defective loans).[26]  Moreover, Defendants held themselves out to investors as intimately knowledgeable about sales, demand, dealer inventory, and the health of MBI's dealer network.  ¶¶2, 58, 77, 88, 173, 196.  *See In re Salix Pharms., Ltd.*, 2016 WL 1629341, at \*14 (S.D.N.Y. Apr. 22, 2016) (management's assurances to analysts they monitored relevant information supports scienter).

### 3.    Defendants' Channel Stuffing Fraud Went To MBI's Core Operations

Defendants' fraud concerned MBI's core operations, including MBI's largest dealers (Tommy's and OneWater), and its largest and most profitable segment (the Malibu Segment). ¶¶70, 99, 102, 111, 142-43, 193.  Sales of these boats were so central to MBI's business that Defendants would clearly have been aware of declines in demand, and they clearly were intimately familiar with their dealers.  *Skiadas*, 2020 WL 3268495, at \*10  (statements involved "the *sin[e] qua non*" for company's "success").[27]

Defendants' claim that Tommy's was "not essential to the survival" of the Company (MTD 32) is irrelevant. Tommy's was MBI's single most important dealer—so important it was one of only two dealers that MBI specifically mentioned by name in its SEC filings (¶4), and representing ***nearly a quarter*** of all sales in MBI's largest and most profitable Malibu Segment. ¶¶70; 193.

---

[25] Defendants' contention there are no contemporaneous facts showing Beckman was aware of contradictory information is meritless (MTD 29) given Beckman's own statements that he monitored dealer health (*id.*; ¶189).

[26] *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 83 (2d Cir. 2021) (MTD 31) does not help Defendants, as there the complaint lacked allegations the individual defendants had access to and monitored the relevant data.  Similarly, *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781-82 (S.D.N.Y. 2021), is unhelpful to Defendants, as, there, the plaintiff made only conclusory allegations regarding sales reports.  And, Defendants' reliance on *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996), wherein the data concerned a wholly different matter than the subject of the false statements, is grossly misplaced.

[27] *Tyler v. Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343-44 (S.D.N.Y. 2011) (MTD at 32) is inapposite, as, in that case, plaintiffs relied *solely* on core operations, which is not the case here.

31

### 4.    Defendant Springer Had A Strong Financial Motive

The fact that Springer stood to more than double his cash compensation for FY 2023 by inflating sales to meet financial targets further supports scienter. ¶¶114-18, 190-92.  By enacting the scheme to pump excess inventory into Tommy's, Springer ensured that MBI's financial results for FY 2023 *just barely exceeded 100% of the targets needed*, making him eligible for a bonus equivalent to at least, if not more, his entire salary for the year, and Springer just barely avoided receiving no bonus at all.  *Id.  See, e.g., San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *7 (May 1, 2024) (the "fraud was critical—the company just barely hit the thresholds necessary for bonuses.").[28]

### 5.    Defendant Springer Resigned Due To The Channel Stuffing Scheme

Defendant Springer's resignation, which came *one week after* three key MBI stakeholders told Borisch that Springer was "not going to last" due to the Tommy's scheme, supports scienter. ¶¶12-13, 194-95.  Indeed, Springer resigned just as his scheme unraveled due to Tommy's financial condition.  As such, Defendants' argument that Springer's resignation was unsuspicious fails. MTD 31-32.  Indeed, analysts expressed shock at the resignation and tied it directly to MBI's inventory and sales troubles, noting that it was "*a surprise to us—and we suspect to the investment community*…," and that MBI "*has struggled recently amid soft demand and excess*

---

[28] That Springer did not ultimately receive his full bonus for unrelated reasons is of no moment; Springer's expectation of more than doubling his compensation was a substantial motive at the time of Springer's statements and conduct. *See, e.g., id.* at *7 (fact that the "board reduced [defendants'] cash and stock bonuses" did not detract from motive because "***courts should not confuse[] expected with realized benefits***.").  Nor is the dollar amount of Springer's expected bonus insufficient to support scienter, particularly where it would have **doubled** his compensation.  *See, e.g., Sills v. United Nat. Foods, Inc.*, 2024 WL 4188324, at *13 (S.D.N.Y. Sept. 13, 2024) (motive allegations supported scienter where "annual bonuses were awarded primarily due to the achievement of the adjusted EBITDA target" and defendants received $765,446, and $918,535, respectively); *see also id.* (finding "the profits from undisclosed and unsustainable inflation-related forward buying were ***key to hitting this benchmark***").

*channel inventory, resulting in a sharp reduction in FY24 guidance in late January*." (¶93).[29]

### 6.    Defendants' Competing Inference Is Not Compelling

Defendants' proposed inference that "Defendants believed what they were saying and reported both good and bad news" (MTD 32-33) fails.  There is simply no good faith inference to be drawn from Defendants' actions, which included threatening to revoke Tommy's MBI dealership status in order to coerce Borisch into cooperating with their scheme.[30]  The Individual Defendants' direction of and participation in this scheme, while misrepresenting to the investing public, among other things, demand, inventory management, and dealer financial health, evinces purposeful conduct, or, at a minimum, deliberate recklessness.  Defendants have failed to assert any innocent competing inference, let alone a more compelling one.[31]

### C.    The Amended Complaint Adequately Pleads Loss Causation

A plaintiff's burden in alleging loss causation "is not a heavy one." *Harrington*, 2023 WL 6316252, at *8. "The complaint must simply give Defendants some indication of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id.*

---

[29] Defendants' reliance on *In re Jiangbo Pharma., Inc., Sec. Litig.*, 884 F. Supp. 2d 1243, 1263 (S.D. Fla. 2012), wherein a CFO stayed on as a part-time consultant but the plaintiffs did not allege the CFO left for any specific reason, let alone a "nefarious reason[,]" is thus patently inapposite. Other courts have found "abrupt" executive resignations to contribute to a holistic inference of scienter. *See, e.g., In re Fibrogen, Inc.,* 2022 WL 2793032, at *25 (N.D. Cal. July 15, 2022) (CEO's public "praise" of officer upon her abrupt resignation did not negate scienter).

[30] Defendants' alternative "nonculpable" story of Tommy's as a struggling dealer that Defendants had little to do with also cannot be accepted on a motion to dismiss, where the court "draw[s] all reasonable inferences in the plaintiff's favor." *Freudenberg v. E*Trade Fin.Corp.*, 712 F. Supp. 2d 171, 179 (S.D.N.Y. 2010).  Further, the well-pled allegations of the AC undermine Defendants' "nonculpable inference"—*i.e.*, that their only mistake was "the inability to anticipate future events." *See In re Top Tankers, Inc. Sec. Litig.*, 528 F. Supp. 2d 408, 417 (S.D.N.Y. 2007) ("factual allegations giving rise to [defendants' proposed innocent] inference must appear on the face of the complaint.").

[31] OneWater's order cancellations also support scienter, as they put Defendants on notice of declining demand. OneWater's CEO directly delivered OneWater's order cancellations to Defendant Springer in a February 2023 meeting (¶185), and these cancellations were so large they reduced OneWater's percentage of Malibu Segment sales from 18.4% in FY 2022 to a mere 6.5% in FY 2023, further evidencing Defendants' knowledge that their statements about demand and inventory were false.  ¶¶6, 44-54, 185.  Defendants' argument that these allegations make "no sense" because OneWater increased overall spending on MBI products in FY 2023 (id.), is a red herring: OneWater cancelled massive numbers of highly lucrative *Malibu Segment* orders.  ¶¶6, 44-54, 185.  Similarly, Defendants' argument that the AC fails to plead particularized facts concerning the cancellations (MTD 30) ignores that CW 3 corroborated such cancellations as being widespread, as "many dealerships [other than Tommy's] were holding off on placing and receiving model year 2024 orders" because "everyone [still] had 2022 and 2023 excess Malibu inventory." ¶66

The AC easily satisfies this burden. The relevant truth was revealed through a series of partial disclosures that disclosed new information about, *inter alia*, poor demand, excess inventory, Defendants' scheme involving Tommy's, and Tommy's resulting poor financial condition, and each of these disclosures caused MBI's stock price to decline significantly. *See, e.g.*, ¶¶200-10.

Indeed, MBI's stock price dropped 14% following the disclosure of Tommy's detailed allegations and the termination of that relationship, and analysts specifically attributed the decline to the information revealed by Tommy's, easily establishing causation. Defendants nonetheless claim that "none of the alleged corrective disclosures 'revealed an alleged misstatement's falsity or disclosed that allegedly material information had been omitted'" and complain that some of the disclosures don't specifically mention Tommy's. MTD at 34. But a corrective disclosure need not directly discuss the fraud. *See, e.g., Kitov Pharms.*, 2018 WL 1406619, at *6 ("Whether the truth comes out by way of a corrective disclosure describing the precise fraud inherent in the alleged misstatements, or through events constructively disclosing the fraud, does not alter the basic loss-causation calculus."); *see also AppHarvest*, 684 F. Supp. 3d at 274 (a "corrective disclosure need not be a mirror image [of the statements] tantamount to a confession of fraud"). Defendants' false statements concerned demand for MBI's boats, inventories, MBI's dealer network, and Tommy's itself, and the disclosures collectively revealed those statements to be misleading, while also revealing a connection between declining demand, rising inventory, and the Tommy's scheme.[32]

### D.    The Amended Complaint Adequately Pleads A Scheme Liability Claim

A scheme liability claim requires: "(1) that the defendant committed a deceptive or

---

[32] Defendants also argue that the April 11, 2024 disclosure of the Tommy's lawsuit was not corrective because it stated that MBI "intends to vigorously defend against claims alleged by Tommy's Boats." MTD at 35. However, these arguments are irrelevant. The April 11, 2024 disclosure revealed to the market both the conduct alleged in the Tommy's lawsuit and the fact that MBI was losing its largest Malibu Brand dealer. Defendants' intent to defend against the claims does not change the fact that Defendants' fraud was disclosed to the market, causing MBI's stock price to decline significantly.

manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *XL Fleet*, 2022 WL 493629, at *7.  The AC is replete with allegations of Defendants' fraudulent scheme and deceptive acts in furtherance of that scheme. Specifically, the AC alleges that beginning in July 2022, Defendants forced Tommy's dealerships into taking $100 million in excess inventory for which Defendants knew there was no demand, and which Tommy's did not ask for or need. ¶216.  Defendants undertook actions to further this scheme, including threatening Tommy's that it would lose its status as an MBI dealer if it did not comply, and promising and/or withholding incentives in order to induce it to order more boats from MBI.  ¶217.

Defendants' argument that the AC "merely repackage[s] the misrepresentation allegations' into a scheme liability claim" fails. MTD at 33-34.  Indeed, this Court and others in this District have found that scheme liability was adequately plead in cases where, as here, manipulative practices were used to artificially inflate revenue or give investors an inflated picture of demand, even if false statements were also involved. *See XL Fleet*, 2022 WL 493629, at *6–7 (scheme liability where defendant's false sales projections were used to mislead investors about the company's sales pipeline and revenue prospects); *Sec. & Exch. Comm'n v. Farnsworth*, 692 F. Supp. 3d 157, 189-90 (S.D.N.Y. 2023) (scheme liability where defendants "made public statements alleging a natural drop-off in ticket usage rates, while at the same time artificially restricting users' ticket usage rates,"; suppression of ticket usage was "something more than just engag[ing] in misstatements."); *In re Mylan N.V. Sec. Litig.*, 2020 WL 1673811, at *5 (S.D.N.Y. Apr. 6, 2020) ("cover bids" used to create false impression of competitive bidding supported scheme liability).[33]

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety.

---

[33] Since the Amended Complaint adequately alleges violations under Section 10(b), Plaintiff has pled a control person claim under Section 20(a) against the Individual Defendants. See *XL Fleet*, 2022 WL 493629, at *7.

Dated: December 6, 2024

Respectfully submitted,

**SAXENA WHITE P.A.**

By: */s/ Steven B. Singer*
Steven B. Singer
Joshua H. Saltzman
Sara DiLeo
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
ssinger@saxenawhite.com
jsaltzman@saxenawhite.com
sdileo@saxenawhite.com

**SAXENA WHITE P.A.**
Lester R. Hooker
7777 Glades Road, Suite 300
Boca Raton, Florida 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com

*Lead Counsel for Lead Plaintiff*

36

## CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2024, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to all counsel of record.

Respectfully submitted,

By: ___/s/ *Joshua H.Saltzman*_____